Albert D. Roer     March 29, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Case No. 05-CV-1765-EWN-BNB

_____

WEST COAST LIFE INSURANCE COMPANY,
a Nebraska corporation,
                    Plaintiff,
vs.
MARTHA HOAR, as the personal representative of
THE ESTATE OF STEPHEN M. BUTTS; TELLURIDE
PROPERTIES, LLC, a Colorado limited liability
company; TELLURIDE PROPERTIES, INC., a Colorado
corporation; ALBERT D. ROER, an idividual; and
POLLY LYCHEE, an individual,

                    Defendants.

_____

DEPOSITION OF ALBERT D. ROER

March 29, 2006

          PURSUANT TO SUBPOENA and the Federal Rules of
Civil Procedure, this deposition was taken by
Plaintiff at New Sheridan Hotel, 231 W. Colorado
Avenue, Telluride, Colorado, before Katherine
Richmond, Certified Shorthand Reporter and Notary
Public within Colorado.

DEFENDANT'S EXHIBIT
A-4
05-cv-1765

Albert D. Roer                                                                    March 29, 2006

Page 126

A    A heli-skier, typically, is a more advanced skier and someone who is seeking powder skiing. And on the resort, you can't get powder on a real consistent basis. And the reason you heli-ski is to get powder.

Q    What function does the helicopter provide in heli-skiing?

A    Lift access.

Q    And in a resort there are helicopters used for access?

A    Generally, no.

Q    So what differentiates in terms of access a heli-skier from a skier in a resort?

A    A helicopter.

Q    It provides access to an area that you can't get to with a ski lift.

A    Exactly.

Q    Do you consider heli-skiing a different activity than skiing?

A    I consider heli-skiing powder skiing.

Q    Would you say you were a skier and a heli-skier, or would you say you're a skier?

A    I would never describe myself as a heli-skier.

Q    Why is that?

Page 127

A    I'm a downhill alpine skier.

Q    Do you feel that heli-skiing is a different activity than skiing?

A    Heli-skiing is skiing.

Q    Now, you were saying in regard to the Selkirk release that Mr. Ramirez was showing and going through some of the language with you that it didn't really matter to you what the release said, you were going to sign it.

A    Absolutely.

Q    Why didn't it matter to you what the release said?

A    Because I didn't perceive it as a -- that there was any hazard. I have signed hundreds of releases in various activities knowing that, you know, that's legalese and that's what you have to do to have fun these days in our litigious society.

Q    Did you necessarily agree that the hazards that were listed on the Selkirk release really were hazards to people involved in heli-skiing?

A    Well, I would say they are potential hazards, but because you're going with a guide, and that's why you go with a guide, is that sure, those hazards exist in the back country, but you're going

Page 128

with a guide service so they don't occur.

I mean, we're not going out there for an extreme adventure. We're going out there to ski powder.

Q    Did Mr. Butts ever indicate to you that he thought that heli-skiing was a hazardous avocation or hobby?

A    We never had a discussion that concerned heli-skiing being dangerous.

Q    Did he ever indicate to you that he thought skiing was a hazardous avocation or hobby?

A    No.

Q    Do you have any reason to believe that Mr. Butts knew that heli-skiing was a hazardous avocation or hobby?

A    I don't believe that he felt heli-skiing was dangerous.

Q    What do you base that on?

A    The fact that he did it regularly.

Q    Would you describe Mr. Butts as a daredevil or a high risk taker?

A    No, not at all.

Q    How would you describe him in that regard as to risk taking?

A    I think that he was highly adverse to

Page 129

risk, except in business. And I think that, maybe, what the people were discussing in the video that you saw, you know, his risk profile in terms of debt and the way he ran business would give me a heart attack.

But in his personal life, you know, he was very methodical. He was an excellent pilot, a very cautious pilot. You know, I never saw his do anything that I thought was risky behavior.

Q    I think you said you flew with Mr. Butts on more than one occasion.

A    Yes.

Q    Prior to taking off, did he proceed through a preflight routine?

A    Of course.

Q    Did he use a written checklist?

A    Absolutely.

Q    And did he do, as far as you could tell, all the things that were on the checklist?

A    Absolutely.

Q    When you landed wherever you were going, did he go through a checklist in terms of what needed to be done before he left the aircraft?

A    And before that on a descent. You know, there were checklists from start to finish. A walk

33 (Pages 126 to 129)

Albert D. Roer                                                                                    March 29, 2006

Page 130

around the aircraft, visual, tactile inspection, checklist for pre-takeoff, checklist for takeoff, checklist for cruise, checklist for descent, checklist for landing, and not necessarily a checklist for buttoning up the airplane.

Q    Did you have occasion to observe Mr. Butts with his daughters?

A    Several times.

Q    Both before and after his divorce from Heidi Winslow?

A    Yes.

Q    How would you describe his relationship with his daughters?

A    I think his daughters were probably the most important thing in his life.

Q    Do you have any reason to think that he would do anything that would jeopardize his ability to continue to be a father to his daughters?

A    None.

MR. PACK:  I have nothing else.

MR. RAMIREZ:  Just one brief follow-up. question.

EXAMINATION

BY MR. RAMIREZ:

Q    You just mentioned that the use of

Page 131

guides is designed so that accidents don't occur; is that right?

A    If that's what I said, I'll agree to that.

Q    But isn't it the case that on this particular trip in January 2005 Mr. Butts had a guide with him?

A    I'm sure he did.

Q    And isn't it the case that an avalanche occurred that killed him?

A    Absolutely.

MR. RAMIREZ:  No more questions.

(Deposition concluded 3:58 p.m.)

*   *   *   *   *

Page 132

DEPONENT'S CERTIFICATE

I, ALBERT D. ROER, hereby certify that I have read the foregoing deposition taken on March 29, 2006, and that the foregoing transcript and accompanying amendment sheets, if any, constitute a true and accurate transcript of my testimony.

_____
ALBERT D. ROER

( ) No Amendments        ( ) Amendments Attached

IN WITNESS WHEREOF, I hereby subscribe my hand and Notarial Seal this _____ day of _____, 2006.

_____
NOTARY PUBLIC

ADDRESS _____

_____

My commission expires _____

Page 133

CERTIFICATE

I, KATHERINE RICHMOND, Certified Shorthand Reporter and Notary Public, appointed to take the deposition of

ALBERT D. ROER

do hereby certify that the deponent was by me first duly sworn to testify to the truth under the penalty of perjury; that the deposition was taken by me at New Sheridan Hotel, 231 East Colorado Avenue, Telluride, Colorado, on March 29, 2006; that the proceedings were thereafter reduced to typewritten form by means of computer-aided transcription; that the foregoing is an accurate transcript of the proceedings at that time.

I further certify that I am not related to any party herein or their counsel and have no interest in the result of this litigation.

IN WITNESS WHEREOF, I affix my Notarial Seal this 17th day of April, 2006.

My commission expires December 17, 2007.

_____
KATHERINE RICHMOND
CERTIFIED SHORTHAND REPORTER

34 (Pages 130 to 133)