IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 05-CV-1765-EWN-BNB

WEST COAST LIFE INSURANCE COMPANY,          )
a Nebraska corporation,                     )
                                            )
            Plaintiff,                      )
                                            )
     vs.                                    )
                                            )
MARTHA HOAR, as the personal representative)
of THE ESTATE OF STEPHEN M. BUTTS,         )
TELLURIDE PROPERTIES, LLC, a Colorado      )
limited liability company, TELLURIDE       )
PROPERTIES, INC., a Colorado corporation,  )
ALBERT D. ROER, an individual, and         )
POLLY LYCHEE, an individual,               )
                                            )
            Defendants.                     )

**CERTIFIED COPY**

DEPOSITION OF STEVEN R. HETHERINGTON

San Francisco, California

Thursday, March 9, 2006

Reported by:
DIANE M. GALLAGHER, RPR
CSR No. Michigan 2191
JOB No. 67994



DEFENDANT'S
EXHIBIT
A-5
05-cv-1765

San Francisco, California - Thursday, March 9, 2006

8:30 a.m. - 2:40 p.m.

R E C O R D

STEVEN R. HETHERINGTON,

having been first duly sworn, was examined

and testified as follows:

MR. PACK:   Good morning, Mr. Hetherington.   My name is Stuart Pack.   We just met.   I am an attorney from Denver, Colorado, representing the defendants in this case.

EXAMINATION

BY MR. PACK:

Q   Would you state your name and business address for the record?

A   Sure.   Steve Hetherington, H-E-T-H-E-R-I-N-G-T-O-N, and it's West Coast Life, 343 Sansome Street, that's San Francisco.   The zip code is on my card.

Q   All right.   Mr. Hetherington, have you ever given a deposition before?

A   Yes, I have.

Q   About how many times have you been deposed?

A   This will be number three.

Q   Okay.   And so I assume you are familiar with how depositions work in terms of questions and answers?

6

indication, a, b, c.

A    Yes.

Q    Is that what you are referring to?

A    Yes.

Q    Have you had any participation in the language of questions 4 and 5 under section IV of the application form?

A    No.

Q    Have you ever seen at West Coast Life an application for life insurance, not necessarily used in Colorado, in which in question 5 it lists additional activities, other than -- it says, or other hazardous avocation or hobby?

A    Not that I recall.

Q    Have you ever seen an application at West Coast Life which defines the hazardous avocation or hobby?

MR. JOHNSTON:    Within the form of Exhibit 2?

MR. PACK:    Within the form of life insurance applications at West Coast Life?

THE WITNESS:    Not that I recall.

Q    (BY MR. PACK)    Have you ever seen an application at West Coast Life that provides either the applicant or the agent with definitions of what hazardous avocation or hobby means in the context of question 5?

43

A    I have not.

Q    So you have never seen a list and you have never seen a definition of the terms hazardous avocation or hobby that is given to agents or applicants?

A    No, I haven't.

Q    Do you have internally a definition for what is hazardous avocation or hobby as used in the context of question 5?

A    We are only human and there are probably more items than you can think of to put in there, so that's the representation of the type of avocation we are concerned about.

Q    That's what I am trying to find out.

In listing the items in question 5, it says auto, motorcycle or boat racing, parachuting, skin or scuba diving, skydiving or hang gliding or other hazardous avocation or hobby.

Are you intending that those are examples of hazardous avocations or hobbies?

A    That is correct.    That's not a definitive list.    There's, that's a representation of the items.

Q    So you are expecting that the insured by reading, or the applicant by reading number 5 and seeing the various specified types of activities is supposed to know what other kinds of hazardous avocation or hobby

44

would be like that?

A   Well, the question represents those type of activities, yes.

Q   Well, what I am trying to understand is that when an insured or applicant, I should say, is asked, question number 5, and there are a number of specified activities, and then it says other, are you, do you intend that the applicant will compare other activities and decide for himself or herself whether they are hazardous in the same way that these others are hazardous avocations?

MR. JOHNSTON:   Objection.  Calls for speculation.

THE WITNESS:  I can't say what an applicant is going to say when they see that.

It says what it says, other hazardous avocation or hobby.

Q   (BY MR. PACK)  So how does an applicant know what is a hazardous avocation or hobby?

MR. JOHNSTON:   Objection.  Calls for speculation.

Q   (BY MR. PACK)  Have you given the applicant any guidance, other than the five examples there or six examples that are there in question 5?

A   We have no other source of examples than that.

45

Q    And you don't give any to the applicant?

A    That is correct.

Q    And you don't give any to the agent?

A    That's correct.

Q    And you don't give any to the field underwriter, by that I mean the person who interviews the applicant after the application is submitted, you don't give them anything either, do you?

A    Nothing other than what it says there.

MR. KITCHEN:    So are you asking if he does or West Coast Life as a company?

MR. PACK:    I am asking as to his knowledge as a West Coast employee, does he know it?

MR. KITCHEN:    You keep asking "you".    I am a little confused.

MR. PACK:    I will be more precise.

Q    (BY MR. PACK)    To your knowledge, does West Coast Life provide to either the applicant, the agent, or the field underwriter anything that defines hazardous, other hazardous avocation or hobby?

A    To my knowledge, no.

Q    All right.  How is the insured supposed to know what those words mean?    Does the company provide any guidance on that?

MR. JOHNSTON:    To the insured -- sorry.

46

Q    Okay.    So would you have any reason to doubt that Deposition Exhibit 4 was prepared in response to the request on Deposition Exhibit 6?

MR. JOHNSTON:    Objection.    Foundation.

THE WITNESS:    The appearance is we ordered that report based on that sheet.

Q    (BY MR. PACK)    Now, who is Jackie Duhacek?

A    She was an underwriter for us.

Q    All right.    And out of what office did she work?

A    Omaha.

Q    And what was her level of underwriter?    Do you have different levels in the company?

A    I don't know at that time what her specific level was.

Q    And what level are you at, sir, in your company?

A    I am called a chief underwriter.

Q    And what does that mean?    What is the level above you, if there is one?

A    There's the vice president of underwriting.

Q    Is there more than one chief underwriter at a given point in time at West Coast Life?

A    No, there's not.

Q    So you are the chief underwriter for all of

60

West Coast Life?

A    That is correct.

Q    Was Jackie Duhacek at a lower level?

A    Yes.

Q    But you don't know what level she was at?

A    No, I don't.

Q    Okay.   Can you tell me what other levels exist below yours?

A    You have senior underwriters, underwriters, screeners.

Q    Anything else?   I am not talking about secretarial staff here.

A    As I don't do the administration, those are the levels I am aware of.   There may be others.

Q    Now do the senior underwriters report to you?

A    No.

Q    Who reports to you as the chief underwriter?

MR. JOHNSTON:   Your secretary.

MR. PACK:   And your wife.

THE WITNESS:   No one reports directly to me. I am a reference source.   I am supposed to have the most experience.   I'm used for continuity across the different offices.

Q    (BY MR. PACK) I was going to ask you about that.   If Ms. Duhacek was in Omaha, do you know who she

61

would have reported to?

A    No, I don't know the specific chain of command there.

Q    Is there someone in Omaha who is the head of the Omaha underwriting area?

A    Yes, there is.

Q    Do you know who that was during the year 2004?

A    2004 was Paul Kibler.

Q    How do you spell that?

A    K-I-B-L-E-R.

Q    Okay.   Is Mr. Kibler still in that position in Omaha?

A    He is.

Q    All right.   And would you have, would you assume that Jackie Duhacek reported to Mr. Kibler or to Mr. Kibler through somebody else?

MR. JOHNSTON:   Objection.   Lacks foundation.

THE WITNESS:   I don't know what the structure is there.

Q    (BY MR. PACK )   Okay.   Do you know how many underwriters there are in the Omaha office?

A    I don't know the specific number.

Q    Can you give me an approximation?

A    15.

Q    And how many underwriters are there in the San

62

received Deposition Exhibit No. 4 as part of the process of underwriting Mr. Butts' application, and you found out that he enjoys skiing, what kind of skiing would you understand that Mr. Butts engaged in?

MR. JOHNSTON:    Objection to that.  Calls for speculation.    Lack of foundation.

Q    (BY MR. PACK)    Would you know?

A    One more time.

Q    All right.    If you were the underwriter working on the Butts' file back in October of 2004, and you read this report, Deposition Exhibit 4, what kind of skiing would you think that Mr. Butts does?

MR. JOHNSTON:    Objection.  Foundation. Incomplete hypothetical.

THE WITNESS:    I can't tell you what Mark was thinking when he read that.

Q    (BY MR. PACK)    No.    I am asking how you would characterize it?

MR. JOHNSTON:    He didn't write it.  He didn't review it.  He didn't have all of the information.  It's unfair to the witness to put a document he did not draft, didn't review as far as underwriting process and ask him to interpret it.

MR. PACK:    You, as an underwriter, if you receive a consumer inspection report that says the

77

hazardous pastimes in which he is active on a regular basis.

Do you see that?

A    I do.

Q    Okay.  Would you consider golf to be a hazardous activity?

MR. JOHNSTON:    Objection.

THE WITNESS:    From a risk selection answer only, no.

Q    (BY MR. PACK)    All right.  And what about skiing, as the word is used in that report, He enjoys skiing?

MR. JOHNSTON:    Objection.  Foundation.

Q    (BY MR. PACK)    How would you interpret that as skiing in that context of information on a consumer inspection report indicate a hazardous activity?

MR. JOHNSTON:    Same objection.  Foundation.

THE WITNESS:    The way it's written, he reported no other recreational or hazardous pastime.

I can't tell you whether that's recreational or hazardous.

Q    (BY MR. PACK)    So you are saying that skiing can sometimes be recreational and sometimes hazardous?

A    I -- yes, yes.

Q    All right.  If you, as an underwriter, had

76

applicant enjoyed skiing, what kind of skiing do you understand the applicant is doing?

MR. JOHNSTON:   Same objection.   Foundation.

MR. PACK:   You may answer.   You are an underwriter.

THE WITNESS:   The way it's phrased in this inspection report, skiing is skiing.   It doesn't make any differential.

Q   (BY MR. PACK)   And do you think that skiing is always a hazardous activity because there are certain waivers of liability that go with skiing?

MR. JOHNSTON:   Same objection.

THE WITNESS:   That would be just my opinion whether skiing is hazardous or not.

Q   (BY MR. PACK)   What's your opinion as an underwriter?

MR. JOHNSTON:   As an underwriter?

MR. PACK:   Yes, as an underwriter.

THE WITNESS:   There's varying degrees in hazards in skiing.

Q   (BY MR. PACK)   So some skiing is hazardous and some isn't, is that what you are saying?   It depends on the kind of skiing you're doing?

A   Yeah.

Q   Okay.

78

that if it's heli skiing you have got to charge more than if it's regular skiing, correct, isn't that right?

A    That is correct.

Q    And you do know that there are several other categories in your underwriting manual dealing with types of skiing, don't you?

A    I would have to look at the guide.

Q    Well, let's take a look at the guide.

MR. KITCHEN:    I want to take a break.

MR. JOHNSTON:    This is clearly another line of questioning.

MR. PACK:    Well, we will let you stop.    Mark this as the next exhibit.

(Break taken from 10:30 a.m. to 10:46 a.m.)

(Deposition Exhibit No. 9 was marked for identification by the court reporter.)

Q    (BY MR. PACK)  Mr. Hetherington, I have shown you what has been marked as Deposition Exhibit 9.

Can you explain to me what this is?

A    That's one of the pages of the non-medical section of the Swiss Re guide and this only relates to the avocation sports life ratings.

Q    All right.  And is this the source that an underwriter at West Coast Life would refer to, in your experience, to determine house to price a policy if an

83

applicant engaged in one of these recreational activities shown on Exhibit 9?

A    Yes.

Q    All right.   Now, under the topic of skiing, the heading of skiing, there are various types of skiing indicated, correct?

A    That is correct.

Q    All right.   And, for example, pleasure only including occasional holiday competitions, that's standard?

A    That's correct.

Q    Meaning that there would not be any increase in premium charged if that's what the applicant engaged in?

A    Yes.

Q    And of course in our circumstance the heli skiing has an upcharge, if you will, or flate rate of $2.50 per thousand dollars of coverage, correct?

A    That is correct.

Q    All right, and then there's another category that is, standard, advanced, amateur, competitor?

A    That is correct.

Q    What does that refer to?  What is an advanced amateur competitor in the context of skiing as you understand it  under this underwriting guideline?

MR. JOHNSTON:   If you know.

84

Q    (BY MR. PACK)   The court reporter has handed to you what has been marked as Deposition Exhibit 13 and it's a string of e-mails in 2005, and I would like to direct your attention to the third page of the exhibit and at the top it says, Thank you for researching this issue.   Do you have that page?

A    Yes.

Q    All right.    And in the middle there appears to be a printing of an e-mail from yourself to Susan Heatherly, dated 3-29-05 at 1:53 p.m.   Do you see that?

A    Yes, sir.

Q    Am I reading that properly that you sent an e-mail to Ms. Heatherly?

A    I am trying to find the 1:53.

MR. JOHNSTON:    It's right there.

THE WITNESS:   Okay.

MR. JOHNSTON:    I had a problem finding it too.

THE WITNESS:   Yes.

MR. JOHNSTON:    I think actually she forwarded it at that point.

THE WITNESS:   Yeah, the actual --

MR. JOHNSTON:    The time is 1:44.   I don't think it makes, the time is not --

Q    (BY MR. PACK)   I was directing you so you could find it.   I'm  not worrying about the time.

136

THE WITNESS:  Okay.

Q    (BY MR. PACK)   The time is irrelevant.

A    Okay.

Q    But there is an e-mail that you apparently sent to Ms. Heatherly on March 29th, 2005, is that what that shows where it  shows Susan:  Had Mr. Butts, below that?

A    Oh, yes, sir, right, okay.

Q    What was the last time you took a look at this e-mail.   Have you seen it before today?

A    No, not since I sent it.

Q    You didn't see it in terms of for preparation for deposition?

A    No.

Q    And it says, Susan had Mr. Butts correctly responded to application question number 5 concerning "other hazardous avocation or hobby",  we would have followed the SWISS Re guide regarding heli skiing and offered at "standard non-smoker rates with a permanent flat extra of $2.50/$1000.

Do you see that?

A    Yeah.

Q    Is that an e-mail that you recall sending in March of 2005?

A    Yes.

Q    And did that e-mail reflect your assessment

137

after you had reviewed the underwriting file for Mr.
Butts' policy?

A    Yes, it does.

Q    All right.   So in March of 2005 you had
reviewed the entire underwriting file to reach this
conclusion?

A    At that time, yes.

Q    And have you reviewed the entire underwriting
file since that time?

MR. JOHNSTON:    Since March of 2005?

MR. PACK:    Yeah, March, at the time, about the
time that you wrote the e-mail March 29, 2005.

THE WITNESS:    I may have.

Q    (BY MR. PACK)   When might you have, under what
circumstances?

A    I take that back.   March 29 is probably the
last time that I can, you know, directly remember.

Q    Now it says, the language that you used is, had
Mr. Butts correctly responded to the application
question.   What do you have referenced as being correct
or incorrect about the response?

A    He did not include heli skiing.

Q    Okay.   So when he said skiing, you think that
did not include heli skiing?

A    On his application he did not declare skiing.

138

A    No.

Q    Okay.   Your, I will call it, opinion or your assessment was that had Mr. Butts correctly indicated that he heli skied that the policy would have been offered with a permanent flat extra.  Is that still your assessment today?

A    That is my assessment.

Q    So there was nothing about heli skiing that prevented the company from issuing a policy and accepting risk.  That activity does not prevent the issuance of a policy?

A    That is correct.

Q    It's just the amount of the premium would have been different had the fact of heli skiing been disclosed?

A    That is correct.

Q    I think you told me earlier that you know nothing about whether the investigation of the death claim had been closed and then reopened?

A    I have no knowledge of that at all.

Q    So on the second page of the exhibit where Ms. Heatherly is telling Laura Ewald that they have reopened the investigation for further interviews, you know nothing about that?

A    I know nothing about that.

146

THE WITNESS:  Sorry.  I thought we already said that was his declaration on his application and he did not list skiing.

Q   (BY MR. PACK)  But I am asking you, would that have been a correct response to question number 5?

A   No.  Heli skiing is the correct response.

Q   All right.  But if he had said that he skied, would that be a hazardous avocation or hobby within the meaning of question number 5?

A   Only Mr. Butts would know that at that point. I can't...

Q   So only Mr. Butts would know if that was a hazardous activity?

MR. JOHNSTON:   Skiing?

Q   (BY MR. PACK)   He knows he skis.  What I am asking you is whether or not within the context of --

A   Well, I can't answer for Mr. Butts whether he thought that was hazardous or not.

Q   Well, do you think that if he skied that that was an other hazardous avocation or hobby within the meaning of question number 5 to the application?

A   I can't respond to what Mr. Butts thought about the question.

Q   All right.  I am not asking what Mr. Butts thought.

152

MR. PACK:    Number 5, thank you very much.

MR. JOHNSTON:    Objection.  Calls for speculation, but you may answer.

THE WITNESS:    I can't respond to what everyone thinks.

Q    (BY MR. PACK)  Okay.   So you would agree that some people may think one way and some people may think another?

MR. JOHNSTON:    Objection.

THE WITNESS:    Again, I am trying to make opinions of what other people think --

Q    (BY MR. PACK)  So you would agree that you don't know what other people might think with regard to certain hazardous activities?

A    I do not know.

Q    All right.   Using Deposition Exhibit 9, is there any reason why your company could not have added heli skiing and snowcross to the list of activities in question number 5?

A    I don't know.

Q    Do you know of any reason why it couldn't be done?

A    I don't have any reason, no.

Q    So it wouldn't have been impossible from your point of view to add a couple more activities that

161