## Compressed Transcript

# WEST COAST LIFE INSURANCE

# VS.

# HOAR

### Deposition

**MARK YOUNGQUIST**

**04/21/2006**



DEFENDANT'S
EXHIBIT
A-6
05-cv-1765

AGREN·BLANDO COURT REPORTING & VIDEO

9

Q   Have you reviewed any depositions that have been given in this case?
A   No.
Q   Have you been informed about what other people have testified in this case?
A   No.
Q   Have you spoken with anyone that you understood has given testimony in this case?
A   No, I haven't.
Q   Did you review any portions of the Swiss Re underwriting manual prior to today's deposition?
A   No.
Q   Do you know what the Swiss Re manual is that I'm referring to?
A   Yes.
Q   Is that something that you use periodically in your work?
A   Yeah, we use it on every case.
Q   Have you ever had any training particularly as to the Swiss Re manual, the underwriting manual?
A   No, not particular to that manual.
Q   Have you had any training regarding other underwriting manuals and their use?
A   Just electronic manuals on how to use

10

them on the computer.
Q   Is that more in the nature of how to locate information on a computer, as opposed to going through a paper version of it?
A   Yes.
Q   Have you done any independent research or investigation regarding any issue that you are aware of in this case?
A   No.
Q   Other than the two hours or so that you spent with Mr. Johnston yesterday, have you spent any other time preparing for this deposition?
A   No.
Q   Have you ever had occasion to discuss Mr. Butts' application for life insurance with anyone in the Omaha office other than an attorney?
A   I discussed it with my boss, the director there.  He had just indicated that -- that I would be having a deposition on the case.
Q   And who is your boss?
A   Paul Kibler.
Q   Did you discuss anything substantive about the underwriting that you did that led to the issuance of the policy to Mr. Butts?
A   No.

11

Q   Was it more just administratively, that you were going to have to give a deposition?
A   Yeah.
Q   And about when did that conversation take place?
A   Oh, probably a month ago.
Q   Have you ever had -- during the course of the time that you were actually working on the underwriting of Mr. Butts' application -- you did -- you did participate in that.  I guess I should start, did you participate in the underwriting of Mr. Butts' application for life insurance?
A   Yes, I did.
Q   Was there anyone that worked with you on that underwriting?
A   I actually -- the original underwriter on the case, Jackie, needed some help, and so I helped her do the -- some of the final requirements.
Q   Did Jackie actually do some of the underwriting?
A   She did the initial underwriting on the case.
Q   And what do you include when you use the word "initial underwriting," what kinds of steps?
A   She did first review of the application,

12

and if I remember right, she looked at some of the exams and lab results.
Q   And what is Jackie's last name?
A   Duhacek, and I don't know how to spell it.
Q   That's fine.  I think I know who you're referring to.  Is Ms. Duhacek still with West Coast Life?
A   No, she isn't.
Q   And do you know when she left?
A   It was late last year.
Q   So, late in 2005?
A   Yeah.
Q   And do you know the reason for her leaving the company?
A   She got another job opportunity with another company.
Q   Do you know what kind of work she's doing now?
A   Underwriting.
Q   Is it for another insurance company?
A   They're an underwriting consulting agency, so they do work for several different companies.
Q   To your knowledge, did Ms. Duhacek's

AGREN·BLANDO COURT REPORTING & VIDEO

17

Ms. Reed?

A   No, I haven't.

Q   Have you ever contacted her in any respect regarding Mr. Butts' application for insurance?

A   No.

Q   How about with regard to the claim for benefits under Mr. Butts' policy?

A   No.

Q   Now, you mentioned that you had spoken briefly with Mr. Kibler about the fact that you were going to be giving the deposition today.  Do you -- that did happen, I assume, about a month ago, I think you said.

A   Yes.

Q   But you never spoke with Mr. Kibler specifically about Mr. Butts' application or his claim?

A   No.

Q   Have you spoken to anyone else in the underwriting department at West Coast Life regarding Mr. Butts' policy or his application?

A   No.

Q   How about at Protective Life Insurance Company?

18

A   No.

Q   Would you tell me a little bit about your employment background, sir?

A   I began underwriting in 1995 at a company called Lincoln Benefit Life, and I worked there until 2002, when I went to United of Omaha.  And I worked there a couple of years, and then I began at West Coast Life.

Q   Would that mean that you began with West Coast Life in 2004?

A   Yes, October of 2004.

Q   When you were with Lincoln Benefit Life, what kind of underwriting were you doing?

A   Life underwriting.

Q   Did you have a position or job title?

A   I was just an underwriter, life underwriter.

Q   Did you have any experience or training in underwriting before beginning work with Lincoln Benefit Life?

A   No.

Q   Did you receive any training while you were at Lincoln Benefit?

A   Yes.

Q   Would you tell me about the training that

19

you received there?

A   Basically, they had an underwriter trainee program, and they provided a -- a class, about an hour a week, where we would do some medical training and -- and meet with our medical director at that time, and we would also -- they gave us a mentor to kind of work with and train on cases on how to underwrite.

Q   Did you start out working under a mentor, or did you have cases that you had to underwrite right from the start?

A   Both.  They gave us a caseload, but we also would review with our mentor.

Q   Did you receive any training in the non-medical aspects of underwriting?

A   Nothing that I can recall.

Q   So did you receive any particular training with regard to recreational activities that insureds or applicants might engage in?

A   No.  Just basically with the manual, how to use the manual in those regards.

Q   What manual did you usually use while you were at Lincoln Benefit?

A   I think it was the Lincoln National manual, if I remember right.

20

Q   Do you recall that it was not the Swiss Re manual, in any event?

A   We may have used that, but it's been a while, so --

Q   You're just not sure about that?

A   Yeah, I'm not sure.

Q   And during the course of roughly six to seven years that you were at Lincoln Benefit, did you receive any promotions?

A   I became a senior underwriter there.

Q   As a result of taking this training course provided by Lincoln Benefit, did you acquire any certification or licensure or designation, anything like that?

A   I was a -- it's called a Fellow of Life Management Institute designation.  It's just an insurance -- insurance industry designation.

Q   Could you say that again?  I'm sorry. Fellow of Life --

A   Fellow of Life Management Institute.

Q   Is there a series of letters or a name for that?

A   FLMI.

Q   FLMI.  And about how many hours of training did you need to take to become a FLMI?

AGREN·BLANDO COURT REPORTING & VIDEO

21

A   There was 10 courses, which we just took on our own.

Q   And then were there tests that you had to pass?

A   Yes, there was a test for each course.

Q   And were these in addition to the in-house classes that you said were roughly one hour a week?

A   Yes.

Q   How long did the in-house classes last, the one hour per week, for what period of time?

A   About six months.

Q   As a senior underwriter at Lincoln Benefit, what did you do?

A   I still underwrote life applications, did larger face amounts.

Q   Was -- other than working on larger face amount, was the job pretty much the same as before you became a senior underwriter?

A   Yes, it was.

Q   Any other promotions after you became a senior underwriter at Lincoln Benefit?

A   No.

Q   And in roughly 2000 -- 2002, excuse me, you said you took a job with United of Omaha?

22

A   Uh-huh.

Q   What was the reason for your leaving Lincoln Benefit?

A   Just a different job opportunity.

Q   Where was your job located with Lincoln Benefit?

A   In Lincoln, Nebraska.

Q   And where -- where was the job with United of Omaha?

A   In Omaha, Nebraska.

Q   And what position did you start off with at United of Omaha?

A   Underwriting consultant is what they called them.

Q   And what did you do as an underwriting consultant?

A   Just underwrote life applications.

Q   Was it similar to what you had been doing as a senior underwriter?

A   Yes.

Q   Was there any underwriting manual in use at United of Omaha during the roughly two years that you were there?

A   Yes.

Q   And what manual was -- did United of

23

Omaha use?

A   The ING manual.

Q   Is that different than the Swiss Re manual?

A   Yes.

Q   Did you receive any training on the ING manual while you were at United of Omaha?

A   Just how to use it.

Q   Is that formal training or is that like on-the-job kind of training?

A   Just kind of on the job.

Q   Was there any training generally in underwriting that you received while you were at United of Omaha?

A   No.

Q   Did you take any additional coursework or professional education on underwriting during the two years you were at United of Omaha?

A   No, I didn't.

Q   Did you attend any professional seminars that dealt with underwriting during those two years?

A   No.

Q   And in October of '04 you moved over to West Coast Life; is that correct?

24

A   Correct.

Q   And what was the reason for leaving United of Omaha?

A   Different job opportunity.

Q   And what position did you have when you joined West Coast Life?

A   Senior underwriter.

Q   In comparison with the job responsibilities you had with United of Omaha, was a senior underwriter the same or different than what you had been doing before?

A   The same.

Q   Did you receive any training while you've been with West Coast Life in the area of underwriting?

A   No.

Q   Have you taken any coursework, attended seminars, anything like that, in the area of underwriting?

A   No.

Q   And what underwriting manual is in use at West Coast Life?

A   Swiss Re manual.

Q   Are there any other manuals that are regularly consulted in your work as an underwriter

25

at West Coast Life?

A No.

Q And I think you told me that you basically got some training on how to use a Swiss Re manual because it was on the computer?

A Back at Lincoln Benefit, yeah.

Q Did you get any training on the Swiss Re manual?

A Just -- yeah, just because it was -- since it was on the computer, just how to use it and where to -- how to access it.

Q So as I understand it, over the course of your career you've worked with several different underwriting manuals. Are they -- in your mind, are they substantially different in how they're set up and what -- the information they provide?

A Oh, there's some similarities and -- but different manuals will handle different impairments, you know, on a different basis.

Q So, in other words, the -- the way that different manuals treat certain conditions may differ from one to the other?

A Yes.

Q Have you ever had occasion prior to the time that you were working on Mr. Butts'

26

application to deal with a life application in which the applicant indicated that he or she was a heli skier?

A No, I haven't.

Q Have you ever had occasion prior to Mr. Butts' application to deal with an applicant in which the -- an application in which the applicant indicated that he or she was a skier?

A Yes.

Q And do you remember that instant? Do you have a recollection of that incidence?

A No, I don't.

Q Okay. Do you recall which company it was with?

A It could have been with any of them.

Q You just don't remember?

A No, I don't remember.

Q Do you recall having any applications during the period of time that you were with West Coast Life, prior to Mr. Butts' application, in which the applicant indicated that he or she was either a skier or a heli skier?

A I -- as far as heli skiing, no, I know I haven't seen an application regarding that, but with skiing, a lot of people ski, so --

27

Q Have you ever had occasion, when an applicant indicated that he or she was a skier, to have to refer to an underwriting manual to see what, if any, impact that has on the underwriting?

A No.

Q Would it be fair to say, then, to try to summarize what you've said, that prior to Mr. Butts' application, you never had an instance in which you needed to consult with an underwriting manual regarding either skiing or heli skiing?

A Correct.

Q Prior to Mr. Butts' application, were you aware of how the Swiss Re manual handled -- treated various kinds of skiing?

A No, I wasn't.

Q And I assume that during the course of underwriting Mr. Butts' application, you had no reason to consult the Swiss Re manual regarding skiing?

A No.

Q And you did not in fact consult the Swiss Re manual regarding skiing as part of your work on Mr. Butts' application?

A Correct.

Q Now, if -- if I have this right, you

28

started with West Coast Life in October of '04, and I believe that's about the time, maybe within a month or so, that Mr. Butts' application came into your office, because it was approved on November 1st of '04. Is that your recollection?

A Yes.

Q So you would not have been an employee of West Coast for more than a month at the time that the policy was approved?

A Correct.

Q You said that Ms. Duhacek had start -- done the initial review and then you kind of took over the file. Once you took over the file, did you consult with her on an ongoing basis as to what was going on with this file, or did you just pretty much finish it up?

A I finished the case.

Q Okay. Did you have to get anyone's approval as to the decision that you made with regard to Mr. Butts' application?

A No.

Q So, once you made the decision as to what you thought was appropriate, that was the company's decision.

A Correct.

AGREN·BLANDO COURT REPORTING & VIDEO

37

apologize.

MR. PACK: That is correct.

Q (BY MR. PACK) During the time period that Mr. Butts filled out an application and submitted it to the company, how did it come about, if you know, that it came to the Omaha office, as opposed to one of the other offices?

A Our office handles certain brokerage agencies, and any -- any case that is from one of those agencies comes to our office for underwriting.

Q Are you familiar with an agency by the name of the Bachmann Agency?

A I've heard of them, yeah.

Q How about Fish & Schulkamp?

A No.

Q I'm going to ask you to take a look, and I'm going to put it before you, at Deposition Exhibit 9. This was marked in a previous deposition. And I'm going to represent to you that this is a page from the Swiss Re Life Guide dealing with winter sports life ratings. Have you ever seen this page before?

A No, I haven't.

Q Would it be fair, then -- it may be

38

obvious. I didn't ask the question the way I should have. At the time that you were working on the underwriting of Mr. Butts' policy, had you ever seen Deposition Exhibit 9?

A No.

Q And I gather that you've never looked at Deposition Exhibit 9 during the course of your work in underwriting Mr. Butts' policy.

A That's correct.

Q All right. Now, as I look at Deposition Exhibit 9, there is a heading toward the middle of the page that says Skiing. Do you see that?

A Yes.

Q And then there are -- I see six different categories of types of skiing underneath the heading of Skiing. Do you see that?

A Yes.

Q Do you know what kind of activity constitutes freestyle skiing, as that term is used in Deposition Exhibit 9?

A I would have to probably look at the manual as far as -- usually it will break it down into what each category -- give a little description as to what each thing is.

Q So you would have to do some more

39

investigation to see if the manual gave a definition or a description of what freestyle is --

A Yeah.

Q -- in order to respond to that question?

A Yeah.

Q All right. Would that also be the same with regard to speed skiing?

A Yeah. I mean, I would look -- look at it, but I've seen that, you know, on the Olympics and that sort of thing, so I -- I kind of know what that is.

Q What's your understanding of what speed skiing is?

A From what I've seen, they go straight down the mountain and as fast as they can go.

Q They go straight down, no turns, no nothing.

A No turns, no nothing.

Q Just get there as fast as they can.

A Yeah.

Q Ski jumping, I imagine you have an idea what that is from the Olympics and watching TV?

A Correct.

Q What about heli skiing? You told me what you understand it is. Do you know if there's a

40

definition or a description of heli skiing in the manual, or you just think that there is?

A I -- I don't know. I assume there would be, but --

Q Now, just to the right of the various types of skiing that are listed on Deposition Exhibit 9, there's a column that says -- that's headed Life?

A Uh-huh.

Q And then across from it, for example, heli skiing, it says, "2.5 per M." Do you see that?

A Yes.

Q And what does that mean to you?

A That means a flat extra of $2.50 per thousand.

Q Does that indicate to you whether or not, if someone were a heli skier, that a policy would be available to them, barring some other problem?

A Well, we would -- we would rate them, you know, higher than a standard -- standard case. I mean, someone that typically skis in bounds, they would be rated -- a heli skier would be rated higher.

Q So there would be an additional premium

AGREN·BLANDO COURT REPORTING & VIDEO

41

charge of $2.50 per thousand of face amount of coverage?

A    Correct.

Q    All right. And just to the right of where it says heli skiing, 2.5 per M, under the ADB column there's a "D." Do you see that?

A    Uh-huh.

Q    And what does ADB stand for?

A    Accidental death benefit.

Q    And what does the D stand for?

A    Decline.

Q    So this would indicate that if someone were applying for accidental death benefit and they heli skied, you would decline that application?

A    We would decline the -- in that regard, the accidental death benefit if they applied for that --

Q    Coverage.

A    -- coverage.

Q    Yes. But as far as a heli skier who is just applying for life coverage, you would accept the application but you would charge more premium?

MR. JOHNSTON: Objection; incomplete hypothetical -- incomplete hypothetical.

Q    (BY MR. PACK) You may answer.

42

A    I mean, there's a lot of things that go into the application.

Q    Assuming there was no other reason to decline, medical problem or anything like that, and the only -- and the only activity that you were aware of that rated it upwards, is there -- is there anything about heli skiing that would indicate that a heli skier is to be declined?

MR. JOHNSTON: Objection; foundation.

A    Well, according to the manual, a 2.50 dollar -- a $2.50 per thousand premium -- extra premium charge would be applied. You know, as to whether or not we would issue the coverage, like I said, it does depend on a lot of different things.

Q    (BY MR. PACK) Sure, but all other things being equal, that there wasn't anything in the medical history that led to a declination, just the fact that someone was a heli skier wouldn't lead to a declination, it would lead to a higher premium?

A    Yeah, if all other things were within our guidelines, it would be issuable.

Q    Do you know anything about how the various premium upgrades are determined in the Swiss Re manual? For instance, do you know how they determined that a heli skier should be charged

43

a flat extra of $2.50 per thousand?

A    No, I don't know.

Q    Do you know if it's based on statistical data or any data?

A    I -- Swiss Re's actuaries would probably have data that they use to determine the additional risk.

Q    But that's not something that you get involved with at West Coast Life?

A    No.

Q    You basically take their -- their recommendation?

A    Yes.

Q    You said that on occasion in the past you've had other applicants, and I know you didn't know if it's a West Coast applicant, but other applicants who mentioned that they were skiers. Were you ever at a company at which you had to up-rate or charge an additional premium to any applicant who told you that they were a skier?

A    No.

Q    Let me ask you, in that loose-leaf notebook, if you would, please, turn to Tab 2, which is Deposition Exhibit 2. And take a moment and maybe just thumb through the pages to refresh

44

your memory, because my first question is, do you recall seeing these documents before today?

A    As far as the application, yes.

Q    Okay. Do you recall seeing Mr. Butts' application during the fall of 2004, when you were working on the underwriting of his application?

A    It was a long time ago, but, no, I don't recall it.

Q    Do you have any reason to doubt that you would have reviewed the application as part of the underwriting?

A    No.

Q    Okay. And when you are reviewing an application generally as an underwriter, do you do anything to denote that you've reviewed the application? Is there a place where you mark on it or mark on someplace else -- someplace else that you've reviewed it?

A    On the underwriter worksheet.

Q    All right. Let me ask you to take a look at Exhibit 7 in that same notebook. What is that document?

A    That's the underwriter worksheet.

Q    So that's what you were just referring to?

AGREN·BLANDO COURT REPORTING & VIDEO

45

A   Correct.

Q   All right.  Is your handwriting on Deposition Exhibit 7?

A   Yes.

Q   Okay.  Now, Deposition Exhibit 7 has several pages.  I'm only talking about the first page right now.

A   Okay.

Q   Okay?  Let's start, is there any handwriting on Deposition Exhibit 7 that you know is not yours?

A   Yes.

Q   All right.  Would you tell me which portions of it are not in your handwriting?

A   Under the Issue Instructions is not my handwriting.

Q   On the left-hand side?

A   Yes.

Q   Okay.  Do you know whose handwriting it is?

A   I -- no, I honestly don't.  It might be Jackie's, the original underwriter.

Q   All right.  Do you know what her hand- -- are you familiar with Jackie's handwriting?

A   It's been a while since I helped on a

46

case.  It kind of looks like hers, but --

Q   All right.  Okay.  What else is not in your handwriting?

A   All the requirements and the -- the date received is not mine.

Q   So the last five columns on the right-hand side of the page?

A   Correct.

Q   Under -- under where it says Underwriting Requirements?

A   Uh-huh.

Q   All right.  Do you know whose handwriting that is?

A   No, I don't.

Q   Do you think it might be Ms. Duhacek's?

A   She -- she might have ordered some of the requirements, but as far as the dates received and the -- that would probably be the case manager's.

Q   And what about the bottom third or fourth, where it says, Underwriting Notes, under that heading.

A   Uh-huh.

Q   There's a lot of different handwriting there.  Is any of that yours?

A   A little bit of it, yes.

47

Q   Which portions are yours?  Maybe you can just read it to us, might be the easiest way.

A   Sure.  It says -- where I wrote was, "IR," means inspection report, "1.5 income. $10 million net worth.  Company net worth 500,000." And my other note is "APS - see notes."

Q   All right.  Now, in the center of the page there is a box that says Approved.

A   Uh-huh.

Q   Do you see that?

A   Yes.

Q   And in that box there appears to be a signature or a portion of a signature.  Is that your handwriting?

A   Yes, it is.

Q   Is that your signature?

A   Yes, it is.

Q   And there's a date 11/1/04.  Does that indicate the date that you approved the application?

A   Yes.

Q   And up above, under Underwriter's Rating, do you see that heading?

A   Uh-huh.

Q   There's some handwriting there.  What

48

does that say?

A   "Standard NT," which is non-tobacco.

Q   Is that in your handwriting?

A   Yes.

Q   What do those two entries mean to you?

A   Once I've fully reviewed the case and determined what the rating class is going to be, then I would write -- you know, in this case I wrote standard non -- NT, non-tobacco, and I mark how many APSs, inspection reports, and MVRs are in the file, and then I sign off on it.

Q   Looking to the right, under the heading Underwriting Requirements, do you see that?

A   Uh-huh.

Q   There is a notation, "Aviation questionnaire."  Do you see that?

A   Yes.

Q   And to the right of it, it appears to say "10/07"?

A   Uh-huh.

Q   Can you explain that entry to me?

A   It looks like aviation --

MR. JOHNSTON:  Let me object to the foundation.  I don't know if that's his handwriting, but he can do his best.

AGREN·BLANDO COURT REPORTING & VIDEO

53

he could get.

Q   Is there a category above preferred?

A   Yes, super preferred.

Q   But he wouldn't be available for that because he had hypertension.

A   Correct.

Q   Okay.

MR. PACK:  Why don't we take a break now.

MR. JOHNSTON:  Okay.

THE VIDEOGRAPHER:  We are off the record at approximately 11:21.  This is the end of Tape 1, to be followed by Tape 2.

(Recess taken)

THE VIDEOGRAPHER:  We are back on the record at approximately 11:35.  This is the beginning of Tape 2.

Q   (BY MR. PACK)  We're back on the record, Mr. Youngquist.  Would you please turn to Page -- excuse me -- Deposition Exhibit 7, the underwriting, I think you called it worksheet or cover sheet?  It's the first page of the exhibit. What do you call that again, please?

A   Underwriting worksheet.

Q   Worksheet.  Under Underwriting Requirements, about the middle of the page, it says

54

Inspection in the printed form.

A   Uh-huh.

Q   And then just to the right of that it looks like "IR/BBR."  Did I read that right?

A   Yes.

Q   Okay.  What do those letters mean to you?

A   The IR is inspection report, and the BBIR is a business beneficiary inspection report.

Q   All right.  And those are the reports that West Coast Life has done by First Financial Underwriting?

A   Yes.

Q   And just to the right of that there's the date 10/07.  What does that indicate to you?

A   That's when it -- it was ordered.

Q   And to the right it says 10/20.  What does that mean?

A   That's when it was received in our office.

Q   All right.  Let me ask you now to please turn to Deposition Exhibit 4, which is behind Tab 4 in the notebook in front of you.  Would you just thumb through that to acquaint yourself with what Deposition Exhibit 4 is?  What is Deposition Exhibit 4?

55

A   It's an inspection report.

Q   And in the lower right-hand corner of the page, there appear to be some initials and the date 10/26.  Do you see that?

A   Yes.

Q   And what -- whose initials are those?

A   Those are mine.

Q   And does the date indicate the date that you reviewed this document?

A   Yes.

Q   And by reviewing it, you would have read the whole document, I assume?

A   Correct.

Q   And what is this document?  What do -- how -- this is the inspection report?

A   Yes, it is.

Q   All right.  Take a look on the first page of it, No. 24.  It says, "Any participation in hazardous or extreme sports?  (Auto racing, scuba, skydiving, mountain climbing, etc.)"  And then to the right of that it says the word "Yes."  What is your understanding of how this document is put together by First Financial Underwriting, if you know?

A   They ask these questions and the client

56

responds to the question.

Q   So there is either by person -- in person or by phone, there is an interview with the applicant?

A   Yes.

Q   And then the interviewer writes down what the applicant has said?

A   Correct.

Q   All right.  And then I note that there is roughly four pages of narrative information in the report, and let me direct your attention to the page that has at the bottom WCL 00207 in the lower right-hand corner.  Do you see that?

A   Yes.

Q   And there's a heading sort of in the middle that says, Aviation-Recreation-Driving Record.

A   Uh-huh.

Q   Would you -- have you had a chance to read that as part of your preparation or do you need to read it again?

A   Can I -- can I read it now?

Q   Absolutely, go ahead.  Just read it to yourself, those three paragraphs.

A   (Deponent examined exhibit)

AGREN·BLANDO COURT REPORTING & VIDEO

**57**

Okay.

Q    All right. So, having now read that -- that section, is it your understanding that this is information that the interviewer obtained from Mr. Butts during the interview that he had with Mr. Butts?

A    Yes.

Q    All right. In the second paragraph, it says that -- the second sentence is, "He also enjoys skiing and golfing in his spare time." Do you see that?

A    Yes.

Q    Can you tell from that sentence what kind of skiing is meant by the word "skiing," what kind of activity?

A    Skiing.

Q    Okay. So you can't tell whether it's pleasure skiing, heli skiing, speed skiing? No way that you can tell from that?

A    No.

Q    All right. Do you recall reading this paragraph as part of your underwriting work on this policy?

A    No, I don't.

Q    All right. Do you recall taking any

**58**

action to find out what kind of skiing Mr. Butts enjoys?

A    No, because when I see "skiing," I guess skiing to me is skiing inbounds at a ski resort.

Q    Okay. So that's the -- that's the understanding or interpretation that you would have put on the word "skiing" as it appears in this report?

A    Yes.

Q    Pleasure skiing.

A    (Deponent nodded head)

Q    Would there be any way for you to know whether, when Mr. Butts said that he enjoyed skiing, that he included heli skiing among his activities?

A    No.

Q    You wouldn't know what he -- what he meant?

A    Not unless he told me.

Q    All right. You just know what's on the report.

A    Right.

Q    Can you tell by the way the report is prepared whether skiing and golf are intended to be part of the information of the hazardous

**59**

activities, which was answered yes in Question 24? Can you put the two together or not?

A    Yes.

Q    So this paragraph is dealing with the answer to Question No. 24?

A    Right.

Q    So is it possible that the word "skiing" as used in this paragraph of the report refers to a type of hazardous or extreme sport?

A    That was not my understanding of that. I took his scuba diving, you know, as being -- it mentions scuba diving on the question, "Any participation in hazardous or extreme sports? (auto racing, scuba.)"

Q    The Question No. 24 doesn't mention -- doesn't mention flying activities. That's in the next question down, 25, right?

A    Yes.

Q    And that was also answered yes. Now, after the sentence that talks about him enjoying skiing and golfing, it says, "He reported no other recreational or hazardous pastimes in which he is active with on a regular basis." Do you see that sentence?

A    Uh-huh. Yes.

**60**

Q    Is there any way from reading that paragraph for you to know whether skiing is included as a recreational or a hazardous pastime in the context of that report?

A    I -- basically, I look at it on how I view skiing, what the typical person does skiing at a resort.

Q    So you -- you applied your experience and your background that most people ski at a resort, and figured that when the word "skiing" was used, that's the kind of skiing that was being talked about.

A    Correct.

Q    But, of course, you don't know what Mr. Butts meant, you only could read the report.

A    Right.

Q    Did you take any action to follow up or get any greater detail as to what the word "skiing" meant in the report that was provided to you by First Financial Underwriting?

A    No.

Q    If you had wanted to know more about any of the activities in those three paragraphs, is it your understanding that you could ask for clarification from the applicant?

AGREN·BLANDO COURT REPORTING & VIDEO

61

A    We would not contact the applicant. We would go through the inspection company.

Q    Okay. So -- okay, that's the process, but if, for instance, you wanted more detail about his flying activities, you could ask the inspection company to go back and get more information if you wanted it?

A    If we wanted --

MR. JOHNSTON: Let me -- let me -- you're building into your question, if appropriate?

MR. PACK: Yes. If you wanted to. Yes.

MR. JOHNSTON: Okay.

Q    (BY MR. PACK) Yeah, I'm just saying, if -- if you felt the need to get more information about private aviational activities, your process would be to go back to the -- the First Financial Underwriter interviewer and say, I want whatever information?

A    We can do it. It's not something we generally do very much.

Q    But if you felt that you needed more information in order to make an underwriting decision, that's one way you could get the information.

A    That's one way, yes.

62

Q    Could you contact the agent and ask the agent to get that information for you?

A    We could, yes.

Q    On occasion have you ever contacted an agent to get clarification or supplemental information?

A    We usually go through their brokerage agency, yes.

Q    So you go to the brokerage agent -- agency, and then will go -- that would go to the agent.

A    Correct.

Q    Do you know who the brokerage agency was for Mr. Butts' policy?

A    I don't.

Q    Okay. If I told you Stuart Bachmann Agency, is that familiar to you?

A    Yeah; yeah, I'm sure we've seen some of it.

Q    But you don't recall specifically for this policy?

A    No.

Q    Now, on occasion applicants are asked to fill out specific questionnaires regarding their recreational activities; isn't that correct?

63

A    Yes.

Q    For instance, someone who is a pilot is asked to give more information about their piloting and aviation activities.

A    Yes.

Q    All right. Let me ask you to look at Deposition Exhibit 1, please. It's in that notebook also, behind Tab 1.

MR. JOHNSTON: I'm sorry, Stuart, what number?

MR. PACK: Deposition Exhibit 1.

MR. JOHNSTON: 1.

Q    (BY MR. PACK) Is that a standard form aviation questionnaire that West Coast Life used in 2004?

A    Yes.

Q    All right. And do you recall if Mr. Butts -- this one isn't signed, but do you recall if he was asked to fill out an aviation questionnaire as part of the underwriting process?

A    It showed one on that underwriter worksheet.

Q    Let me ask you to turn to Deposition Exhibit 3, please. And Deposition Exhibit 3 is -- I will tell you, is from the Swiss Re Life Guide,

64

and it's various forms of questionnaires for sports activities. Take a moment to thumb through it.

Did you have a chance to just thumb through it?

A    Yes.

Q    Are you familiar with this portion of the Swiss Re underwriting manual?

A    No.

Q    At the time that you were working on the underwriting of Mr. Butts' policy, were you aware that there were a number of available questionnaires for different sports activities in the Swiss Re underwriting manual?

A    No.

Q    All right. And are you aware of any standard questionnaire dealing with skiing activities?

A    No.

Q    So have you ever had occasion to ask an applicant to fill out a questionnaire regarding different skiing activities?

A    No.

Q    Okay. Let me ask you to please turn now in the notebook to Tab 8, which has Deposition Exhibit 8 behind it, and take a moment to just

65

acquaint yourself with what that is.

Q   Do you recognize what Deposition Exhibit 7 is?

A   Yes, it's --

Q   I'm sorry, I said 7. I meant 8.

A   Yes, it's a business beneficiary inspection report.

Q   In the lower right-hand corner, there are some initials and a date. Do you recognize those?

A   Yes, they're mine.

Q   And that would indicate that you reviewed this business beneficiary report on October 26, 2004?

A   Correct.

Q   Let me ask you to turn to Deposition Exhibit 10 in the notebook. Do you recognize that document?

A   Yes.

Q   What is that?

A   That's our computer-generated underwriting final action sheet.

Q   Do you provide the information into the computer that results in this document being prepared?

A   Just the approval, the underwriter rating

66

and the reason for the rating. Everything else is input by others.

Q   And that information essentially is taken off of Deposition Exhibit 7 that we were looking at, the underwriting cover sheet?

A   Underwriting worksheet, yes.

Q   Worksheet, excuse me. Now, on Deposition Exhibit 10, the final action document, there is a David Kramar listed there as the case manager.

A   Yes.

Q   Do you know what Mr. Kramar does as a case manager?

A   Yes. They basically receive -- order and receive the requirements that the -- for the underwriter.

Q   With regard to Deposition Exhibit 7, your worksheet, do you have any idea whether any of those -- the handwriting there that you did not think was yours would be Mr. Kramar's?

A   I don't know.

Q   Is that his function, however, to -- to receive things like medical records and inspection reports, and match them to the -- to the file?

A   Yes.

Q   And just below Mr. Kramar's name, which

67

is spelled K-R-A-M-A-R, there is a name of Bachmann Brokerage. And I was asking, do you recognize that name as being associated with the Butts policy or not?

A   No.

Q   Let me ask you to please turn back in the notebook to Deposition Exhibit No. 2, which is the application. Do you have that?

A   Uh-huh.

Q   All right. If you would turn to the second page, which is marked WCL 00272 in the lower right, do you have that?

A   Yes.

Q   Okay. And take a look at Question No. 5 under Section VI, Non-medical History. And it says, "Engaged in auto, motorcycle or boat racing, parachuting, skin" -- "skin or scuba diving, skydiving, or hang gliding or other hazardous avocation or hobby." Do you see that question?

A   Yes.

Q   Have you seen questions like that on life applications prior to working on the ones -- the one for Mr. Butts?

A   Yes.

Q   Is this a fairly standard type of

68

application, although the language may vary somewhat?

MR. JOHNSTON: Objection; foundation, vague.

Q   (BY MR. PACK) In your experience.

A   In my experience, it's generally the same.

Q   Yes. Now, at the end of that question there is a phrase, "or other hazardous avocation or hobby." Do you see that?

A   Yes.

Q   Are you aware of any information at West Coast Life that defines what is an "other hazardous avocation or hobby" within the meaning of Question 5?

A   No.

Q   Are you aware of any information provided by West Coast Life to the applicant to define or describe what is meant by "other hazardous avocation or hobby" within the meaning of Question No. 5?

A   No.

Q   Is there anything that's provided to the agent who is taking the application from the applicant?

69

A   No.

Q   And are you aware of any information provided by West Coast Life to the interviewer for the inspection report that defines what "other hazardous avocation or hobby" means within the context of that question?

A   I -- I don't know in that regard for the inspection company.

Q   Do you know how an applicant would know what is an "other hazardous avocation" based upon anything other than their own personal assessment of that -- of those words?

MR. JOHNSTON:  Objection; foundation, it calls for speculation.

Q   (BY MR. PACK)  You may answer.

A   I look at that question, and it's -- if they answer it yes or no, as far as -- I can't tell what the client is --

Q   So you obviously don't know what the client or the applicant is thinking when they answer that question.

A   Right.  We just deal with the facts.

Q   You just deal with what's given to you.

A   Right.

Q   Because it's difficult to read, I'm going

70

to ask you to turn to Exhibit 1, the second page. This is the same declaration that appears in Exhibit 2 but you just can't read it, it's too small.  Do you see in the middle of the page, it says, Declarations?  There's a little heading, Declarations?

A   Yes.

Q   And then before the little numbered paragraphs it says, "I represent that all statements and answers made in all parts of this application are full, complete and true to the best of my knowledge and belief."  Do you see that?

A   Yes.

Q   Would it be your understanding that the applicant is answering the question based upon his or her knowledge and belief?

A   Yeah.  They're answering it to their -- to -- yes.

Q   To the best of their knowledge and belief.

A   To the best of their belief.  Yes.

Q   Going back in -- in the notebook to Deposition Exhibit 2 and to that same Question 5 about the different kinds of activities -- okay? Do you have that?

71

A   Uh-huh.

Q   All right.  Are you able to give me a definition as you sit here today of what is an "other hazardous avocation or hobby?"  Can you define those terms for me?

A   No.

Q   Would you agree that that's pretty much left up to the applicant to decide what those words mean?

MR. JOHNSTON:  Objection; foundation.

Q   (BY MR. PACK)  You may answer unless Mr. Johnston tells you not to.

A   Can you repeat the question?

MR. PACK:  Would you read it back?  I may -- I may want to rephrase it, but I don't remember --

(Requested record read)

A   Well, the applicant answers the questions.  I have to use their answers when I underwrite the case.

Q   (BY MR. PACK)  Based upon what you saw in Deposition Exhibit No. 9, which is the underwriting manual that had the winter sports activities, including heli skiing, do you believe that heli skiing is an "other hazardous activity or

72

avocation" within the meaning of Question 5 on the application?

A   Yes, I consider that a hazardous activity.

Q   And you base that to some extent on the fact that there is an additional premium charge if someone heli skis.

A   Correct.

Q   There isn't any reason to think that the typical applicant would have a copy of Deposition Exhibit 9, the underwriting manual?

A   No, they wouldn't.

Q   I mean, that's -- that's proprietary confidential information within West Coast Life.

A   Right.

Q   Would it be fair to say, based on what -- what we've gone through so far in your testimony, that if Mr. Butts had indicated in response to Question 5 or his inspection report that he was a heli skier, that that would have had an impact on your underwriting decision on the case?

A   Yes.

Q   And are you able to tell me, if Mr. Butts had said, I heli ski, what impact would that have had on your underwriting decision?  What would have

73

been the outcome? Everything else is the same, just that new bit of information.

A   I can't really say what the decision might have been. You know, I would have used that information, and definitely considered the manual as far as the, you know, additional rating on the case.

Q   Do you have any reason to think that you would not have accepted the policy, smoker, non-tobacco, but have added a flat extra premium of $2.50 per thousand?

A   Yeah. If he would have admitted to heli skiing and we would have approved the case, based on that information, there would have been an additional 2.50.

Q   Going back in the notebook to Deposition Exhibit 2, which is the application, and Page 2, which is Question No. 5, as you look at the Question No. 5, there's a list of a variety of activities there. Can you tell whether those activities have an equal or similar level of hazard, or do they just have hazards?

A   They're hazardous.

Q   Can you tell whether one is more hazardous than the other?

74

A   Not without reviewing the manual.

Q   So you'd have to go to the manual to see which one is considered more hazardous than the other, if any.

A   Correct.

Q   Do you know of any reason why West Coast Life could not have added heli skiing as one of the activities in Question No. 5?

A   No. I didn't have any -- anything to do with writing the application.

Q   But do you see any reason, having been an underwriter for a number of years, why there could have been -- couldn't have been additional activities, including heli skiing, listed there along with the ones that are listed?

MR. JOHNSTON: Objection; foundation.

A   Like I said, I -- I don't have anything to do with writing the application, so --

Q   (BY MR. PACK) Okay. Is there anything that you can think of from an underwriting point of view why the list in Question No. 5 couldn't have included more activities than just the ones that are there, from an underwriting point of view?

MR. JOHNSTON: Objection; foundation.

A   I -- I can't speak for what they -- why

75

they included those and not others.

Q   (BY MR. PACK) If they included heli skiing in there, then you would have considered the response to the question as including heli skiing, correct?

A   If it was included in that question.

Q   Are you aware of any reason why West Coast Life, for underwriting purposes, could not have provided the applicant with a list of all the activities that West Coast Life considers to be a hazardous avocation or hobby?

MR. JOHNSTON: Objection; foundation.

Q   (BY MR. PACK) From an underwriting point of view, do you know of any reason why that couldn't happen?

MR. JOHNSTON: Same objection.

A   I -- I don't have anything to do with the application, so I don't know.

Q   (BY MR. PACK) But certainly knowing more about the insured's non-medical avocations or hobbies would be helpful as an underwriter, knowing more about what they do?

A   Yes. I mean, more information allows us to make a better decision.

Q   Okay. So questions that would have

76

evoked more information would be good from an underwriting point of view?

MR. JOHNSTON: Objection; foundation.

A   We base our -- our decision on information, so we can only use what we have.

Q   (BY MR. PACK) I think I asked you this, and if I did, I apologize. You were not asked for any opinion on the underwriting of the Stephen Butts policy during the claims portion of the process?

A   No.

Q   Did you have any involvement with the claims committee in its deliberations?

A   No.

MR. PACK: Let's take a break, I may well be done.

MR. JOHNSTON: Okay.

MR. PACK: Thank you.

THE VIDEOGRAPHER: We are off the record at approximately 12:03.

(Recess taken)

(Mr. Kleiman was not present)

THE VIDEOGRAPHER: We are back on the record at approximately 12:18.

Q   (BY MR. PACK) Mr. Youngquist, would you

**77**

please look in the notebook in front of you at Tab 6, Deposition Exhibit 6. And my question is, do you recognize that form?

A   Yes.

Q   All right. What is that form?

A   It's basically the order form for the inspection report.

Q   Do you recall whether you filled this out to make the order for the inspection reports for Mr. Butts, or -- or not?

A   No. Our case managers do that.

Q   That might be someone like Mr. Kramar?

A   Yes.

Q   Let me ask you now to turn to Exhibit 5, the tab in front of that. This document is entitled Interview Notes, and I will tell you we received it from First Financial Underwriting Services. My question is, do you recall seeing Deposition Exhibit 5?

A   No.

Q   Let me ask you to turn to Deposition Exhibit 11, which is behind Tab 11 there. Are you familiar with what kind of document that is?

A   Yes.

Q   What is this?

**78**

A   It's basically a copy of the e-mail of the approval that goes out to the broker.

Q   And the information that you would have provided is under "Reason for Rating"?

A   Yes.

Q   Let me ask you to turn to Exhibit 12. And this is a copy of the policy that was issued to Mr. Butts. Is this something that you would have seen?

A   No.

Q   So you don't see the policy when it's actually put together and issued and sent out?

A   No.

Q   Let me ask you to turn to Deposition Exhibit 14. This is a hand -- set of handwritten notes signed by Mr. McIntyre, who's in the San Francisco underwriting office, West Coast Life. Have you ever seen this document before?

A   No.

Q   Let me ask you to turn to Exhibit 17. Do you have that, sir?

A   Yes.

Q   Have you ever seen this document before?

A   No.

MR. PACK: I don't have any more

**79**

questions. Thank you very much.

MR. JOHNSTON: I have just a couple of follow-up questions for you, Mr. Youngquist.

EXAMINATION

BY MR. JOHNSTON:

Q   If you wouldn't mind getting in front of you the Exhibit No. 2, which is in the notebook in front of you, which is the application, correct?

A   Correct.

Q   I believe your testimony was that you had no input as to the preparation of Exhibit 2; is that right?

A   That's correct.

Q   Let me ask you, even though you didn't put any effort into drafting the printed words here on Exhibit 2, how do you evaluate the applicant's responses?

A   Basically, the -- the applicant would respond -- you know, a reasonable applicant would respond to the questions, you know, in -- in a -- I don't know -- reasonable way, I guess, a correct way for them.

Q   And you mentioned before in your prior testimony that -- on more than one occasion I believe your answers were, We only rely on the

**80**

facts. Is that something that you rely on the applicant to provide?

A   Yes.

Q   Okay. And are those objective facts that you're relying on?

MR. PACK: Objection; calls for a legal conclusion.

You may answer. I was just making a record.

A   Yes. I mean, we expect, you know, a reasonable person to answer those questions objectively.

Q   (BY MR. JOHNSTON) Okay. Take a look at the second page of Exhibit 2, Mr. Butts' application. But before I get to that, you mentioned that as an underwriter, you rely on objective facts given by a reasonable applicant?

A   Correct.

Q   Is that fair?

A   Yes.

Q   Is that how you evaluated Mr. Butts' application for life insurance?

A   Yes.

Q   Let's take a look at Exhibit 2, Question No. 5 on Page 2. Do you have that in front of you?

AGREN·BLANDO COURT REPORTING & VIDEO

81

A   Yes, I do.

Q   Given the way or standard that you evaluate responses from an applicant, how does that -- that method of evaluation impact your evaluation, in particular with respect to Question No. 5?

A   Well, when an applicant is answering the questions, and I as the underwriter am reviewing that, we are looking at, you know, if they're -- that they're answering these questions, you know, objectively and, you know, in a way that applies to them.

Q   When you say in a way as to -- that "applies to them," are you saying that, for instance, in the context of Exhibit 5 (sic), that they have engaged in a hazardous activity?

A   Yes.  I mean, you know, with regards to Question 5, it's kind of a listing of, you know, a few of the more known hazardous type of activities. You know, we would expect, you know, a person to, you know, answer that question, you know, in a reasonable way that applies to them.

Q   Okay.  And as far as -- Mr. Pack had asked you some questions about whether or not heli skiing was listed in Question No. 5, and obviously

82

it isn't.  But my question to you is, what is the purpose of the listing, as you view it as an underwriter, of listing the items that are contained in Exhibit -- or Question No. 5?

A   Well, I -- as I mentioned, it's basically -- you know, it's not an all-encompassing list of every hazardous activity there is.  It's kind of a -- you know, for the client to look at and see that these are some of the hazardous -- some hazardous activities, but, you know, it may trigger something in them to -- you know, that maybe this activity that I do is also considered hazardous.

Q   And are these activities that are listed in Question No. 5, from an underwriting standpoint, are these objectively hazardous activities?

MR. PACK:  Objection; lack of foundation.

A   Yes, I mean, we would consider these to be objectively hazardous activities.

Q   (BY MR. JOHNSTON)  You were asked some questions as to whether or not there was a written definition of "other hazardous avocation or hobby" within West Coast Life.  Do you recall that question?

A   Yes.

Q   Okay.  And I believe you testified that

83

you weren't aware of any kind of written listing of -- of hazardous activities as it would relate to Exhibit 5 -- or --

MR. PACK:  Question.

Q   (BY MR. JOHNSTON) -- Question No. 5.

A   No, there's nothing that I know of that's written.

Q   Okay.  From an underwriting perspective, would you feel it necessary to have such a listing of other hazardous activities in the context of Question No. 5?

A   No.  I mean, there's so many different hazardous activities, it would be a huge list.  You know, we look at the question as, you know, something that, you know, a normal person would consider as a hazardous activity, you know, and if they participate in that, they would respond and answer the question accordingly.

Q   Okay.  And you were also asked if you were aware of any listing or information that was given that defined hazardous activity in the context of Question No. 5 to the insured -- or the applicant, the agent or the broker, and I believe your answer was that you weren't aware of any such written listing given to them.

84

A   No.

Q   And from an underwriting perspective, would you feel it necessary to provide that?

A   No.  I mean, the question is -- you know, it's asked on the application, you know.  And once again, we can't include a -- or give a document probably that has every hazardous activity out there.  We would just expect that they would, you know, objectively answer the question, did they participate in such and such of activity.

Q   Okay.  Are you aware of any other insurance -- well, let me ask you this:  Are you aware of any insurance company providing such a written list to applicants?

A   No.

MR. PACK:  Objection; foundation.

Q   (BY MR. JOHNSTON)  Well, are you aware of the companies that you've worked for ever providing that kind of list to applicants?

A   No.

Q   Are you aware of any company that you've worked for providing that list to the brokers or to the agent or the life inspector?

A   No.

Q   And I apologize, I left off the life

AGREN·BLANDO COURT REPORTING & VIDEO

89

questions to the best of their knowledge.

Q    (BY MR. PACK)  How about to the best of their knowledge and belief, as it says in the declaration?

A    To the best of their knowledge, yeah.

Q    No.  Doesn't the declaration say, "best of my knowledge and belief"?

A    Yes, it does.

Q    So isn't that what you have to expect the applicant to do, to answer to the best of their knowledge and belief?

A    We would expect them to answer the questions, yes.

Q    To the best of their knowledge and belief, that's what -- that's the standard that you would expect them to adhere to.

MR. JOHNSTON:  That mischaracterizes his testimony.

MR. PACK:  I'm asking him.  Either he does or he doesn't.

MR. JOHNSTON:  Well --

MR. PACK:  You're trying -- he keeps on leaving off half of the thing.

Q    (BY MR. PACK)  I'm asking you, the declaration says that it's the best of their

90

knowledge and belief.  Is that what you would expect the applicant to do, to give you the best of their knowledge and belief?

MR. JOHNSTON:  Well, you're leaving off a lot of his other prior testimony.

MR. PACK:  I'm asking him if that's the standard that he would use.

MR. JOHNSTON:  Well, I object, that it mischaracterizes his testimony.

Q    (BY MR. PACK)  Tell me if that --

MR. JOHNSTON:  You're trying to get a sound bite, Stuart, that you think will assist you.  I think if you ask the question in a fair way --

MR. PACK:  This is a perfectly fair question.  First he tells me it's reasonable and objection -- objective, and then you tell me that it's how it applies to the applicant.

Q    (BY MR. PACK)  Now I'm trying to find out if you would expect that the applicant would answer the question to the best of his or her knowledge and belief, as it says under the heading Declarations.  That's all.

MR. JOHNSTON:  Yeah.

MR. PACK:  It's adequate.

MR. JOHNSTON:  Objection.

91

A    I guess when I'm reviewing an application, I expect that the -- the answers that the client gives -- I mean, those are the -- that's the only information I can use in order to, you know, do my job as far as placing him in a -- in a classification.  I would expect them to answer the questions, you know, truthfully, as -- you know, as best as they can.

Q    (BY MR. PACK)  Would you expect them to answer them in accordance with their belief as to what is true?

A    Well, I can't speak to their beliefs.  I -- I can only use what they indicate on the application.

Q    But as far as the standard, you were saying what you expect an applicant to do, would you expect that an applicant would be able to answer the question only to the best of his or her knowledge and belief?  How else could they answer it?

MR. JOHNSTON:  Well, I object.  He's previously testified, Stuart, as to the reasonableness of the standard that he applies.  I'm not sure how he -- else he can answer your question.  I don't know if there are any other

92

synonyms, I guess is my -- my problem.

Q    (BY MR. PACK)  Are you saying it doesn't matter what the applicant believes?

A    Well, I can't speak to what the applicant believes.  I can only go based on the facts that I receive as an underwriter.

Q    Well, then, what is the purpose, as you understand it as an underwriter, in asking the applicant to declare that he's given his -- that he answers the questions to the best of his knowledge and belief?  What's the purpose of that?

MR. JOHNSTON:  Objection; foundation.

Q    (BY MR. PACK)  You don't know?

A    I didn't write the application.

Q    You don't know?  You've been an underwriter.  You don't know what that means?

MR. JOHNSTON:  He said he didn't know.  Don't make him feel bad about not knowing an answer to your question.

MR. PACK:  I'm not trying to make him feel bad.

MR. JOHNSTON:  Okay.

Q    (BY MR. PACK)  You're telling me, as an underwriter, you don't know what that means, it has no meaning to you?  If that's your answer, that's