Alex Chu                     June 13, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

---

WEST COAST LIFE INSURANCE COMPANY,  )    No. 05-CV-1765-EWN-BNB
a Nebraska corporation,             )
                                    )
                Plaintiff,          )
                                    )
        v.                          )
                                    )
MARTHA HOAR, as the personal representative  )
of THE ESTATE OF STEPHEN M. BUTTS,  )
TELLURIDE PROPERTIES, LLC,          )
a Colorado limited company,         )
TELLURIDE PROPERTIES, INC.,         )
a Colorado corporation,             )
ALBERT D. ROER, an individual, and  )
POLLY LYCHEE, an individual,        )
                                    )
                Defendants.         )

---

 DEPOSITION OF
ALEX DUD-YIN CHU

Edmonton, Alberta, Canada
June 13, 2006

Volume 1

---

L. F. Johnston, Esq.        For the Plaintiff

Kara Veitch, Esq.           For the Defendants

Kori Janisse, CSR(A)        Realtime Reporter


DEFENDANT'S
EXHIBIT
A-9
05-cv-1765

Alex Chu                                    June 13, 2006

Page 18

to Mr. Butts?

A  Yes.

Q  Let me hand you what was previously been marked as Deposition Exhibit 6, which appears to be a Web page printout of an inspection request; is that right?

A  Yes.

Q  And it indicates that it is for Mr. Butts' life insurance, correct?

A  Correct.

Q  So is it correct that what we are seeing here as Exhibit 6 is the information that you obtained with respect to beginning your work on Mr. Butts' file?

A  Yes.

Q  If you'd take a look, it indicates the date of the request was October 7, 2004; is that correct?

A  Yes.

Q  Is that consistent with your recollection of the Butts case?

A  Yes, that is.

Q  And it has a number of check marks in the box that's labeled inspection services, the life, IR and business IR or BBR.  I take it that whoever at West Coast Life checked these boxes, that's

Page 19

not something that you checked.

A  That's ordered by the requester.

Q  In this instance who is the requester if you can tell?

A  It says David Kramar.

Q  So you understood that what was being asked of you was to conduct a life inspection report and a business inspection report; is that correct?

A  Yes.

Q  There are a number of other inspection or specialty services available such as an MBR spousal supplement, et cetera.  Do any of these other services involve questions to the applicant about his or her hazardous activities?

A  No.

Q  There are a number of names listed on Exhibit 6, one of them is Jackie Duhacek.  Do you see that name?

A  Yes.

Q  In connection with your work on the Butts case did you ever speak with Ms. Duhacek?

A  Not to my recollection.

Q  There's also a brokerage agency identified as Bachmann Brokerage.  Did you ever have any discussions with Bachmann Brokerage?

Page 20

A  Again, not to my recollection.

Q  There is an agent's name as Sharon Karls, did you have any discussion with Ms. Karls?

A  Again, not to my recollection.

Q  Mr. Kramar, did you have any discussions with Mr. Kramar?

A  Not to my recollection.

Q  Is the fact that you didn't have this type of discussions typical or atypical in the way that you typically do your work?

A  The reason that we would ever have discussions with any one of those individuals would typically be due to problems in reaching the client or reaching the applicant.

Q  So if for whatever reason you got a phone number that was disconnected or you simply couldn't get a call back from in this case Mr. Butts, you would contact who?

A  Our standard procedure would be to contact the agent of record first of all, and if the agent was not available then we would ensure that the requester was made aware.  And usually the requester is made aware of the status on the case if -- especially if it's, say, over two weeks old.

Page 21

Q  You indicated earlier a special attention section of the inspection request form.  Do you recall that testimony?

A  I'm sorry.  Can you repeat the question, please.

Q  Sure.  You mentioned earlier, I believe a section dealing with special attention.  There's a space on Exhibit Number 6 that is entitled "special instructions."  Do you see that?

A  Yes.

Q  And it's blank, right?

A  Yes.

Q  So in this case there weren't any -- there wasn't any indication about any particular areas that you were supposed to hone in on with respect to Mr. Butts; is that right?

A  Yes.

Q  Is the information that's contained in Exhibit 6 a fairly typical type of inspection request that you received from the insurance companies that you work with?

A  Yes.

EXHIBIT NUMBER 192:
INTERVIEW NOTES OF MR. CHU.

Q  MR. JOHNSTON:    Mr. Chu, let me hand you what's been marked as Deposition Exhibit 192.

Alex Chu                          June 13, 2006

Page 22

For the record this is Bates stamped Chu 00001 through Chu 00004. Can you identify what we're looking at here in Exhibit 192?

A  Yes. Those are my interview notes. Basically it's a word -- or a document on my computer that I would use to fill in as I interview an applicant.

Q  I take it that when you started work on Mr. Butts' case that Exhibit 192 was more or less just an outline of questions; is that right?

A  Yes. This is a typical standard, for me, a question sheet for when I interview clients.

Q  Do you have a different interview sheet for other insurance companies, or is this your typical or standard interview checklist?

A  This is the -- my standard checklist.

Q  Okay. Do you recall whether or not you conducted a telephonic or in-person interview with Mr. Butts?

A  It was done over the telephone.

Q  Is that unusual in your experience to conduct a telephone interview of a life insurance applicant?

A  It is typical that we interview them over the telephone.

Page 23

Q  How did you come up with the outline of questions or topics that are reflected in your interview notes in Deposition Exhibit 192?

A  The sections and the questions are provided by our company.

Q  I take it that when you first started back in 1993 you were provided with a template of standard questions to ask; is that right?

A  Yes.

Q  Is it correct that over the course of your career, 13 years as a life inspection reporter you have refined and developed what we are looking at here as Exhibit 192?

A  Yes.

Q  Does the -- has any insurance company during your career dictated to you what questions you were to ask an applicant?

A  No.

Q  So MetLife or Banner Life has never instructed you to ask particular questions; is that right?

A  That's correct.

Q  And again, what is your understanding as to why that doesn't happen, that is, why an insurance company doesn't dictate the questions that you are asking applicants?

Page 24

A  I suspect that it goes back to the whole idea of being independent and unbiased.

Q  In the present case does Exhibit 192 reflect your notes of your conversation with Mr. Butts as well as Ms. Barr and Mr. Kenning?

A  Yes.

Q  Were the notes that we see reflected on Exhibit 192 taken contemporaneously with your telephone interview of those individuals?

A  Can you explain?

Q  Contemporaneously? That is as you are asking the question and the interviewee, be it Mr. Butts or Ms. Barr or Mr. Kenning, you are typing those on your computer and that is now memorialized in what we are looking at in Exhibit 192?

A  That's correct.

Q  Are these interview notes which we have marked as Exhibit 192 kept in the ordinary course of your business at First Financial?

A  Yes.

Q  Take a look within Exhibit 192 to page Chu 00002, and there is a section called "lifestyle." Do you see that?

A  Yes.

Q  What is your understanding as to why you are

Page 25

asking questions about an applicant's lifestyle?

A  My understanding is that it pertains towards the relevant risk assessment of one's life.

Q  That is in the lifestyle section you are trying to determine whether or not a person engages in activities that might impact the risk assessment conducted by the life insurance company?

A  Yes.

Q  Do applicants sometimes have objections to answering lifestyle questions?

A  Yes.

Q  Which ones are most commonly objected to in your experience?

A  Typically it would have to do with drug usage or criminal convictions.

Q  Take a look at the box that's the -- what appears to be the last section of the lifestyle questions. It begins with a paragraph that begins "Any involvement." Do you see that?

A  Yes.

Q  What does this section of your notes reflect?

A  It reflects any engagement in hazardous type activities and any general activities that they may be involved with as far as, say, exercise or hobbies.

442e55e9-50ad-44e4-b980-e6bd270c2c11

Alex Chu                June 13, 2006

Page 25

asking questions about an applicant's lifestyle?

A  My understanding is that it pertains towards the relevant risk assessment of one's life.

Q  That is in the lifestyle section you are trying to determine whether or not a person engages in activities that might impact the risk assessment conducted by the life insurance company?

A  Yes.

Q  Do applicants sometimes have objections to answering lifestyle questions?

A  Yes.

Q  Which ones are most commonly objected to in your experience?

A  Typically it would have to do with drug usage or criminal convictions.

Q  Take a look at the box that's the -- what appears to be the last section of the lifestyle questions.  It begins with a paragraph that begins "Any involvement."  Do you see that?

A  Yes.

Q  What does this section of your notes reflect?

A  It reflects any engagement in hazardous type activities and any general activities that they may be involved with as far as, say, exercise or hobbies.

---

Alex Chu                June 13, 2006

Page 26

Q  Did you specifically ask Mr. Butts if he engaged if any hazardous activities?

A  Yes.

Q  What did he report to you?

A  He indicated that he was involved with private aviation as a pilot, and he also indicated that he is a certified scuba diver.

Q  Anything else on the hazardous activities question?

A  No.

Q  You mentioned that you also asked about general activities regarding exercise and hobbies.  Did you ask Mr. Butts if he engaged in exercise or hobbies?

A  Yes.

Q  What did he respond to?

A  He indicated that he skied and that he golfed.

Q  When Mr. Butts indicated that he was a private pilot, did you ask any follow-up questions to determine what type of pilot he was?

A  According to my notes it looks like I asked him approximately how many -- well, I asked him first of all when he obtained his license.  It looks like I asked him approximately how many hours he's had in command.  I asked him what type of

---

Alex Chu                June 13, 2006

Page 27

aircraft he flew, and he indicated two.  And I also asked him the percentage of time, if he could break it down into business versus pleasure flying.

Q  In connection, since this is what we have determined to be a standard form, do you ask applicants other than Mr. Butts whether or not they engage in private aviation?

A  I'm sorry.  Could you repeat that question.

Q  That's a bad question.  Let me ask you this: Have applicants ever told you that they ride or rode in helicopters when you asked them if they engaged in any private aviation?

A  To my recollection, yes.

Q  Did Mr. Butts indicate that he ever rode in helicopters?

A  No.

Q  In those instances when an applicant has told you that they rode in helicopters, have you asked follow-up questions to determine when they ride in helicopters and what they are doing when they are riding in helicopters?

A  Yes.

Q  I take it you didn't ask Mr. Butts about any helicopters because he didn't identify

---

Alex Chu                June 13, 2006

Page 28

helicopters when you asked him about whether or not he engaged in private aviation; is that right?

A  Yes.

Q  You stated that Mr. Butts indicated that he engaged in scuba diving in response to your question about hazardous activities; is that right?

A  Yes.

Q  Did you ask follow-up questions about Mr. Butts' scuba diving activities?

A  Yes.

Q  What kind of information did you ask him for?

A  According to my notes it looks like I asked him when he obtained his certification.  I asked him when his last dive was approximately and whether it was for pleasure and/or business, and he's a pleasure diver.

Q  With respect to both of the aviation information in the scuba diving information, did you satisfy yourself that you obtained enough information through your follow-up questions about those activities?

A  Yes.

Q  Has any insurance company ever provided you with

Alex Chu                June 13, 2006

Page 29

a list of hazardous activities to go through with an applicant?

A   No.

Q   Are you aware of any such list in existence?

A   I am not aware of any such list.

Q   Do you recall Mr. Butts ever voicing any concerns or questions about what was meant by the phrase "hazardous activities" when you posed that question to him?

A   To my recollection I do not believe he had any objections or concerns.

Q   He didn't ask you to define what "hazardous activities" meant?

A   No.

Q   In your experience, has a life insurance applicant identified heliskiing in response to your question about hazardous activities?

A   Yes.

Q   In those instances that they identified heliskiing, did you note that on your interview notes?

A   Yes.

Q   Why did you do that?

A   Heliskiing would be considered a hazardous activity.

Alex Chu                June 13, 2006

Page 30

Q   When you were speaking with Mr. Butts and asking him questions, did you have an expectation that he would identify those activities which a reasonable person would regard as hazardous?

A   I'm sorry. Would you repeat that will question, please.

Q   Sure. When you were interviewing Mr. Butts, did you have an expectation that Mr. Butts would identify in response to your questions those activities which a reasonable person would regard as hazardous?

A   Yes.

Q   In your 13 years as a life inspection reporter, have you ever utilized what at least you consider to be a exhaustive list of hazardous activities in conducting life inspection interviews of life applicants?

A   Have I?

Q   Yes.

A   No.

Q   Has any insurance company you have worked with over the 13 years that you have worked for First Financial ever dictated the way that you ask the hazardous activities question?

A   No.

Alex Chu                June 13, 2006

Page 31

Q   Does this go back to the issue of independence that we talked about earlier?

A   Yes.

Q   I want to turn to what appears to be -- well, let me ask you, was it a second line of questioning you asked Mr. Butts first do you engage in any hazardous activities or private aviation, and then he responded?

A   I asked him if he was involved with private aviation, scuba diving, skydiving or any hazardous activities, and then he answered the private aviation, and we went through the scuba diving and then those follow-up questions.

Q   Then is it correct that then you asked him whether you engaged in recreational activities or exercise activities?

A   Yes.

Q   What did he identify in response to those recreation/exercise questions?

A   He indicated that he was involved with skiing and golfing.

Q   Now, in your life inspection report which we have previously marked if this case as Deposition Exhibit 4 you indicated that Mr. Butts reported that he enjoyed skiing and golfing in his spare

Alex Chu                June 13, 2006

Page 32

time. Do you see that?

A   Yes.

Q   Did Mr. Butts -- well, the phrase "in his spare time," are those your words or words that he used?

A   Those are my words.

Q   Did you ask the question in such a way that you asked what type of recreation or exercise activities do you do in your spare time?

A   Yes.

Q   Did Mr. Butts voice any uncertainty as to the meaning of the phrase "recreation activities"?

A   To the best of my recollection I do not believe that he had any uncertainty.

Q   Did Mr. Butts voice any uncertainty as to the meaning of the phrase "exercise activities"?

A   Again, to the best of my recollection, I do not believe he did.

Q   He didn't ask any questions or ask you to define what you meant by recreation or exercise activities?

A   No.

Q   Did he ask you to define what you meant by hazardous activities question?

A   No.

Alex Chu                June 13, 2006

Page 37

questions of a business beneficiary report interviewee?

A  No.

Q  It wouldn't make sense?

A  Well, in this particular instance I had asked him questions in the personal section of the question.

Q  That's Mr. Butts, right?

A  Yes. But as far as the business beneficiary report questions, hazardous activities do not come into play there.

Q  The idea is to get the idea of financial condition of in this case Mr. Butts, right?

A  That's correct, in regards to the financial risk assessment on Telluride Properties.

Q  Now, on page Chu 00003 of Exhibit 192 there are some names of folks that I wanted to run through with you. The first is Tom Kenning. Do you see that?

A  Yes.

Q  Did you speak with Mr. Kenning in connection with Mr. Butts' business beneficiary report --

A  Yes.

Q  What information did you discuss with Mr. Kenning?

Alex Chu                June 13, 2006

Page 38

A  It looks like I confirmed the corporate affiliation at the First National Bank of Telluride for about ten years and that apparently Mr. Kenning had known Mr. Butts for 11 years. I'm not quite sure about those other dates there, but it looks like he said there has been to problems with corporate affiliation and that Mr. Butts was considered very honorable and reputable.

Q  Okay. And did you speak with Kathleen Barr?

A  Yes.

Q  Who did you understand Ms. Barr to be?

A  She is the corporate accountant for Telluride Properties.

Q  What information did you seek from Ms. Barr?

A  I confirmed that -- the ownership structure of Telluride Properties. It looks like I confirmed income that Mr. Butts had indicated, confirmed the fiscal year end to be December 31, and confirmed a net worth estimate on Telluride Properties at half a million.

Q  There's a third name, Albert Roer. Did you ever speak with Mr. Roer?

A  To the best of my recollection, no.

Q  Did you attempt to contact him?

Alex Chu                June 13, 2006

Page 39

A  Yes, I did.

Q  On how many occasions did you try to call Mr. Roer or did you call Mr. Roer?

A  I believe that I did leave at least one message for him in order to obtain financial statements.

Q  Did Mr. Roer ever call you back?

A  Again, to the best of my recollection, I don't recall.

Q  You don't recall him ever calling you back, or you don't recall whether he did or didn't?

A  I don't recall him ever calling me back.

Q  I take it that the information that you gained through your life inspection report and business beneficiary interview are coalesced or summarized in the your life inspection and financial inspection reports; is that right?

A  Yes.

Q  I will hand you what was previously marked in this case as Deposition Exhibit 4. Is this a copy of your life inspection report for Mr. Butts?

A  Yes.

Q  And on the first page of Exhibit 4 it indicates 26 questions. Are these questions that you specifically asked the applicant and the

Alex Chu                June 13, 2006

Page 40

applicant wrote in his answers?

A  No.

Q  Tell me what the enumerated questions and responses here on the first page of Exhibit 4 pertain to.

A  These questions I filled in based on my interview notes and conversation with Mr. Butts.

Q  Okay. Does the applicant ever see a copy of the life inspection report?

A  Typically, no.

Q  Did Mr. Butts request to see a copy of the life inspection report that you prepared for him?

A  No, I do not believe so.

Q  Drop down to on the first page of Exhibit 4, Question Number 24. Do you see that?

A  Yes.

Q  It reads (quoted):

"" Any participation in hazardous or extreme sports? (auto racing scuba, sky diving, mountain climbing etc)."

The answer that you put down was "yes."

A  Yes.

Q  Is that correct?

A  Yes.

Page 50

A   Again based on what I see here, after contacting the accountant and the banker and not having success with reaching Mr. Roer, I submitted -- I compiled the information into a report format and then I sent it to West Coast Life underwriting.

Q   Who else received a copy of that report?

A   It would be simply West Coast Life underwriting.

Q   Can an insurance company ask First Financial to do a follow-up interview or ask an applicant to answer additional questions?

A   Yes.

Q   How would an insurance company request that?

A   Typically a case coordinator or an underwriter would contact our company, and they would refer them to the inspector, in this particular case of course me, and they would ask me to recontact the applicant with what their -- what they wanted as far as specific questions.

Q   You said "typically." Does that mean insurance companies have in the past asked you to do follow-up or seek additional information?

MR. JOHNSTON:    Let me just object. I'm just going to object to the preamble, but I think Mr. Chu is going to clarify that for us.
                 OBJECTION TO QUESTION

Page 51

A   It doesn't happen often that an insurance company would ask us to recontact a client. The typical reason why that may occur is if there was something in my report that they wanted clarification on or they wanted elaboration on.

Q   MS. VEITCH:    If an insurance company asked you to do a follow-up, what would happen?

A   If they asked me to do a follow-up, I would recontact -- if they were wanting me to recontact the applicant, I would do so and ask them the questions that were provided by the insurance company.

Q   We'll turn to this specific matter. When did you first contact Mr. Butts?

A   I conducted the interview on the 12th. As to whether that was my first contact with him I can't say for sure. I might have left a message with him before that, but the interview, actual interview was conducted on the 12th of October.

Q   Of October 2004?

A   Yes.

Q   Before you were contacted by -- before you contacted Mr. Butts, can you please turn to Exhibit 6.

A   Okay.

Page 52

Q   And at the bottom it says "special instructions" section.

A   Yes.

Q   Can you just explain what that section is for?

MR. JOHNSTON:    Objection. Asked and answered.
                 But you can go ahead --
                 OBJECTION TO QUESTION

MS. VEITCH:    You can answer.

A   That is specific instructions by the requester or the underwriter. In this particular case it would be the people that worked for West Coast Life who would want me to pay special attention to any particular topic or subject on the matter of Mr. Butts.

Q   MS. VEITCH:    So if West Coast Life has questions as to what kind of activities Mr. Butts engaged in, they could indicate that in the special instructions section?

MR. JOHNSTON:    Objection. Hypothetical. Incomplete hypothetical, I apologize.
                 OBJECTION TO QUESTION

Q   MS. VEITCH:    You can answer, Mr. Chu.

A   Can you repeat the question, please.

Q   Sure. If an insurance company had -- if West

Page 53

Coast Life had questions as to what activities Mr. Butts engaged in, could they indicate that in the special instructions section of Exhibit 6?

MR. JOHNSTON:    Objection. Foundation.
                 OBJECTION TO QUESTION

Q   MS. VEITCH:    You can still answer that.

A   Yes.

Q   How many times did you speak with Mr. Butts?

A   To my recollection it was just the one time.

Q   I believe you said that the interview was conducted by telephone; is that correct?

A   Yes.

Q   Do you remember how long the interview took?

A   I don't know.

Q   Typically they last between 5 and 35 minutes; is that correct?

A   In this particular instance because a business beneficiary report was required as well, I would suspect it would be at least 15 to 20 minutes.

Q   Did you ask Mr. Butts about his hobbies?

A   The question that I asked him was regarding if he had any recreational activities or exercise that he would do in his spare time.

Q   Did you ask Mr. Butts about any of his avocations?

442e55e9-50ad-44e4-b980-e6bd270c2c11