IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 05-CV-1765-EWN-BNB

WEST COAST LIFE INSURANCE COMPANY, )
a Nebraska corporation, )
 )
        Plaintiff, )
 )
  vs. )
 )
MARTHA HOAR, as the personal representative)
of THE ESTATE OF STEPHEN M. BUTTS, )
TELLURIDE PROPERTIES, LLC, a Colorado )
limited liability company, TELLURIDE )
PROPERTIES, INC., a Colorado corporation, )
ALBERT D. ROER, an individual, and )
POLLY LYCHEE, an individual, )
 )
        Defendants. )
_____)

VIDEOTAPE DEPOSITION OF MARILYN REED

San Francisco, California

Thursday, June 1, 2006

Reported by:
DIANE M. GALLAGHER, RPR
CSR No. Michigan 2191
JOB No. 69289

---

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Civil Action No. 05-CV-1765-EWN-BNB

WEST COAST LIFE INSURANCE COMPANY, )
a Nebraska corporation, )
 )
        Plaintiff, )
 )
  vs. )
 )
MARTHA HOAR, as the personal representative)
of THE ESTATE OF STEPHEN M. BUTTS, )
TELLURIDE PROPERTIES, LLC, a Colorado )
limited liability company, TELLURIDE )
PROPERTIES, INC., a Colorado corporation, )
ALBERT D. ROER, an individual, and )
POLLY LYCHEE, an individual, )
 )
        Defendants. )
_____)

Videotape Deposition of MARILYN REED,
taken on behalf of Defendants, at 560 Mission
Street, Suite 3100, San Francisco, California,
beginning at 9:00 a.m., and ending at 12:12 p.m.,
Thursday, June 1, 2006; before DIANE GALLAGHER,
Certified Shorthand Reporter, Michigan No. 2191.

---

APPEARANCES:

For Plaintiff:
    HOLLAND & HART LLP
    BY:  LEE F. JOHNSTON
    Attorney at Law
    555 17th Street, Suite 3200
    Denver, CO  80202
    303-295-8562
    e-mail: ljohnston@hollandhart.com

For Defendants:

    ISAACSON ROSENBAUM, P.C.
    BY:  STUART PACK
    Attorney at Law
    633 17th Street, Suite 2200
    Denver, CO  80202
    303-256-3965
    e-mail: spack@ir-law.com

VIDEOGRAPHER:
Benjamin Gerald
Esquire Deposition Services
505 Sansome Street - 5th Floor
Sand Francisco, CA  94111

---

INDEX

| WITNESS | PAGE |
|---|---|
| MARILYN REED | |
| BY MR. PACK | 6, 114 |
| BY MR. JOHNSTON | 112, 115 |

\*        \*        \*

EXHIBITS

There were no exhibits marked.

\*        \*        \*

---

1 (Pages 1 to 4)



DEFENDANT'S
EXHIBIT
A-15
05-cv-1765

Q You don't know?
A I don't know any heli skiers that I know of.
Q So you don't know what people who have heli skied would think about whether it's dangerous or not. You know what people you might contact who haven't heli skied would think about the dangerous nature of heli skiing?
MR. JOHNSTON: Objection. Vague. Do you understand that? You might want to read that one back.
THE REPORTER: I want to make sure I have that.
MR. PACK: Are you not sure you got it. Read it back.
(Requested portion of the record was read by the reporter.)
Q (BY MR. PACK) You don't know what heli skiers would think about the danger level of heli skiing?
A I don't know what they think, but I know that they from -- from a certificate I saw that they sign waivers. I know that they are, that there can be some training involved. That's all. That's what I know.
Q All right. Let me ask you to turn to your Lotus Note memo 47, and prior to sending this e-mail --
A Uh-huh.
Q -- did you discuss the situation with anyone?

41

A Yes.
Q Who had you discussed it with?
A I discussed it with Steve Hetherington, and I discussed it, I think I ran it by Dale Moon, you know, just -- we have casual conversations.
Q Do you recall whether you spoke with Roger McIntyre about this?
A I don't recall that.
Q All right. Let me ask you to turn back, for a moment to tab 14 in the notebook, which is Deposition Exhibit 14, and this is a handwritten memo prepared apparently by Mr. McIntyre on March 16th of '05. Do you recall ever reading this before?
A I read it yesterday.
Q Okay. Do you believe that was the first time you might have read it?
A I can't remember.
Q Okay. Do you need to read it again to refresh your memory? You are welcome to. If not, I just want to ask you a question.
A Go ahead.
Q If you need to read it, take your time.
Do you recall discussing this memo, or Mr. McIntyre's assessment with Mr. Hetherington?
A No.

42

Q Okay. And I assume you don't recall speaking to Mr. McIntyre about this in March of '05?
A I don't recall that.
Q And who is Mr. Moon?
A He is, oh, my boss.
Q And do you know his title?
A I think he's senior vice president.
Q And do you, as vice president of underwriting, report to Mr. Moon?
A Yes.
Q What circumstances led to you and Mr. Moon discussing, to whatever extent you did, Mr. Butts' claim?
A It would be speculative. I don't recall talking to him, but I -- he will pop his head in the office, and I will tell him what's going on for the day, and I maybe ran it by him, the fact that we had this claim.
Q Are you telling me that you cannot tell me what you and Mr. Moon talked about?
A No. I can't remember the conversation.
Q Would it be fair to describe it as a casual conversation?
A Yes.
Q So it wouldn't have lasted more than a couple

43

minutes?
A Right.
Q Are there any written notes or memos that reflect that conversation that you are aware of?
A I am very sure there aren't.
Q All right. Let me ask you to go back now to Exhibit 47 in that notebook that's behind tab 47.
A Okay.
Q And do you need to read this or have you read this recently enough?
A I have read it.
Q Okay. And you say in the second sentence, We feel that on the helicopter skier -- is that referring to Mr. Butts?
A Yes.
Q That this claim should be contested in that a reasonable person should know that helicopter skiing out of bounds, territory, etc., are hazardous. The hazardous sports question should have been answered yes. Did I read that correctly?
A Yes.
Q When you say a reasonable person in that memo, what do you refer to? What is a reasonable person?
MR. JOHNSTON: If you can answer, go for it.
THE WITNESS: An average person. Normal

44

Esquire Deposition Services
800.770.3363

person.

Q   (BY MR. PACK)  Is that a normal person who has heli skied?

MR. JOHNSTON:   Objection. Vague.

Q   (BY MR. PACK)  I am asking, does the word that you  use, reasonable person, include persons who have heli skied?

A   I think that this is semantics, and I don't -- I would like for you to define reasonable.

Q   No.   These are the words you used and upon which the claim has been denied.  So I want to know --

A   What I am saying is that an average person in the public would, who, if they heard that someone was helicopter skiing, would think that it's dangerous.

Q   So you are, by that you are telling me it doesn't have to be someone who has had any experience with heli skiing?

A   Yes.   I would say so.

Q   All right.   And so it doesn't matter whether the applicant has a different set of experience and circumstances than the average person.  The applicant's answers are judged by the standards of an average person?

MR. JOHNSTON:   Objection.  That misstates her testimony.

45

MR. PACK:   Well, tell me what you are getting at, then.  I am trying to make sure I understand what you mean by an average person.

MR. JOHNSTON:   Well, she can tell you reasonable.   I mean, I think what you are asking, Stuart, is asking her for synonyms for reasonable; but if she can do any better than that, I don't know.

THE WITNESS:  A reasonable person knows, to my knowledge, that heli skiing is a dangerous sport.

Q   (BY MR. PACK)  And what do you base that on? Do you have any factual support as to what a reasonable or average person knows about heli skiing?

A   I just base it upon my experience.

Q   Okay.   What I am asking you is does the reasonable person also include people who have heli skied?

A   I don't know if they are reasonable or not.   I don't know.

Q   You don't know?

A   I would guess that a heli skier would know about the inherent dangers in what they are doing.

Q   Do you know whether or not a heli skier would believe that heli skiing is dangerous?

A   It doesn't matter what they believe.   It only matters that they heli-ski, and heli skiing is dangerous

46

to a reasonable person.

MR. PACK:  All right.   I am asking -- well, would you read back my question?  Listen to the question and see if you can answer it.  If you can't, you can't.

(Requested portion of the record was read by the reporter.)

MR. JOHNSTON:   Objection.

MR. PACK:   Do you know?

MR. JOHNSTON:   Foundation.  Calls for speculation.

THE WITNESS:   I can't answer that.

Q   (BY MR. PACK)  Because you don't know?

A   I can't answer it.

Q   Can you explain to me what you mean by I can't answer it?

A   Read the question one more time.

(Requested portion of the record was read by the reporter.)

MR. JOHNSTON:   Same objection.

MR. PACK:   You may answer, if you can.

THE WITNESS:  They should know that heli skiing is dangerous.

Q   (BY MR. PACK)  Should they believe that?

A   They should know it.

Q   I am asking you, do you know what their belief

47

would be?

A   No.  I don't know what their belief would be.

Q   And it would not be important to you what their belief was, just the fact that they heli skied would lead to following the underwriting manual guidelines?

A   A heli skier should know that heli skiing is dangerous.   Our question should have been answered yes. We should have had the privilege of underwriting knowing that he was doing a dangerous sport, and we would have rated the case based upon that, based upon sound underwriting principles, based upon the Swiss Re manual.

Q   And by rating the case means there would have been an additional premium charge?

A   Right.

MR. JOHNSTON:   Stuart, we've been going about an hour.  Do you want a break?

MR. PACK:   Let me just do one more thing and then we will take a break.

Q   (BY MR. PACK)  It says in the second sentence, we feel.  Who is the "we" you are referring to?

A   I believe that I discussed this case with Steve Hetherington.

Q   Would it also include Mr. Moon or not?

A   I don't know what I meant by we at that point. I know it would have included Steve

48

Esquire Deposition Services
800.770.3363

understand.

A  I don't understand. I thought I had answered it. I don't know how to answer it any better for you.

Q  I am trying to find out whether the applicant's belief as to the hazardous nature of skiing is an issue. It seems to me you are telling me that all heli skiers as well as the average person would know and believe that heli skiing is hazardous. Is that what you are telling me?

A  It doesn't matter what they believe. It matters that a reasonable person has knowledge that heli skiing has inherent danger in it, and we expect that they will truthfully answer our question in regard to hazardous sports or avocations.

Q  That's what I was trying to get at. What if an applicant truthfully believes from his experience and circumstances that heli skiing isn't hazardous?

A  I don't believe that a heli skier could have that belief.

Q  You just don't think that's possible?

A  No.

Q  Did you review any information from any of the friends and relations of Mr. Butts that suggested that they didn't think heli skiing was hazardous?

69

A  No.

Q  Are you aware that such information exists?

A  I think that there were a couple of other policies involved. I have not seen them or reviewed them or given an opinion on them.

Q  Have you seen any statements given by any friends, business associates or relations --

A  No. Sorry.

Q  -- excuse me, of Mr. Butts as to their belief as to whether heli skiing was hazardous or not?

A  No.

Q  And so you don't know whether there are heli skiers who believe that heli skiing is not hazardous? You don't know whether that exists or not. You are saying that everyone should know that, but you don't know whether or not there are people who don't think it's hazardous?

A  I don't -- it doesn't matter to me what their belief is.

Q  Okay. With regard to Question No. 5 in the application that's number 2, Exhibit 2, have you ever seen any definition of the term other hazardous avocation or hobby in the West Coast Life underwriting or claims materials that you have seen over your career?

A  If I wanted to know about other hazardous

70

avocations or hobbies, I might turn to the list in the Swiss Re manual, but we are asking the general public if, and relying upon what their answer is in what hazardous activity is, and we are giving them some examples, and we don't have -- I don't have or keep up to date any exhaustive list of every hazardous activity. There are many and they change all of the time.

Q  Is there any list that you have ever seen, whether up to date or not, that lists the hazardous avocations or activities as West Coast Life interprets that term, other than the underwriting manual?

A  No, no. No.

Q  And you are not aware, then, of any information that's given to an applicant to give them information as to what is included within the term other hazardous avocation or hobby?

A  No. I am not aware of anything.

MR. JOHNSTON:  Other than what's there.

THE WITNESS:  Other than what's --

Q  (BY MR. PACK)  Other than the question. The question is the question?

A  Uh-huh.

Q  How about any such information given to the agent who takes applications from applicants? Other than the language of Question 5, is there

71

any information given to those agents as to what is within the term other hazardous avocation or hobby.

A  The agent is asking the question and getting an answer, recording the answer. He's not giving advice as to the intent of the question.

Q  So the answer is that no such information is provided to the agent who writes the application as to what that term means?

A  I am not aware of any.

Q  How about to the person who does an interview after the application is submitted and prepares a report, such as this Exhibit 4 that we have looked at earlier? Do they get any definition or explanation of what's within the term other hazardous avocation or hobby?

A  They don't see our application.

Q  And so the answer is they don't get any additional information that tells them what other hazardous avocation or hobby is? They don't have that information one way or the other?

A  Not about our definition. I don't know what they get.

Q  So if no such information is given to the applicant, the agent, or the interviewer, how is the

72

Esquire Deposition Services
800.770.3363