IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO


WEST COAST LIFE                    )

INSURANCE COMPANY                  )

a Nebraska                         )

Corporation,                       )

      Plaintiff,              )

                              )

VS.                                )CIVIL ACTION NO:

                              )05-CV-1765-EWN-BNB

MARTHA HOAR, as the                )

personal representative )

of the estate of                   )

Stephen Butts, et al.,  ) DEPOSITION OF:

        Defendants.       GARY CARROLL


      S T I P U L A T I O N S

      IT IS STIPULATED AND AGREED, by

and between the parties through their

respective counsel, that the deposition

of:

              GARY CARROLL,

DEFENDANT'S EXHIBIT
A-18
05-cv-1765

2

(Pages 2 to 5)

Page 2

may be taken before Jennifer Roebuck, Commissioner and Notary Public, State at Large, at the Law Offices of Maynard, Cooper & Gale, 1901 6th Avenue North Birmingham, Alabama 35203, on the 22nd day of March, 2006, commencing at approximately 1:00 p.m.

IT IS FURTHER STIPULATED AND AGREED that the signature to and reading of the deposition by the witness is not waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of the trial, or at the time said deposition is offered in evidence, or prior thereto.

Page 4

INDEX
Examination by Mr. Pack          6
Examination by Mr. Johnston      160
Further Examination by Mr. Pack   164

EXHIBIT LIST
Defendant's Exhibit Number 31-A    154
Plaintiff's Exhibit Number 31-B    164

Page 3

APPEARANCES

FOR THE PLAINTIFF:
    LEE JOHNSTON
    HOLLAND & HART
    555 Seventeenth Street
    Suite 3200, P.O. Box 8749
    Denver, Colorado 80201

FOR THE DEFENDANTS:
    STUART PACK
    ISAACSON, ROSENBAUM
    633 17TH Street, Suite 2200
    Denver, Colorado 80202

Page 5

I, Jennifer Roebuck, a Court Reporter of Birmingham, Alabama, and a Notary Public for the State of Alabama at Large, acting as Commissioner, certify that on this date, as provided by the Federal Rules of Civil Procedure and the foregoing stipulation of counsel, there came before me on the 22nd day of April, 2006, at the law offices of Maynard Cooper & Gale, 1901 6th Avenue North, Birmingham, Alabama 35203, commencing at approximately 1:00 p.m., Gary Carroll, witness in the above cause, for oral examination, whereupon the following proceedings were had:

THE VIDEOGRAPHER: This begins Video Tape Number 1 in the deposition of Gary Carroll in the matter of West Coast Life Insurance Company versus Martha Hoar, et. al. Case Number 05CV-1765-EWN-BNB. We're on the record at 1:03 p.m. on Wednesday, March 22nd, 2006. This deposition is taking place at Maynard,

Fax: 205-251-4824          Bain & Associates Court Reporting Service, Inc.          Phone: 205-322-0592

(Pages 14 to 17)                                                                                    5

Page 14

claims that dealt with a policy issued by West Coast Life?

A    Yes, I have.

Q    I assume you've never been an employee, per se, of West Coast Life; is that correct?

A    Not per say, no.

Q    Okay.  Now, tell me what a utilization nurse and a case manager job involved as far as you were concerned?

A    At that time, Protective Life Insurance had a health product, a full-indemnity product, such as you see with Blue Cross/Blue Shield.  And when an individual would, say, get into the -- go into the hospital, we would monitor their condition via utilization review nurses to help certify their stay.  And if someone had a critical or catastrophic illness, we could get more personally involved via telephone and help set up care for them that might not be covered in the contract, but would still be best for the client.

Page 15

Q    And how long did you work in the utilization nursing and case management area?

A    Until April of 1996.

Q    And what job did you take at that point?

A    I took a job as the compliance officer for the individual life division.

Q    And what did you or do you do as a compliance officer for the individual life division?  What does that job entail?

A    The job has grown --

Q    All right.

A    -- since it started in 1996.  Are you asking what I did initially or what I'm doing now?

Q    Okay.  Are you -- are you still in that position as a compliance officer?

A    I'm the chief compliance officer now.

Q    When you started in 1996, did you have a different position within the compliance area?

Page 16

A    It -- it was the same position, but the sphere of accountability was smaller.

Q    All right.  Why don't you tell me what your job entailed at the outset, in April of 1996?

A    At the outset, it was to help ensure that the individual life division complied with applicable state, federal regulations and laws regarding our life insurance products.  And that entailed review of advertising, market conduct examinations, agent issues that would come up, multiple questions about different situations, and the issuing of a -- of a policy and what state regulations might apply in some particular case.

Q    At the outset, in April of '96, when you were doing those functions, were you involved in deciding whether life insurance policy claims would be paid or not paid by Protective or West Coast Life, as the case might be?

Page 17

A    Not at the outset, no.

Q    Have you come to become involved in determining whether claims are to be paid or not paid?

A    Yes.

Q    And about when did you start doing that kind of work?

A    Around 2000, I was involved in the claim committee and around 2002, I believe, in that general area, I became the chairman of the contestable claims committee.

Q    Are there two separate committees, a claim committee and a contestable claim committee, or is it just one committee?

A    It's one committee.

Q    All right.  What does it mean when you say that you became the chairman of the contestable claims committee?  Were you in charge of the entire claim committee or a subdivision of the claim committee that dealt with contestable claims?

6                                                                                    (Pages 18 to 21)

Page 18

A     I chaired the committee of the membership of the contestable claims only.

Q     Is there a claim committee that deals with claims that are not within the contestable period?

A     No.

Q     Does the same group of people who deal with contestable claims also make decisions on claims that are not contestable?

A     No.

Q     It's a different group that deals with non-contestable claims?

A     That's correct.

Q     All right. I am particularly interested in the year 2005, which is the year in which Mr. Butts' life claim was being processed by Protective Life and/or West Coast Life. So I'm particularly interested in you answering these questions with regard to the year 2005. Okay?

A     That's fine.

Q     Now, in the year 2005, do you

Page 19

recall that a claim, death claim on the life of Stephen Butts came before the contestable claim committee?

A     Yes.

Q     And you were the chairman of the committee at that time?

A     Yes.

Q     Who else participated as a member of the claim -- contestable claim committee in the year 2005 with regard to Mr. Butts' claim?

A     Arthur Tyson, Tracy DeFoor, and Bridgett Rucks.

Q     So at -- in this year 2005, there were four members of the contestable claim committee?

A     That's correct.

Q     Did all of the individuals that you just mentioned serve on the contestable claim committee throughout the year 2005, for the purpose of dealing with Mr. Butts' claim?

A     Correct. We had one member who

Page 20

resigned from the company in the year 2005.

Q     And who was that, sir?

A     Tracy DeFoor.

Q     Do you recall if she resigned after the decision was made to deny Mr. Butts' death claim?

A     She did.

Q     So all four of these individuals that you mentioned participated throughout the process that led to the denial of the claim?

A     They did.

Q     And there was no one else who participated as a member of the committee in the process of handling -- as part of the committee process of processing and deciding Mr. Butts' claim?

A     There were no other contestable claims committee members other than those I mentioned.

Q     Thank you. Now, there apparently was in the year 2005 another

Page 21

group of people who handled non-contestable claims? Did I misunderstand that?

A     There is an -- the claims processing area in Brentwood that handles claims in general that are non-contestable.

Q     All right. If there -- is there a committee that deals with claims that are not in the contestable period that meets as a committee to decide whether a claim not in the contestable period is to be paid or not?

A     None that I'm aware.

Q     Okay. So if someone were to say that a claim went to the claim committee, that would be the same as saying the claim went to the contestable claim committee; is that correct?

      MR. JOHNSTON: Objection. Go ahead.

A     As far as I know. But, you know, how someone refers to a claim committee is their own interpretation.

Q     Right. But --

(Pages 46 to 49)                                                                                        13

Page 46

claims, as well?

A    That is correct.

Q    So when Brentwood felt that there was either a West Coast Life or a Protective Life contestable claim that had been investigated to the point that it was ready to go to the claims committee, it would notify the claims committee of that fact?

A    That's correct.

Q    And who would be responsible in 2005 for actually getting the committee together at a certain time and date to meet?

A    Two people:  Arthur Tyson and Tracy DeFoor.

Q    And what would their roles be in actually scheduling a meeting?

A    They would either make a phone call or do an e-mail saying we've got so many claims to review, can you -- can we set a meeting for 9:00 o'clock?  And we would respond back if we could or couldn't

Page 47

until we could reach a time and we could all sit down and review the claim.

Q    Did Ms. Rucks participate in the scheduling of meetings of the claims committee?

A    Not -- no, not as a rule.

Q    So she would just be somebody who would respond as to her availability or lack of availability for a suggested meeting time?

A    That would be -- for the most part, yes.

Q    And with regard to Mr. Butts' claim, it appears that the decision to deny the claim was made in a meeting held approximately July 26th of 2005.  Does that seem consistent with your recollection?

A    That seems to be.  Of course, looking at the file --

Q    All right.  We'll get to the file.  But what I'm getting at is, do you recall the meeting at which a decision was made to deny the death claim submitted on

Page 48

behalf of Mr. Butts' policy?

A    The specific meeting itself, in detail, no.  Generally, yes.

Q    And do you recall how long the meeting took at which Mr. Butts' claim was discussed and ultimately denied?

A    I would not.  I would say this: That the claims committee had an opportunity and does take the opportunity to review the file individually before we meet as a committee so that we may have questions during the time -- most often would have questions -- which would be discussed in the meeting, and then a decision could be made to approve or decline or we need -- need a little more information or further investigation and meet again.

Q    So one of the options that was available to the claims committee was to say, "We need some additional information before we can make a decision"?

A    That is an option.

Page 49

Q    Now, do you recall that you received a claim file materials regarding Mr. Butts' death claim prior to meeting with the claim committee to discuss the claim?

A    Yes.

Q    Do you recall how long in advance of the meeting you got those materials?

A    No.

Q    Would we be talking the same day or days in advance --

A    Days --

Q    -- or you don't remember?

A    It would be days in advance, but I couldn't tell you how many.

Q    And was it your practice that if you had any questions as you were individually reviewing the file, that you might ask for additional information in advance of the meeting, or would you save all of your questions until the meeting?

A    It could happen either way.

14

Page 50

Q    Do you recall when you reviewed Mr. Butts' -- you did review Mr. Butts' file, claim file before you went to the meeting at which it was discussed?

A    I did.

Q    Do you recall that you had any questions or issues that you wanted to have clarified either before the meeting or at the meeting?

A    I -- I don't recall that.

Q    Do you recall at the meeting at which Mr. Butts' death claim was discussed and the decision made, if there were any other claims that were before the committee at that same meeting, other policies and other insured?

A    It is not uncommon for there to be more than one claim, but I cannot tell you if there was more than one claim at the time we reviewed Mr. Butts' claim.

Q    Is there any written record kept, notes, minutes, et cetera, of what happens during a claims committee meeting?

Page 51

A    If there are any scratch pad notes or whatever that are taken during a meeting, they're not kept. Quite frankly, once we get our questions answered or there's a plan for more investigation or whatever, then any notes of this nature or whatnot are discarded immediately.

Q    So in terms of any preserved written record of claims committee meetings, there is none, that you're aware of, with regard to Mr. Butts' policy?

A    Claim committee minutes, no. That would be correct. Is there -- there's information in the file generally, but no, there's no minutes.

Q    So there are no written records that would reflect what happened during the meeting, just the decision that resulted from the meeting; is that a fair understanding?

A    A written record would be like a decline letter?

Q    Right.  That would be the

Page 52

outcome. We have a decline letter, and we also have a sign-off letter -- I believe you're one of the signatories --

A    Right.

Q    -- we'll look at it -- that you agreed with the decision to decline.

A    Right.

Q    Other than the decline letter and the sign-off, that that's what you felt should be done, is there any other record, written record, that you're aware of, of what happened during the actual claims committee meeting at which Mr. Butts' claim was being discussed?

A    None that I recall.

Q    And I assume you don't recall seeing any in your conversations with your counsel, a document like that?

A    I don't recall seeing any documents like that.

Q    Other than reviewing the materials that were submitted to you as part of your work on the claims committee

Page 53

and reading them and then attending the meeting at which a decision was made, did you do any other work on the Butts death claim; reviewing the materials, going to the meeting, and participating in the decision?

A    None that I recall.

Q    Once the -- let me try that over again.

Who has the final decision-making authority as to whether a West Coast Life Insurance death claim like Mr. Butts' is paid or not paid?

A    The contestable claims committee.

Q    When the contestable claims committee makes a decision, as it did with Mr. Butts, to deny the claim, does that have to be reviewed or approved by anyone else or any other group of individuals, that you know of?

A    No, none that I'm aware of.

Q    Okay.  Once the decision had

(Pages 86 to 89)                                                           23

Page 86

believed? Do you recall without looking at any documents?

A    What he was asked on his application?

Q    Yes, sir.

A    The application did not talk about a reasonable person.

Q    Okay. Do you recall that the application asked Mr. Butts to answer the questions with full, complete, and true knowledge and belief? Do you recall if that was the standard?

A    I recall that being in the application.

Q    All right. So would you think that Mr. Butts' belief as to whether helicopter skiing was a hazardous avocation or hobby was something that needed to be considered in deciding whether or not the claim should be paid?

A    From --

Q    From Mr. Butts' belief.

A    From Mr. Butts' belief?

Page 87

Q    Right.

A    Well, of course, we're not in Mr. Butts' head.

Q    That's correct.

A    So we have to make an assumption that when an individual looks down at a piece of paper, particularly an individual who is a very sophisticated individual, highly knowledgeable individual, and he looks down at a sheet of paper and it talks to him about all the dangers that are readily apparent in a particular sport and it's -- in this paper, it's seeking to disclaim liability of the company providing that sport for him to enjoy, that he would have to know, he would have to believe that that, indeed, is a hazardous activity.

Q    Because a person, and particularly Mr. Butts, signed a waiver of liability to Selkirk Tangiers, does that tell you whether he believed that the sport was hazardous or simply that he was going to release Selkirk Tangiers from liability

Page 88

resulting from the activity?

MR. JOHNSTON: Objection. Asked and answered.

Q    (By Mr. Pack) That's not asked and answered. It's a totally different question. But please answer it as best as you can. It --

A    Could you repeat the question?

Q    Yes. Does the fact that Mr. Butts signed a waiver or release of liability of Selkirk Tangiers tell you whether he believed that the sport was hazardous or simply that he was waiving liability resulting from participating in that activity?

MR. JOHNSTON: I object to the extent it mischaracterizes the Selkirk Tangier acknowledgment and waiver of liability.

Q    You may answer.

A    It is what it is.

Q    Well, I'm --

A    I mean, it is -- it says what it

Page 89

says, and it is what it is. And anyone who would sit down and review that -- and review that document would come to the conclusion, a reasonable conclusion that that was a hazardous activity.

Q    Let me ask you to take a look at Deposition Exhibit Number 2, which is the application, or at least some of the pages from the application.

A    Okay.

Q    And just so that we're clear, I would like for you to look at the last page, page marked WCL-195.

A    Okay.

Q    Similar verbiage appears on the second page, WCL-027. And there is a heading there that says "Declarations."

A    Uh-huh.

Q    And it's very difficult to read, but I'll read the preamble before the fore-numbered paragraph: "I (we) represent that all statements and answers made in all parts of this application are full,

Page 90

complete, and true to the best of my knowledge and belief." Do you see that?

A    Uh-huh.

Q    Would you agree that that declaration, as indicated by the applicant signing it, asks the applicant to answer the questions with regard to his knowledge and his belief?

A    That's what -- that's what it says.

Q    All right. So you would agree, then, that belief is important in judging the truthfulness of the answer given by an applicant in response to the questions on the application?

MR. JOHNSTON: Objection to the extent it calls for a legal conclusion.

A    And it is speculative. It's knowledge.

Q    Well --

MR. JOHNSTON: That's right.

Q    You're saying belief doesn't matter there?

Page 91

A    Knowledge, it's -- I'm looking at both words. I'm looking at "knowledge" and "belief."

Q    All right. So you would say that anyone that knew that they heli-skied would have to believe that it was hazardous? Is that your opinion?

A    You're asking my opinion on that. And anyone who heli-skied, had knowledge of heli-skiing, had signed those waivers, in my opinion, would have to believe that it was a hazardous activity.

Q    In other words, you are assuming that you know what Mr. Butts believed because you think any person would believe that? Is that essentially what you're telling me?

MR. JOHNSTON: Objection. It mischaracterizes his testimony.

A    It does mischaracterize it.

Q    Well, then, correct it. I'm trying to understand.

MR. JOHNSTON: No. He just told

Page 92

you, Stewart.

MR. PACK: I'm allowed to get a clarification. I'm allowed to get a clarification. He told me I mischaracterized it, so now I'm going to try to get a correct characterization. Eventually, he'll tell me.

MR. JOHNSTON: He did tell you. That's the thing.

MR. PACK: Well, no, he didn't tell me this.

Q    (By Mr. Pack) Are you saying, in other words, that any reasonable person who knew that they heli-skied would also believe that it was hazardous?

A    In the -- in these circumstances, in these exact circumstances, where an individual would hire a company to take them heli-skiing and present to them this form of waiver which detailed to an individual, to a sophisticated individual, the dangers that they are -- could and may and likely may

Page 93

encounter would believe that they are participating in a hazardous activity.

Q    So you are saying that you know because Mr. Butts signed a number of releases to Selkirk Tangiers and we know he heli-skied, he knew he heli-skied, that he therefore believed it was hazardous?

MR. JOHNSTON: Objection.

Q    (By Mr. Pack) That's your opinion?

MR. JOHNSTON: It mischaracterizes the testimony.

A    I gave my opinion, and it is what it is.

Q    It is what it is if you tell me. Do you believe --

MR. JOHNSTON: He did.

Q    (By Mr. Pack) Do you believe -- do you know that Mr. Butts believed that helicopter skiing was hazardous?

MR. JOHNSTON: I would like to just have the prior answer -- a couple of questions back, the answer read back. And

(Pages 94 to 97)                                                                          25

**Page 94**

I think it's going to show you've asked this question three times, Stewart. He's given you the same answer three times.

MR. PACK: It's not the same question.

MR. JOHNSTON: It is. I want to take a break, and I want to listen -- hear the question.

MR. PACK: Okay. Let's do it.

COURT REPORTER: Take a break?

MR. PACK: No.

MR. JOHNSTON: No.

MR. PACK: We're going to stay on the record.

(Record read.)

Q     (By Mr. Pack) And my question is, just to make sure that you answered it, you know that Mr. Butts believed that heli-skiing was a hazardous avocation or hobby?

A     What I'm saying is that any individual under these exact same circumstances who was presented with these authorizations detailing the dangers of

**Page 95**

what they would likely encounter in this sport would know that they were participating in a hazardous activity.

Q     So you've now told me what you think any reasonable person would know based upon the release. Do you know what Mr. Butts believed as opposed to what he knew about the dangers of helicopter skiing?

A     I really don't know how to answer the question any other way than I have answered it.

Q     So you can't tell me whether you know or don't know what Mr. Butts believed about whether helicopter skiing was a hazardous avocation or hobby within the meaning of Question 5 of the application? You don't know what he believed?

A     I think I have provided a more than adequate answer to the question.

Q     And that's the best answer you can give me?

A     That is.

**Page 96**

Q     All right. Fine. Do you know anything about Mr. Butts' skill level as a skier?

A     Only what was reviewed in the file.

Q     All right. And do you recall what that was?

A     What was reviewed in the file was that -- revealed in the file that he was an experienced skier. But you're talking about skiing. You're not talking about heli-skiing. You're talking about skiing.

Q     What is the distinction in your mind that you're making between heli-skiing and skiing?

A     The distinction between heli-skiing and skiing is -- seems pretty obvious to me. But when you're skiing down a slope which is -- I'm not a skier myself, so I'm not sure the terms that I could use here. But I know that if you're being taken up in a helicopter and being dropped

**Page 97**

off on a mountain on an uncharted course, that is not, to me, skiing. That is heli-skiing, which apparently is recognized as a separate sport or activity, separate and distinct from skiing.

Q     What is the basis for you saying that heli-skiing is recognized as a separate sport or activity from skiing?

A     Because there is a company that provides that unique service, which he took advantage of, and that's what they do.

Q     And so that tells you that heli-skiing is something different than skiing?

A     Well, that tells me that there is a company that provides a very unique service that's very different from people who go to Colorado or other places, ride up in a ski lift, and go skiing.

Q     Do you know whether or not Mr. Butts believed that there was a distinction between heli-skiing and skiing? Do you have any information on that?

A     No.

26

(Pages 98 to 101)

Page 98

Q      Do you know whether West Coast Life uses the Swiss Re underwriting manual in underwriting policies?

A      I answered the question earlier. I can't remember if it's Swiss Re or the Cologne manual.

Q      Did you speak to anyone in underwriting regarding the manual they used in underwriting Mr. Butts' policy?

A      No, I did not.

Q      Do you know whether or not the underwriting manual used by West Coast Life breaks down skiing into five or six different categories?

A      I do not know.

Q      Let me ask you to take a look -- and I'll hand it to you -- to Deposition Exhibit Number 9, which I'll represent to you is a page from the Swiss Re underwriting manual used by West Coast Life at the time that Mr. Butts' policy was being underwritten. And do you see that there is a heading toward the middle that

Page 99

says "Skiing"?

A      Uh-huh.

Q      And under that, it's got a number of different types of skiing --

A      Uh-huh.

Q      -- before it gets to snow boarding. Do you see that?

A      I do.

Q      And do you see that some types of skiing are considered standard, STD, and others have "Standard" or a price next to it?

A      That's correct.

Q      Do you recognize or understand that heli-skiing indicates that there is an additional price of $2.50 per thousand?

A      I see that.

Q      Okay. And that's what you would understand those words to mean?

A      Yes.

Q      All right. Do you know if there is any definition that you've seen written with regard to Protective Life or West

Page 100

Coast Life defining what a hazardous activity is?

A      We have a question that addresses certain recognized hazardous activities, but it does not contemplate all hazardous activities.

Q      All right. So I assume you're referring to the application Question Number 2 (sic) --

A      That's correct.

Q      Actually, Deposition Exhibit 2, Question Number 5.

A      Uh-huh.

Q      And that lists certain activities, and then it says "Other Hazardous Avocation or Hobby."

A      Uh-huh.

Q      Are you aware of any definition either at West Coast Life or Protective Life as to what activities would fit within the category other hazardous avocation or hobby within the meaning of that question?

A      There is nothing -- no standards

Page 101

that are written to question -- it is what it is, and it depends on the truthfulness of the person answering the question.

Q      Does it depend on their truthfulness or their belief as to what is hazardous or not?

A      Well, it depends on partly their knowledge and partly their belief.

Q      All right. So their belief may impact how they answer in response to the words "Other Hazardous Avocation or Hobby"? Their belief would be a factor there?

A      Belief is a factor.

Q      All right. Now, have you seen any materials that are provided to an applicant to give an applicant guidance as to what is meant by "other hazardous avocation or hobby"?

A      No.

Q      Are you aware of any materials that are given either to the agent who takes the application that tells the agent