## Compressed Transcript

# WEST COAST LIFE INSURANCE

# VS.

# HOAR

**Deposition**

**BRIDGETT RUCKS**

**04/25/2006**



DEFENDANT'S
EXHIBIT
A-19
05-cv-1765

AGREN·BLANDO COURT REPORTING & VIDEO

25

A    Kathy for several years had some direct responsibility for the claims committee.

Q    And do you recall if Ms. Britton had direct responsibility for the claims committee in the year 2005, or was it prior or subsequent to that?

A    It was prior to that, I believe.

Q    So by the time the year 2005 rolled around, Ms. Britton was not -- did not have a direct responsibility for the claims committee, as far as you know?

A    That's correct.

Q    Was there anyone else that had responsibility for the claims committee in the year 2005 other than the people who were members of the committee?

A    I believe that Arthur's direct boss would have some organizational responsibility.

Q    And Arthur is Arthur Tyson?

A    Arthur Tyson, uh-huh.

Q    Do you know who the boss is that you said was Mr. Tyson's boss who might have some organizational responsibility?

A    I'm having a memory lapse of Wayne's last name at the moment, but --

26

Q    Wayne Hall, is that --

A    Wayne Hall, thank you.

Q    Did Mr. Hall, to your knowledge, attend any meetings of the claims committee in the year 2005?

A    No.

Q    In the year 2005, do you recall who were the members of the claims committee?

A    Myself, Arthur Tyson, Gary Carroll, Tracy DeFoor, and we have some adjunct members.

Q    And what does that mean, an adjunct member?

A    In the event that one of the regular members is not available for some length of time, then other people are authorized to sign claims.

Q    Do you recall for the year 2005 who the adjunct members were?

A    The one that I do know would be Jan Brown.

Q    Do you have any recollection of the claims committee's activities with regard to the claim on Stephen Butts' life insurance policy?

A    Do I have any recollection of --

Q    Sure. Do you recollect -- do you have any recollection of the claims committee's work on

27

the Stephen Butts' death claim?

A    I know that we reviewed it, and we met and discussed the facts on multiple occasions.

Q    Do you recall if there were any notes or records or minutes kept of the meetings held by the claims committee at which Mr. Butts' life claim was discussed?

A    I'm not aware of anything like that.

Q    Are you aware that a letter was sent to the beneficiaries under that policy, informing them of the decision not to pay the claim? Do you -- do you have any recollection of that happening?

A    I know a letter was written. I'm not sure what the disposition of it was.

Q    Do you remember the outcome of the meetings that you said you did have some recollection at which the facts of the Butts' death claim were discussed? Do you remember the decision being made?

A    I do.

Q    Do you remember when the decision was made?

A    I don't remember the date.

Q    Can you give me an approximation, an estimate of when that took place?

28

A    I think it was early summer.

Q    Are we talking the year 2005?

A    Uh-huh. Yes.

Q    Thank you.
Do you recall the meeting at which the final decision was made with regard to the Butts' policy?

A    I believe it was in July.

Q    And do you recall who attended that meeting?

A    The four regular members.

Q    Including yourself?

A    Yes.

Q    Do you recall whether there were any other claims discussed at that meeting other than Mr. Butts'?

A    I don't recall, but I don't think so.

Q    Can you relate to me what you recall of the discussion that took place at the meeting at which the decision was made not to pay Mr. Butts' claim?

A    I -- I can't recall any of the specifics.

Q    Can you recall what the basis was that led the committee to decide to decline paying the policy claim?

AGREN·BLANDO COURT REPORTING & VIDEO

---

37

signing off on it.

Q   Do you have any recollection of participating yourself in drafting the letter to the beneficiaries of the Butts policy?

A   I -- I did not.

Q   Would -- do you recall seeing that letter prior to its being sent to the beneficiaries?

A   I don't recall reviewing it.

Q   Would it be customary that you would review it or customary that you would not review such letters?

MR. JOHNSTON:  If there is a customary practice.

A   Yeah, I -- it varies.

Q   (BY MR. PACK)  But with regard to Mr. Butts, you don't have a recollection one way or the other whether you saw it before it was sent out?

A   No, I don't.  I don't recall.

Q   Okay.  Just try to wait until I finish if you can.

A   Okay.

Q   To your knowledge, was the Butts death claim ever approved by West Coast Life prior to the summer 2005 meeting at which the decision was made

---

38

to decline the claim?

A   You're asking did West Coast approve the policy or the --

Q   The claim.

A   -- the claim.

Q   Let me -- let me try the question again.

A   Okay.

Q   So -- make sure that it's clear to you.

A   Okay.

Q   Have you ever heard or did you have any knowledge that prior to the summer of 2005, when the claim committee met and decided not to pay the Butts claim, had you ever heard or have any information that a decision to pay the claim had been made?

A   No.  That would only be a decision that the claims committee could make.

Q   So, to the best of your recollection, the claims committee never made a decision to pay the Butts claim.

A   That's correct.

Q   I'm going to show you what's been marked as Deposition Exhibit 2, and ask you if you've ever seen that document before.

A   Yes.

---

39

Q   What do you -- what do you recognize Deposition Exhibit 2 to be?

A   That is an application for insurance.

Q   Specifically, this is Mr. Butts' application --

A   It is.

Q   -- for the life policy that we're discussing?

A   Yes, it is.

Q   Do you recall reviewing this during the year 2005?

A   Yes, I do.

Q   All right.  Let me direct your attention to the second page.  In the lower right-hand corner you'll see a number WCL 00272.  Do you see that?

A   I do.

Q   Those are numbers that have been placed on various documents during the course of the lawsuit so that we can find the pages more easily. It's like page numbers.  Okay?

A   Okay.

Q   It's not part of the document, per se. On WCL 00272, up in Section IV, there's a Question No. 5.  Do you see that?

A   I do.

---

40

Q   All right.  And it talks there about various activities, and it says at the end of it, "or other hazardous avocation or hobby."  Do you see that phrase?

A   I do.

Q   All right.  Have you ever seen any definition or explanation of what an "other hazardous avocation or hobby" is within the context of that Question No. 5 during the time that you've been with Protective Life?

A   Not a specific definition.

Q   Okay.  Have you seen a general definition?

A   I have not seen one, but we've discussed, you know, that it -- it's inclusive of things that most of us, most people would reasonably believe to be hazardous.

Q   Okay.  So your understanding of -- of the meaning of that phrase is that it's what most reasonable people would consider a hazardous avocation or hobby?

A   Right.

Q   Okay.  But you have never seen any explanation of what most people would specifically consider to be a hazardous activity; is that

---

AGREN·BLANDO COURT REPORTING & VIDEO

41

correct?

A   I have not seen a written definition.

Q   Okay.  So I assume, in addition to a written definition, you haven't seen any list of activities that would indicate that that -- that those are other hazardous avocations or hobbies within the meaning of Question 5?

A   I have not, but the underwriter may have that.  I do not know.

Q   But as far as you're concerned, you've never seen such a thing?

A   No, but -- but I -- I would know to question or recognize or identify if something might fit that definition.

Q   And how would you know if something might fit that depo- -- that definition?  What would be your basis for knowing that?

A   My experience.

Q   Your -- your everyday experience as a person?

A   And working with life insurance.

Q   Have you ever while sitting on the claims committee dealt with a claim that involved skiing of any type?

A   I don't recall any specific one.

42

Q   Prior to the Butts claim, do you recall as a claims committee member ever dealing with a claim that involved heli skiing?

A   No, I have not.

Q   So this was the first time that that particular issue came up for the claims committee?

A   That is true.

Q   Do you have any information as to whether the average person or a reasonable person would make a distinction between skiing and heli skiing as being an "other hazardous avocation or hobby" within the context of Question 5?  Do you have any information on that, other than your personal opinion?

A   I know that the committee, you know, as diverse as it -- as it is, felt that it was a distinction, a very clear distinction.

Q   And do you know the basis upon the -- upon which the committee arrived at the conclusion that there was a distinction between skiing and heli skiing?

A   I think we understood enough about traditional skiing being under controlled conditions, versus heli skiing being in less controlled, less predictable circumstances.  I

43

think we knew that it did entail signing a different type of release, and carried a higher risk.

Q   And how did the committee inform itself of those facts?

A   Well, I think it was our job to identify that it indeed might merit a higher risk assessment, and that was our job to ask the underwriter whether that was true.

Q   Did you make any effort to find out what Mr. Butts' belief was as to whether or not heli skiing fit within the phrase "other hazardous avocation or hobby," Question 5 on the application?

A   Our job wasn't to ascertain a specific person's belief, but what -- what would be a reasonable objective person's interpretation of the question.

Q   So your recollection of the committee's decision-making process was to look at the average, customary, reasonable person's view of what is a hazardous avocation or hobby rather than what Mr. Butts may or may not have thought about that; is that -- is that what you're telling me?

A   The test really is for us to -- to determine, would a reasonable person make that

44

distinction between regular skiing and -- and heli skiing.

Q   And where did you or the committee as a whole get the standard of looking to a reasonable person's view of what a hazardous avocation or hobby would be within the context of Question 5?  How did you arrive at that standard?

A   I think that is the standard for any kind of contract or legal document.

Q   At least you felt that's what the committee generally believed?

A   Uh-huh.

Q   As you --

A   Yes.

Q   As you recalled the discussion that day in the summer of 2005?

A   Yes.

Q   Okay.

A   And earlier.

Q   All right.  Let me ask you -- you can keep Exhibit 2 in front of you if you'd like, and turn, if you would, to WCL 00273, which is a couple -- a page back from where you just were.

A   273?

Q   Yeah, 00273.

AGREN-BLANDO COURT REPORTING & VIDEO

45

A    It's actually the next page; is that correct?

Q    It's the next page, okay.  Very good. I'm going to direct your attention to -- to a portion that's very hard to read under the word Declarations in the middle of the page.  Do you see where I'm talking about?

A    I do.

Q    Okay.  To try to make it a little easier, let me ask you to turn -- you can keep that -- your hand in place there if you like -- to please turn to Deposition Exhibit 1, which is behind Tab 1 in the notebook, and I'm just going to show -- direct your attention to a better copy of that page.  If you go to the page, it's the second page of the exhibit, and it says Fish Schulkamp 00091.  Do you see that page?

A    I do.

Q    And you see the heading Declarations?

A    Uh-huh.

Q    Okay.  And under that it says we or I "represent that all statements and answers made in all parts of this application are full, complete and true to the best of my (our) knowledge and belief."  Do you see that?

46

A    I do.

Q    All right.  Is that a portion of the application that you were aware of as being part of Mr. Butts' application when the decision was made in the summer of 2005 to decline the policy claim?

A    Yes.

Q    Okay.  Was there any discussion that you recall by the claims committee as to what Mr. Butts' belief might be with regard to heli skiing being hazardous or not?

A    I don't remember specific discussion, but it is typical that we look at the declarations, and we do ask ourselves, you know, is it -- is it a reasonable standard to apply.

Q    And the reasonable standard goes to your perception of what the reasonable or customary person would say was or was not a hazardous activity.

A    Right.

Q    Okay.  And was there any review of information in the claim file that you recall during this meeting in the summer of 2005 as to what people who knew Mr. Butts felt his belief would be as to the hazardous nature of heli skiing?

A    No.  That would not be something that we

47

would look at.  It would be what a reasonable person overall.

Q    Was there any discussion of Mr. Butts' level of skill; the fact that he was an expert skier, according to various people, was that a relevant factor that was discussed at the claims committee meeting?

A    It would not have been relevant.

Q    Would the fact that Mr. Butts had heli skied on five, six, or maybe more occasions without incident, was that a factor that was discussed in determining whether or not he believed that heli skiing was hazardous or not?  Do you recall that being part of the discussion?

A    Skill would not have been part of the discussion.

Q    Okay.  What about experience with heli skiing?

A    Or experience.

Q    That would also be --

A    Our understanding --

Q    Sorry.  Go ahead.

A    I apologize.  My -- our understanding again would have been that the activity itself, you know, had elements that were beyond the control of

48

the -- the person doing it.

Q    And that would be the most important factor for the committee, looking at the activity itself?

A    I don't know that it's the most important element, but it is an important element.

Q    And that would be viewed from a more or less objective standard, as opposed to the subjective standard of Mr. Butts' view?

A    We would be looking at it objectively.

Q    Okay.

MR. PACK:  Why don't we take a break, I see that our tape is running low, so why don't we take a break.  We've been going about an hour.

THE DEPONENT:  Okay.

MR. PACK:  We'll just take a little break for comfort and get up and stretch.  Thank you very much.

THE DEPONENT:  Thank you.

THE VIDEOGRAPHER:  We're going off the record, the time is approximately 10:01.  This is the end of Tape 1, to be followed by Tape 2.

(Recess taken)

THE VIDEOGRAPHER:  We're back on the record.  The time is approximately 10:18.  This

AGREN·BLANDO COURT REPORTING & VIDEO

81

Q   Let me ask you to turn to Tab 31, and behind that you'll find Deposition Exhibit 31. And this appears to be an e-mail from Susan Heatherly to a variety of people, and that you are listed as one of the people who were copied on it.

A   Uh-huh.

Q   Do you see that?

A   I do.

Q   All right. And behind that is a variety of information from Selkirk Tangiers. Do you recall receiving this information as part of your work on the claims committee?

A   I would have gotten the message, and the attachment I would have reviewed, yes.

Q   What was the purpose in continuing to review information that came into the company after the decision had been made?

A   We would also want to -- we would always want to look at -- at any additional information that we receive on a -- on a case, no matter of the timing.

Q   All right. Let me ask you to turn to Deposition Exhibit 33, which is behind Tab 33. Do you recognize this form, which at the top says Contestable Claim being handled by SH Investigative

82

Firm?

A   Yes.

Q   Okay. Is this a document that was made available to you while you were working on the claim?

A   Yes.

Q   All right. There are various entries under the Comments section. Some have initials, some don't. Would you take a moment and look at those, tell me if there are any that you provided to this form as the author or assisted in providing?

A   No, there's nothing that I -- that I added.

Q   Let me ask you to turn to the next page, and it says at the top, Life Benefits Worksheet. Do you see that?

A   Yes.

Q   And at the bottom, under a line, it says "To Claims Committee." Do you see that?

A   Yes.

Q   And below that there are three signatures. Do you see that?

A   Yes, I do.

Q   Is the first signature yours?

83

A   It is.

Q   All right. And to the left of your signature there's the date July 26, 2005. Do you see that?

A   Yes.

Q   Would that indicate to you the date of the meeting at which the claims committee decided not to pay Mr. Butts' claim?

A   That was our -- our final meeting, yes.

Q   Okay. So when we were saying the meeting held in the summer of 2005, we're actually talking about this July 26, 2005 meeting.

A   Yes.

Q   Let me ask you to turn to the next page, which is a letter on West Coast Life letterhead dated July 27th, directed to Telluride Properties. Do you see that?

A   Yes, I do.

Q   It's a two-page letter. Take whatever time you -- and read to whatever extent you want. Do you recall seeing this letter in July or -- or August of 2005?

A   I don't recall seeing it.

Q   Okay.

A   But it -- yeah.

84

Q   Have you read it sufficiently to answer this question, and if you need some time -- the letter appears to indicate that the reason for denying the claim was a failure to disclose heli skiing activity in the Selkirk Mountains prior to the issuance of a policy. Is that -- is that the reason for the denial of the claim?

A   Yes.

Q   Is there any other reason other than the failure to disclose heli skiing that was the basis for denying the claim?

A   No.

Q   Let me ask you to please turn back to Deposition Exhibit 4, which was the First Financial Underwriting Services inspection report. I think you need to go back a little further. There you go.

Okay. On the first page, in the second line from the bottom, it says, "Inspector: Alex Chu." Do you see that?

A   Yes.

Q   Do you recall anyone on the claims committee discussing whether Alex Chu should be contacted to find out what the discussion was between himself and Mr. Butts regarding skiing and

AGREN·BLANDO COURT REPORTING & VIDEO

85

golfing, as reflected in his report?

A   I don't recall that being discussed.

Q   And certainly you never requested that Mr. Chu be contacted?

A   No.

Q   Are you aware of any statistical data that compares the risk of heli skiing with ordinary skiing?

A   Not personally.

Q   Okay.  And you don't recall that being a topic of discussion of the claims committee while working on the Butts claim?

A   Not explicitly, but the nature of the underwriter's guidelines would have some -- some pertinence as far as the mortality statistical information.

Q   Do you know whether the underwriter's guidelines are based upon statistical data?

A   To my knowledge, they would be.

Q   Okay.  And what's the basis for your knowledge in saying that?

A   My life insurance education.

Q   Okay.  And has your -- has your life insurance education included how underwriting manuals are created by various reinsurance

86

companies?

A   Not in any specific way.

Q   In any event, you have not seen any statistical data that compares heli skiing with ordinary skiing?

A   No.

Q   Would it be fair to say that you don't know what Mr. Butts believed as to whether heli skiing was hazard -- a hazardous avocation or hobby, do you?

A   I would not know that.

Q   And you really don't think that's a relevant question as to whether or not the claim should be paid or not?

MR. JOHNSTON:  Objection; it calls for a legal conclusion.

You can answer if you can.

Q   (BY MR. PACK)  Let me try it a different way.  Whether or not Mr. Butts believed heli skiing was a hazardous avocation or hobby within the context of Question 5 on the application was not an issue that the claims committee felt was determinative of its position to decline the claim?

A   We really just sought as to whether or not a reasonable person would answer that question

87

differently.

Q   And other than the opinions and perceptions of the underwriters that you had been in communication with and the members of the committee, there was no other information that told you what an average or reasonable person would believe as to whether heli skiing was hazardous or not?

MR. JOHNSTON:  Objection; it misstates her testimony.

MR. PACK:  Okay.  Well, I'll try the question a different way.

Q   (BY MR. PACK)  What were the bases for the claims committee view that a reasonable person would know that heli skiing was a hazardous avocation or hobby within the context of Question 5?

A   It was our role to identify if there were things that we needed to clarify that might have changed the underwriting, which we did.  And the response was that it would have changed the underwriting had we known of the heli skiing.  So that was -- that was the basis.

Q   And that was information that came from Marilyn Reed and/or Steve Hetherington?

88

A   Uh-huh.

Q   Correct?

A   Yes.

Q   I'm going to just ask you about a couple of people, and the question is:  have you ever discussed the claim or the underwriting of the Butts policy with any of these people.  Marilyn Reed?

A   I have not.

Q   Mark Youngquist?

A   I have not.

Q   Jackie Duhacek?

A   No.

Q   Was an underwriter in Omaha.

A   No, I have not.

Q   Do you know who she is?

A   No, I don't.

Q   Okay.  Paul Kibler or Kibler?  I'm not sure how you pronounce his name.

A   No, I've had no discussion.

Q   And how about Dale Moon?

A   No.

MR. PACK:  Let's take a break.  I may be done.

MR. JOHNSTON:  Okay.