IN THE UNITED STATES DISTRICT COURT

FOR THR DISTRICT OF COLORADO


WEST COAST LIFE                )

INSURANCE COMPANY, a           )

Nebraska Corporation,          )

     Plaintiff,              )

                     )

VS.                            )CIVIL ACTION NO:

MARTHA HOAR, as the            )05-CV-1765-EWN-BNB

personal representative)

of THE ESTATE OF               )

STEPHEN M. BUTTS,              )

TELLURIDE PROPERTIES,          )

LLC, a Colorado limited)

liability company,             )

TELLURIDE PROPERTIES,          )

INC., a Colorado               )

corporation, ALBERT D.         )

ROER, an individual,           )

and POLLY LYCHEE, an           )

individual,                    )DEPOSITION OF:

     Defendants.             )TRACY DEFOOR

DEFENDANT'S
EXHIBIT
A-20
05-cv-1765

RECEIVED APR - 7 2006

2                                                                    (Pages 2 to 5)

Page 2

STIPULATIONS

IT IS STIPULATED AND AGREED, by and between the parties through their respective counsel, that the video deposition of:

TRACY DEFOOR,

may be taken before Merit Gilley, Commissioner and Notary Public, State at Large, at the Law Offices of Maynard, Cooper & Gale, P.C., AmSouth/Harbert Plaza, 1901 6th Avenue North, Suite 2400, Birmingham, Alabama 35203, on the 23rd day of March, 2006, commencing at approximately 8:45 a.m.

IT IS FURTHER STIPULATED AND AGREED that the signature to and reading of the deposition by the witness is not waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

Page 3

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of the trial, or at the time said deposition is offered in evidence, or prior thereto.

***

Page 4

APPEARANCES

FOR THE PLAINTIFF:
LEE F. JOHNSTON
Attorney at Law
Holland & Hart, LLP
555 17th Street
Suite 3200
Denver, Colorado  80202

FOR THE DEFENDANTS:
STUART PACK
Attorney at Law
Isaacson, Rosenbaum, P.C.
633 17th Street
Suite 2200
Denver, Colorado  80202

INDEX

EXAMINATION BY MR. PACK: 7 - 141

Page 5

I, Merit Gilley, a Court Reporter of Birmingham, Alabama, and a Notary Public for the State of Alabama at Large, acting as Commissioner, certify that on this date, as provided by the Federal Rules of Civil Procedure and the foregoing stipulation of counsel, there came before me on the 23rd day of March, 2006, at the law offices of Maynard, Cooper & Gale, P.C., AmSouth/Harbert Plaza, 1901 6th Avenue North, Suite 2400, Birmingham, Alabama 35203, commencing at approximately 8:45 a.m., TRACY DEFOOR, witness in the above cause, for oral examination, whereupon the following proceedings were had:

THE VIDEOGRAPHER:  This marks the beginning of tape number one of the deposition of Tracy DeFoor in the matter of West Coast Life Insurance Company, a Nebraska corporation versus Martha Hoar, as personal representative of The Estate of Stephen M. Butts, Telluride Properties,

BAIN & ASSOCIATES COURT REPORTING SERVICE, INC.
Phone:  205 322-0592   Fax:  205 251-4824

(Pages 46 to 49)

13

Page 46

A    (Witness complies.) I don't recall this.

Q    You don't recall this --

A    Right.

Q    -- at all?

A    I don't remember if I saw this or not.

Q    Other than yourself, who were the members of the claims committee at -- during 2005?

A    Gary Carroll, Arthur Tyson, and Bridgette Rucks.

Q    What is or was, at the time of 2005, Ms. Ruck's position in Protective Life?

A    I don't know her title. I believe she handled training.

Q    And in the context that that word "training" was used, can you give me any description of the kind of training Ms. Rucks was involved with?

A    No.

Q    Okay. Do you know if Ms. Rucks

Page 47

had any background or experience in the claims area?

A    To the best of my recollection, Ms. Rucks had been on the claims committee for quite some time.

Q    Okay. Other than sitting on the claims committee as part of her day-to-day activities, do you know or have any knowledge as to whether the training that she was involved with dealt with claims handling?

A    I have no knowledge.

Q    Do you know as part of Mr. -- Ms. Ruck's everyday job duties she had any involvement with underwriting?

A    I don't have any knowledge of that.

Q    As claims were being considered by the claims committee, was it your understanding that all the members of the claims committee would receive the same information?

A    That was my understanding.

Page 48

Q    Can you describe to me, as best you can remember, the process or procedure by which materials came to the claims committee for review and consideration?

A    They would come from the Brentwood, Tennessee office.

Q    And where would they come to?

A    They would come to either Arthur Tyson or me.

Q    And do you know what would determine whether materials went to yourself or to Mr. Tyson?

A    I handled West Coast Life and Empire General. And Arthur Tyson handled Protective and assumed companies.

Q    So would it be correct for me to understand that if materials from Brentwood dealt with a West Coast Life policy, they would be directed to you?

A    Correct.

Q    And that you would then do something with those materials, I would imagine, once you get them?

Page 49

A    Correct.

Q    And what would you do with the materials once you received them?

A    They were reviewed, and then they were assimilated in a claim file.

Q    And who would do the review?

A    I would review them. Sometimes Gary Carroll would review them.

Q    And when you say that they were assimilated, what does that mean?

A    They were prepared in a claim file.

Q    They were --

A    Categorized.

Q    Okay. So they were categorized and put in a file in hard copy form?

A    Yes.

Q    All right. And what would be done with the materials after they were assimilated into a file?

A    There was a process. The Brentwood claims office would send out status letters to the beneficiaries or

Page 50

their representatives, and we would wait for the investigation to continue.

Q    Would there come a time when the claims committee would meet to discuss a particular West Coast Life claim?

A    If the claim investigation was finished and there was no outstanding issues and the claim was ready, it would be presented to claims committee and discussed.

Q    If we're talking about a West Coast Life contestable claim in the year 2005, how would a meeting to discuss a West Coast Life contestable claim be scheduled?

A    It would be scheduled sometimes by phone, verbally; sometimes by E-mail.

Q    Was there anyone who was responsible for putting into place the process of scheduling a meeting to discuss a West Coast Life contestable claim during the year 2005?

A    No.

Q    Okay. Did you have that

Page 51

responsibility?

A    Claims committee meetings were gathered or put together as needed.

Q    And do you have any recollection of who initiated the process to set up the meeting of the claims committee to discuss Mr. Butts' death claim?

A    I don't.

Q    And you don't recall it being you in any event?

A    That's correct.

Q    Do you have -- do you know or have any idea how that meeting got to be called?

A    I don't.

Q    Do you know whether or not other claims besides Mr. Butts' claim were discussed at the claims committee meeting at which his -- his policy was discussed?

A    I don't recall.

Q    Okay. Do you have any recollection of how long the meeting took at which Mr. Butts' claim was denied?

Page 52

A    I don't have a recollection of that.

Q    And you've already told me you don't know what happened at that meeting?

A    I don't recall.

Q    Okay. Do you recall reviewing the application that Mr. Butts submitted for the policy that was ultimately issued and put in force on his life?

A    I don't recall that.

Q    Would you, in the normal course, expect the application to be part of the claims committee package?

A    Yes.

Q    Let me ask you to please take a look at deposition Exhibit 2. And if you wouldn't mind handing me back those two so I can keep them in the right pile.

A    (Witness complies.)

Q    Thank you, ma'am. And I'm going to hand you deposition Exhibit 2. If you would, take a moment to take a look at that please.

Page 53

A    (Witness complies.)

Q    Thank you. And my question -- you don't need to read it all unless you'd like to -- is: Do you recall reviewing this document, and particularly the second page of the exhibit, as part of your work on the claims committee dealing with Mr. Butts' death claim?

A    I don't recall that specifically.

Q    Do you think you did, or you just can't remember one way or the other?

A    I can't remember one way or the other.

Q    Have you looked at this document recently for the purpose of preparing for this deposition?

A    No.

Q    May I have that back please? I'm going to hand you what's been marked as deposition Exhibit Number 4 and ask you whether you recognize deposition Exhibit 4 which is about five pages -- four or five

(Pages 54 to 57)                                                                          15

Page 54

pages to it.

A    I don't recognize this.

Q    All right. Do you know what kind of document deposition Exhibit 4 is?

A    It says at the top it's underwriting services life inspection.

Q    Are you familiar with that type of document from your work on the claims committee?

A    During the claims committee -- well, during my work as a claims committee member, often times policies would have financial underwriting or a financial inspection report.

Q    Do you know whether, in your experience, after an applicant submits a application to the company; the company would then hire a third-party company to interview the applicant about information that's on the application?

A    That would have been something handled by underwriting.

Q    All right. So that's not a

Page 55

process that you're familiar with?

A    No.

Q    And you would -- you do not recognize this document as a document generated at the request of underwriting to verify the information on an application?

A    I would have no knowledge of that.

Q    Do you recall reviewing this document? I forgot what you said. I apologize if I am asking the same thing twice. Do you recall reviewing deposition Exhibit 4 as part of your work on the claims committee with regard to Mr. Butts' death?

A    I don't recall.

Q    That's -- it could be yes; it could be no. You just don't know?

A    That's correct.

Q    Let me now ask you to -- may I have that back please?

A    (Witness complies.)

Q    Thank you. Let me show you

Page 56

what's been marked as deposition Exhibit 5 and ask you to take a look at that with the purpose of telling me whether you recall seeing that document while you were on the claims committee processing or dealing with Mr. Butts' death claim?

A    I don't recall whether or not I saw this document.

Q    Just looking at it, do you know what kind of document it is?

A    The top says interview notes, and the bottom has a fax label, labeled First Financial. It would appear to be interview notes from the financial inspection report.

Q    May I have that back please?

A    (Witness complies.)

Q    I am going to show you what's been marked as deposition Exhibit Number 6. Let me hand that to you please and ask you whether you recognize that document?

A    I don't recognize this document.

Q    Do you recall looking at this

Page 57

document as part of your work as a claims committee member dealing with the Butts death claim?

A    I don't recall.

Q    Thank you. May I have that back please?

A    (Witness complies.)

Q    Thank you. Generally speaking, when the claims committee was considering a death claim -- a contestable death claim of West Coast Life; would it receive a copy of the underwriting file which led to the issuance and putting into force of the policy?

A    Yes.

Q    Would that generally be the entire underwriting file?

A    Yes.

Q    So you would expect, as a claims committee member, that you would receive as part of your materials everything that the underwriting department had with regard to that particular policy?

16

(Pages 58 to 61)

Page 58

A     Yes.

Q     As part of your work over the years on West Coast Life contestable claims; did you learn what, if any, underwriting manual West Coast Life used to set the rates for its policies?

A     No.

Q     Is the term "Swiss Re" or Swiss Reinsurance Underwriting Manual something that you know or heard about as part of your work on contestable West Coast Life claims?

A     As part of my compliance functions in gathering information for market conduct exams, I did hear Swiss Re Underwriting Manual.

Q     Do you recall receiving any portion of the Swiss Re Underwriting Manual in connection with the Stephen Butts death claim?

A     ⁻I don't recall that.

Q     Let me hand you deposition Exhibit Number 9, ma'am, and ask you to

Page 59

take a look at it.

A     (Witness complies.)

Q     I'll tell you that that is a copy of the page from a Swiss Re life guide dealing with winter sports life ratings. And my question for you is:  Do you recall ever seeing that page?

A     I don't recall.

Q     And with regard to the Butts death claim, I assume your answer would be the same that you don't recall?

A     No, I don't recall.

Q     May I have that back please?

A     (Witness complies.)

Q     Thank you.  I'm going to hand you what has now been marked as deposition Exhibit Number 14 and ask you -- this is -- let me represent to you that this is from West Coast Life's files and from the underwriting department.  And ask you whether you recall seeing this document during the time that you were working on the Butts claim as a member of the claims

Page 60

committee?

A     I don't recall whether I did or not.

Q     All right.  Let me just direct your attention to the last few lines -- handwritten lines of the page where it says "I did not see any information that would have changed original underwriting decision."  Do you see that?

A     Yes.

Q     And the signature appears to be that of Roger McIntyre.  Do you recall receiving information like that or with that substance from the underwriting department during the time that you were working on -- as a member of the claims committee on the Butts claim?

A     I don't recall whether I did or not.

Q     If it was in -- if this document was in the underwriting file, would you expect it to have come as part of the claims committee package?

Page 61

A     If it were in the underwriting file, yes.

Q     Thank you.  I'm going to hand you now what's been marked as deposition Exhibit 17 and ask you whether you recognize that document.

A     This is a document that the claims committee used.  I don't recognize this particular document.

Q     But the form of the document is one that's familiar to you?

A     Yes.

Q     All right.  So with regard to the Butts claim which, of course, is what this document deals with; you have no recollection of seeing this document?

A     No.

Q     All right.  Let me ask you to just scan it a little bit close -- more closely if you wouldn't mind.  And tell me whether or not you authored or inserted any of the comments or information that are on deposition Exhibit 17.  And particularly

(Pages 62 to 65)                                                                17

Page 62

the second page. Yes. I want to make sure you look at that.

A    (Witness complies.) I don't -- I don't recall this document. And it looks like there's some names authored to -- to these comments. But I don't recall. And I don't see my name authored to any of these doc -- comments.

Q    I agree. Your name or initials are not on any of the comments. My question just to make sure it was clear was: By looking at the comments; do you recall that you might have authored any of them, especially the ones that don't have any attribution to them?

A    I don't recall.

Q    All right. During the course of handling a contestable West Coast Life claim, would members of the claims committee have access to this form on -- through the computer system?

A    Yes.

Q    And would members of the claims

Page 63

committee have the ability and the authority to add comments to this form if they wanted to do so?

A    Yes.

Q    Let me direct your attention to the second page please.

A    (Witness complies.)

Q    And up at the top there is a box that says admitted history, and then there's information after that. Do you see that?

A    Yes, I do.

Q    Do you know who would have supplied that information and put it on the form?

MR. JOHNSTON: Objection. Foundation.

A    I --

Q    Do you know?

A    I don't know.

Q    All right. And same thing with pertinent findings. Do you know who authored and put that information on the

Page 64

form?

A    I don't know.

Q    And same thing for recommendations?

A    I don't know.

Q    Okay. Would the recommendations have been the recommendations of the claim committee or someone else, or don't you know?

A    I don't know.

Q    Would it have been the customary practice for the claims committee to have its decision on a policy claim, either paying it or not paying it, put on this form after the decision was made?

A    May -- would you repeat the question?

Q    Sure. As a normal practice, after the claims committee had made a decision on the claim, either to pay it or not pay it; would it have been the practice to put that decision on this form?

A    I believe that was the practice.

Page 65

Q    All right. Would that practice be rec -- be entitled a recommendation in your experience, or would it be entitled something else to indicate that it was a decision?

A    I don't know the answer to that.

Q    Let me ask you to please turn to the first page on the exhibit.

A    Uh-huh.

Q    And direct your attention toward the bottom to the entry that's dated 3/30 that has at the end of it in parentheses the name Marilyn Reed. Do you see that entry?

A    Yes.

Q    Take a moment and please read it to yourself.

A    (Witness complies.) Okay.

Q    Do you recall receiving information like that that's on this form during the time that you were sitting on the claims committee and processing the Butts death claim?

Page 66

A   I don't recall.

Q   Do you -- and you don't recall speaking with Ms. Reed, I think you told me, about the Butts claim; correct?

A   That's correct. I don't recall speaking with her.

Q   Do you remember having this information that's attributed to Ms. Reed during the time that the claim committee was making its decision?

A   I don't recall whether I did or not.

Q   Let me ask you to look at the comment dated 7/20 just below that on the first page. Do you see that, ma'am?

A   Yes, I do.

Q   Please take a moment and read that to yourself.

A   (Witness complies.) Okay.

Q   And you see that that comment is attributed at least to Mr. Heatherington. Do you see that?

A   I do.

Page 67

Q   All right. Do you recall having that -- received that information during the time that you were on the claims committee and making a decision about the acceptance or rejection of the death -- of the Butts death claim?

A   I don't recall.

Q   And, again, when you say you don't recall; you don't recall either yes or no? No recollection at all?

A   That's correct.

Q   Thank you.

MR. PACK: Why don't we take a brief break. We've been going about an hour.

MR. JOHNSTON: Okay.

THE VIDEOGRAPHER: We are off the record. The time is 9:32 a.m.

(Short recess.)

THE VIDEOGRAPHER: This marks the beginning of video tape number two of the deposition of Tracy DeFoor. The time is now 9:42 a.m.

Page 68

Q   We are back on the record, Ms. DeFoor. I'm going to hand you what's been marked as deposition Exhibit 13 and ask you to just thumb through it. You don't need to read it because I'll direct you to certain E-mails there.

A   (Witness complies.) Okay.

Q   All right. Would you please turn to the third page of the exhibit?

A   (Witness complies.)

Q   And at the top of the page, it just says, thank you for researching this issue and for your response. Do you see that?

A   I do.

Q   Okay. We're on the same page. This is a string of E-mails that appears to have been copied to you, and I just want to run that by you. Up at the top, there is an E-mail from Susan Heatherly to Laura Ewald dated March 29th. Do you see that?

A   I do.

Q   Okay. And below that, there are

Page 69

a number of people who are copied; one of which appears to be you. Does that appear to be a copy to you?

A   It appears that way.

Q   Yes. Do you recall receiving this E-mail in March of 2005?

A   I don't.

Q   All right. Do you have any reason to think you didn't. I know you don't remember. But is there reason to think you wouldn't have gotten it just by looking at?

A   Not that I know of.

Q   All right. Let me ask you to please take a look -- and I'm going to hand it to you. And keep that by you if you wouldn't mind. I'm going to ask you to work with these kind of together -- deposition Exhibit 33. And are you familiar with that form of documentation?

A   Yes.

Q   All right. And is there something that would be customary for you

Page 130

heli-skied.

Q     So I'm just trying to clarify that whether or not there was fighting between the family and the beneficiaries was not part of the claim per se that the claims committee would consider. It just wasn't part of your decision making process?

A     The claims committee when I was there did not make decisions based on fighting between families.

Q     That's all I was trying to clarify. That's fine. Earlier I had shown you the letter that Mr. Tyson signed. I'm handing it to you, Exhibit 48, denying the claim. And if you need to read the letter, please do. But here's the question: As I read the letter, the only basis for the denial of the claim was the fact that Mr. Butts did not say in his application that he heli-skied and that that was the basis for the denial of the claim. And my question is: Are you aware of any other

Page 131

reason that the claim was denied besides that? Either read the letter or not as you choose.

A     The claims decision is generally and in my experience put in the decline letter so that this says the information regarding heli-skiing was not included by Mr. Butts in the life insurance application; therefore, the statements made in the life insurance application were incorrect or information was omitted. If our underwriters had known about this history of heli-skiing at the time they were considering the application, they would not have issued this policy. In view of this material misrepresentation, the company deems that no insurance ever became effective, and we must now void the policy as of the date it was issued. That's the reason for the decline.

Q     All right. That's how I read it that that's the most important part of the letter in explaining the reason for the

Page 132

company's decision. All I'm trying to find out is: Are you aware of any other reason, other than the one you just read, for the denial? That's all.

A     No.

Q     That's all I really needed to know. Let's take a moment. I may well be done. Let's take a break.

THE VIDEOGRAPHER: We're off the record. The time is 10:53 a.m.

(Short recess.)

THE VIDEOGRAPHER: We're back on the record. The time is 10:58 a.m.

Q     Ms. DeFoor, I'm going to hand you again Exhibit 48, which is the declination letter. And starting at the bottom of page one on to page two there are passages quoted from a release document of Selkirk Tangiers for a number of years there which he signed these releases. And there's some language quoted in italics. Do you see generally what I'm talking about?

Page 133

A     Yes.

Q     All right. Do you recall that in the process of investigating this claim, international claims specialists forwarded a number of waiver and release documents that had been signed by Mr. Butts?

A     Part or the documents I reviewed today did include those.

Q     Right. And so you would recall that that at least was, in part, the basis for the decision to decline?

A     In part. Yes.

Q     All right. Can you tell me any other factual -- facts that you recall that led to the decision to decline in addition to and other than the various release of waiver -- release of liability waiver claim forms that Mr. Butts had signed to Selkirk Tangiers.

A     I don't recall specifically. Based on this document that is, in addition to the answers on the application, what was considered.

(Pages 134 to 137)                                                                           35

Page 134

Q      Okay. So in terms of the most important factors were the fact that he had signed a number of these releases and he didn't disclose heli-skiing on the application. Would you agree with me those are the main reasons --

MR. JOHNSTON: Objection.

Q      -- for denying the claim?

MR. JOHNSTON: Objection. Vague.

A      I don't recall the main reasons. And I'm only going based on this document.

Q      Right. Yeah. Well, you would agree with me based on the document?

A      Based on this document. Yes.

Q      Now, based on the E-mail that we saw that you sent to Ms. Ewald on August 16th in which there's an indication that Mr. Butts had disclosed that he skied, although not heli-skiing; do you remember what the basis was for deciding that heli-skiing was something different than disclosing that you skied?

Page 135

A      I don't remember. Based on the Swiss Re manual you showed me today there was a heli-skiing on the -- I forget what the page was called.

Q      Okay.

A      Hazardous activities I believe.

Q      Right. So in the Swiss Re manual, there was skiing; and there were different kinds of skiing. And one of the kinds of skiing was heli-skiing, and another kind was just called pleasure skiing?

A      I don't --

MR. JOHNSTON: Objection. To the --

A      I don't know how --

MR. JOHNSTON: -- extent that mischaracterizes -- hold on a second. To the extent that mischaracterizes the manual.

A      I don't know how the categories were set out.

Q      All right. Let's just go back

Page 136

and look at that.

MR. JOHNSTON: And, Stuart, I know you appreciate the fact that she's already testified that she doesn't -- she's not an underwriter and the like so --

MR. PACK: I understand that. But she was referring to the document, and I just wanted her to have it in front of her so she wasn't uncertain as to what we were talking about.

Q      So I've handed you deposition Exhibit 9. And that's the page we were talking about that has the underwriting categories for skiing. And it has several different categories under the heading of skiing. Do you see that?

MR. JOHNSTON: That's your characterization of it. The document speaks for itself.

A      There are several categories on this page.

Q      And there's a heading that says skiing, and then there are several other

Page 137

kinds of activities listed before it gets to snow boarding. Do you see that?

A      It lists different ski categories.

Q      Right. And so you were, in your answer, just referencing the fact that this document makes a distinction between heli-skiing and other types of skiing. Is that what you were referring to? I'm just trying to clarify that that's what you were saying when you were giving me your prior answer. That's all.

A      Frankly I don't remember the prior question.

Q      All right. I was asking you that -- what the basis was in your statement to Ms. Ewald that although Mr. Butts had disclosed to the insurance company that he skied, he hadn't disclosed that he heli-skied. And I was asking you what was the basis for you making that distinction?

A      I don't recall exactly. But

36                                                                    (Pages 138 to 141)

Page 138

given the documents you've shown me today, it appeared that our underwriting department differentiated heli-skiing.

Q     Okay. Do you recall asking anyone in the underwriting department how it differentiated between heli-skiing and other forms of skiing?

A     I don't recall that.

Q     So you were relying on the fact that that distinction was conveyed to you by the underwriting people?

A     I don't understand your question.

Q     Okay. You said that the underwriting department made a distinction between heli-skiing and other forms of --

A     Based on the documentation you've shown me today, that's correct.

Q     All right. Did you know before you worked on this claim that heli-skiing was different than skiing in your own mind?

A     Yes.

Q     All right. And how did you

Page 139

acquire that knowledge? Just tell me how you -- what you based that on.

A     Just everyday knowledge.

Q     All right. And what I'm asking is: Did you ever talk to the underwriting people, either in person or through correspondence or E-mails, to inquiry more about the distinction between heli-skiing and skiing other than what Mr. Heatherington told you about how the policy would be priced if it had been known that Mr. Butts heli-skied?

A     I don't recall asking that.

Q     Are you aware of any written definition of other hazardous avocation or hobby either at West Coast Life or Protective Life?

A     I believe that there's a definition on the application. I'm not sure.

Q     All right. What --

A     And I'm not sure if there's any other documentation that has a definition

Page 140

for hazardous activities or sports.

Q     All right. So other than what is said in the application, can you recall ever seeing a definition of other hazardous activity?

A     I don't recall.

Q     Do you recall whether West Coast Life provides to its agents who are taking applications from pro -- from applicants, any information as to what activities come under the term other hazardous avocation or hobby?

A     I'm not in sales, and I don't know what they provide the sales force with.

Q     So at least as far as you know, you don't know of any such thing even though that's not your area. You're just not aware of it?

A     I don't know.

Q     All right. Are you aware whether West Coast Life provides to the companies like First Financial Underwriting

Page 141

who interview and do inspections with the applicants, did West Coast Life provide those people with any definition of what activities come under the term hazardous activities?

A     I don't know.

Q     Thank you very much. I'm done. Thank you.

A     Thank you.

Q     Appreciate your time.

     MR. JOHNSTON: I'll reserve my questions until time of trial. And I believe Ms. DeFoor will read and sign her deposition.

     THE VIDEOGRAPHER: This ends video tape number two and the deposition of Tracy DeFoor. The time is now 11:06 a.m.

     (END OF DEPOSITION.)