IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

WEST COAST LIFE                    )

INSURANCE COMPANY                  )

a Nebraska                         )

Corporation,                       )

     Plaintiff,                   )

                    )

VS.                                )CIVIL ACTION NO:

                     )05-CV-1765-EWN-BNB

MARTHA HOAR, as the                )

personal representative )

of the estate of                   )

Stephen Butts, et al.,  ) DEPOSITION OF:

     Defendants.       AUTHOR TYSON

         S T I P U L A T I O N S

        IT IS STIPULATED AND AGREED, by

and between the parties through their

respective counsel, that the deposition

of:

         AUTHOR TYSON,

DEFENDANT'S
EXHIBIT
A-22
05-cv-1765

Page 2

may be taken before Jennifer Roebuck, Commissioner and Notary Public, State at Large, at the Law Offices of Maynard, Cooper & Gale, 1901 6th Avenue North Birmingham, Alabama 35203, on the 22nd day of March, 2006, commencing at approximately 8:32 a.m.

IT IS FURTHER STIPULATED AND AGREED that the signature to and reading of the deposition by the witness is not waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of the trial, or at the time said deposition is offered in evidence, or prior thereto.

Page 3

APPEARANCES

FOR THE PLAINTIFF:
LEE JOHNSTON
HOLLAND & HART
555 Seventeenth Street
Suite 3200, P.O. Box 8749
Denver, Colorado 80201

FOR THE DEFENDANTS:
STUART PACK
ISAACSON, ROSENBAUM
633 17TH Street, Suite 2200
Denver, Colorado 80202

Page 4

INDEX
Examination by Mr. Pack              6

EXHIBIT LIST
Defendant's Exhibit Number 48      135

Page 5

I, Jennifer Roebuck, a Court Reporter of Birmingham, Alabama, and a Notary Public for the State of Alabama at Large, acting as Commissioner, certify that on this date, as provided by the Federal Rules of Civil Procedure and the foregoing stipulation of counsel, there came before me on the 22nd day of April, 2006, at the law offices of Maynard Cooper & Gale, 1901 6th Avenue North, Birmingham, Alabama 35203, commencing at approximately 8:32 a.m., Author Tyson, witness in the above cause, for oral examination, whereupon the following proceedings were had:

THE VIDEOGRAPHER:  This begins Video Tape Number 1 in the deposition of Arthur Tyson in the matter of West Coast Life Insurance Company versus Martha Hoar, et al.  Case Number 05-CV-1765-EWN-BNB. We're on the record at 8:35 a.m. on Wednesday, March 22nd, 2006.  This deposition is taking place at Maynard,

Page 6

Cooper and Gale in Birmingham, Alabama. And the videographer is Jeff Totherow.

Would counsel please identify yourselves and state whom you represent?

MR. JOHNSTON: Good morning. My name is Lee Johnston. I'm with the law firm of Holland and Hart in Denver, Colorado. And I'm appearing on behalf of the plaintiff, West Coast Life Insurance Company.

MR. PACK: Good morning. My name is Stewart Pack. I'm representing the defendants. I'm with the law firm of Isaacson Rosenbaum in Denver.

THE VIDEOGRAPHER: Would the court reporter please swear in the witness?

ARTHUR TYSON
being first duly sworn, was examined and testified as follows:

EXAMINATION BY MR. PACK:

Q      Would you please state your name and business address for the record?

Page 7

A      My name is Arthur Tyson. The business address is 2801 Highway 280 South, Birmingham, Alabama. The zip, I believe, is 35223.

Q      Mr. Tyson, my name is Stewart Pack. I'm an attorney from Denver, Colorado representing the defendants in this lawsuit. We've just met. And before we get into the substance of the deposition, I'd just like to make sure we have the same ground rules in mind.

Have you ever had your deposition taken before today?

A      Yes, sir, I have.

Q      About many times?

A      Oh, something between 10 and 20.

Q      And when was the most recent time that you can remember that you had a deposition taken?

A      First of this month.

Q      With that much experience, I assume that you know how a deposition proceeds, but let me just go through a

Page 8

couple of ground rules for you. If I ask a question to you that you don't understand, would you please be sure to tell me so I can get to you a question that you do understand?

A      Yes.

Q      All right. And if you ask -- if you answer a question, I'm going to assume that you thought you understood it before you answered; is that fair?

A      That's fair.

Q      All right. Is there anything about your health today or your condition today that isn't customary for yourself?

A      No.

Q      So there isn't anything that you can think of that would affect your ability today to understand and answer questions truthfully; is that correct?

A      That's correct.

Q      One thing that you're doing very well is waiting until I finish my question to answer and answering with either yes or

Page 9

no. And I would hope that you would try to do that. It's sometimes easy to jump the gun a little bit, so if you would try to avoid that, that would be helpful. All right?

A      Yes.

Q      Would you please tell me your position with -- with whom you're employed, I should start with that.

A      Well, I'm employed with Protective Life Insurance Company, and my position is Senior Claims Specialist.

Q      Mr. Tyson, before today's deposition, did you do anything to prepare for today's deposition?

A      Only talked with my attorney here.

Q      All right. And let me just advise you -- and I'm sure Mr. Johnston will remind you when he thinks it's appropriate -- none of my questions are intended to ask you about any conversations with your attorneys about this case. So

Page 10

please don't tell me any of those things. And you can assume that when I ask you if you've ever talked with anyone that I'm not talking about whether you ever talked with your attorney about it. All right?

A    All right.

Q    Did you review any documents before coming to the deposition today for the purpose of being prepared?

A    No, sir, I did not.

Q    Do you remember about when was the last time that you reviewed any materials pertaining to the life insurance death claim filed on Stephen Butts' policy?

A    I don't remember.

Q    If I were to tell you that the decision was made by the claim committee to deny Mr. Butts' estate claim -- actually, the owner of the policy was a company -- was in July of 2005, do you think that you reviewed any documents since the decision was made to deny the claim?

A    I don't believe I have.

Page 11

Q    Do you believe that in arriving at the decision that you did review claims to arrive at the decision -- excuse me. Let me start that over. It's a poorly-worded question.

In the course of the company arriving at a decision to deny the claim, were you a participant in that decision?

A    Yes, sir.

Q    And what was your role?

A    I was one of the members of the claim committee.

Q    As a member of the claim committee, did you review materials prior to that decision to deny being made?

A    I believe so.

Q    And who were the other members, if there were any, of the claim committee besides yourself? And I'm talking about the time period between January of 2005 and, let's say, August of 2005. And particularly, with regard to Mr. Butts' death claim.

Page 12

A    Okay. I believe -- well, of course, it would be myself, I believe Gary Carroll, and Bridgett Rucks.

Q    Do you recall whether Tracy DeFoor was part of the claim committee with respect to this claim?

A    I don't specifically remember.

Q    Let me ask you a question about Ms. Rucks. Last night, I was reviewing a large number of e-mails, many of which we'll go through this morning. And Ms. DeFoor and yourself and Mr. Carroll are copied on a large number of them, as well as other people. And Ms. Rucks appears to only be copied on two, and they're both on August 26th of 2005.

Now, I did not find an e-mail copied to her prior to the date of the decision. And I'm asking you if perhaps Ms. DeFoor was on the claim committee and Ms. Rucks was not or you -- if you remember it the other way. I just want to make sure I know your best recollection.

Page 13

A    I don't remember whether she was on it at that point or not. I

Q    Ms. Rucks, you're talking about?

A    Ms. -- no.

Q    I need to know who you're --

A    Ms. DeFoor, I thought you were asking me.

Q    Right.

A    I'm not sure whether she was actually a member of the claim committee at that time or not.

Q    But you're pretty sure Ms. Rucks was?

A    I think so. You know, I -- if you could show me a document or something, I could tell you. I don't remember for sure.

Q    All right. We'll go through some documents, and maybe that will refresh your memory.

In any event, what position did Ms. Rucks hold in the company, to the best of your knowledge?

Page 74

helicopter skiing was hazardous or not?

A     I'm sorry. I missed just the first. Would you rephrase that?

MR. PACK: All right. Ms. Court Reporter, would you mind repeating that, please? I'm not sure I can say it again the same way.

(Record read.)

A     I don't remember. I'm sorry.

Q     Do you feel that in deciding whether or not to pay Mr. Butts' claim, it was important for the insurance company to find out what Mr. Butts believed about whether heli-skiing or helicopter skiing was a hazardous avocation or hobby?

MR. JOHNSTON: Object to the form to the extent that it calls for a legal conclusion.

Q     You may answer.

A     Well, I don't know how -- that's, again, a rather long question. Do you want to --

Q     Well, let me ask it to you

Page 75

again. And I'm asking for your opinion as one of the people who sat on the claims committee. Do you think it is important in deciding whether or not to pay Mr. Butts' death claim for the West Coast Life to determine and gather information regarding Mr. Butts' belief as to whether helicopter skiing was a hazardous avocation or hobby?

MR. JOHNSTON: Same objection.

A     Well, frankly, I don't know how I could gather what his belief was. He was deceased.

Q     I understand that. He was deceased. He couldn't tell you. But did you feel it was important to try to get information from other sources that would shed light on what Mr. Butts believed about whether helicopter skiing was a hazardous avocation or hobby?

MR. JOHNSTON: Same objections. If you have an opinion, tell him.

A     I don't really have an opinion, frankly. I thought we had adequate

Page 76

information. I'm not -- I'm not sure.

Q     To your knowledge, did West Coast Life and the claim committee have any information that indicated one way or the other whether Mr. Butts believed that helicopter skiing was a hazardous avocation or hobby?

A     I don't remember.

Q     And I gather from that that you don't recall any discussion of this issue in the claims committee at the time that the claim committee was deciding not to pay Mr. Butts' claim?

A     By this issue?

Q     This issue whether or not Mr. Butts' believed that helicopter skiing was a hazardous avocation or hobby.

A     I don't remember discussing it in those terms.

Q     Do you remember any of the discussion -- I think you told me -- I'm not trying to put words in your mouth, but I think you told me that you really don't

Page 77

recall --

A     I don't.

Q     -- any discussion of what happened that day on Mr. Butts' claim?

A     No. But as you focus in, I still don't remember that discussion.

Q     All right. Thank you. Do you recall any discussion at the claims committee to the effect that a reasonable person would know that helicopter skiing was a hazardous avocation or hobby?

A     I don't remember that specific discussion, no.

Q     In your opinion as someone in claims for over 30 years, is it the same to say that a reasonable person would know that helicopter skiing was hazardous as opposed to say that Mr. Butts believed that helicopter skiing was a hazardous avocation or hobby?

MR. JOHNSTON: Objection to the form. Incomplete hypothetical. Calls for speculation.

Page 86

sure that you've never seen a document like this.

A    Okay. Well, it's -- I've looked at it. What was your question?

Q    Have you ever seen a document or report like this in other claims files that you have reviewed over the years?

A    I've seen similar ones. I've just not seen one in this form.

Q    And what do you understand this kind of report to be, even though the format of other ones may be a little bit different than this one?

MR. JOHNSTON: Objection. Foundation.

A    Well, it's something for the underwriters to consider. It's not a form that I normally use in claims.

Q    All right. Is it something that the underwriters consider as part of the decision as to whether to offer a policy or not and, if so, under what terms?

A    I --

Page 87

MR. JOHNSTON: Objection. Foundation.

A    I don't know. That's for them to say, they procured it.

Q    Are you familiar with the practice in the insurance industry of having a third-party interview, either in person or by phone, the applicant to verify information that has been provided on the application?

A    Am I aware of that practice?

Q    Yes.

A    I understand that goes on, yes. I don't participate in it.

Q    I understand that. Are you -- do you recognize Deposition Exhibit 4 to be a report on an interview with Mr. Butts that took place prior to the issuance of the policy by First Financial Underwriting Services to ask him questions about information that had been disclosed on the application?

MR. JOHNSTON: Objection. The

Page 88

document speaks for itself. Foundation.

MR. PACK: I'm asking him what he understands.

MR. JOHNSTON: Yeah, but he's never seen it. You've never offered it. I mean, that's a totally unfair question, Stewart.

MR. PACK: It's totally fair. If he doesn't know what it is, if he doesn't recognize that that's what it is, that's all he needs to tell me.

A    Well, I've never seen it before, and I'm not sure who's getting it or what they're doing with it. So I'm not quite sure of the rest of your question.

Q    (By Mr. Pack) All right. Let me ask you to assume that Deposition Exhibit 4 is a report that was prepared by First Financial Underwriting Services as a result of an interview between someone at First Financial Underwriting Services, specifically Alex Chu and Mr. Butts, during the underwriting process. All right?

Page 89

Would you assume that?

A    Well, you're telling me that. I guess that's --

Q    I'm just asking you to assume that. Is that something you understand, what I've just said?

A    Well, I didn't read the names or the date or something like that, but generally what you're saying, I think, is true.

Q    All right. Would you expect that this would be information that would be important for you as a claims person to consider as far as what the company knew at the time it decided to offer a policy?

MR. JOHNSTON: Objection. Foundation.

A    It would only be important to me in regards to whatever I got from underwriting as a result of their knowledge of this.

Q    All right. Well, assume that this document, Deposition Exhibit 4, is

24

(Pages 90 to 93)

Page 90

part of West Coast Life underwriting file for the Stephen Butts' policy and was among the materials that were delivered to you as a claims committee member. My question is: Would it be important for you to review this document as part of your consideration of whether the claim should be paid or not?

MR. JOHNSTON: Objection. Object to the form of the question.

A    I'm going to say what I said before.

Q    Which is, sir?

A    I would be interested only in what the underwriting department -- advice from their review of the claim file. After we gave it to them, they would interpret the file back to me, whatever they used. I'm not sure what they would be looking at to get their reply.

Q    All right. Let me ask you to turn to page WCL-207, which is several pages back. And in the middle of the page,

Page 91

there's a section that says "Aviation Recreation Driving Record." Do you see that section?

A    Yes, I see the heading.

Q    All right. And I think you've already told me you've never seen this document before, so take a moment and just read to yourself the second paragraph under that heading.

A    The one about scuba --

Q    Yes, please.

A    Okay.

Q    All right. And you see in that paragraph the sentence, "He also enjoys skiing and golf in his spare time"? Do you see that sentence?

A    (Witness nods head.)

Q    All right. I assume that's a yes?

A    Yes. I'm sorry. Uh-huh.

Q    Thank you. Would it be important to you as a claims person deciding whether to pay Mr. Butts' claim or

Page 92

not to know that the underwriter had been informed prior to deciding what to do with the application that Mr. Butts skied?

MR. JOHNSTON: Object to the form.

A    Well, frankly, I don't know whether it would be important to me or not.

Q    As a claims person?

A    (Witness nods head.)

Q    Now, assuming that Mr. Butts died helicopter skiing, would it be important to you to know whether the underwriter found out what kind of skiing Mr. Butts did as a result of seeing in the report that he skied?

MR. JOHNSTON: Objection. Incomplete hypothetical. It's misleading.

A    I assume the underwriter worked on what he had. I -- you know, I can't speak to the underwriting issues.

Q    Do you -- you told me that you had never heard of the term heli-skiing or that practice prior to this claim. Do you

Page 93

know whether or not the term "skiing" as used here includes heli-skiing, helicopter skiing or does not include helicopter skiing?

A    No.

Q    You don't know --

A    Well, I don't know. Yeah, whatever -- you mean today do I know it, or did I know it back then? That --

Q    Well, let's start with today.

A    I still don't know. That's an underwriting issue.

Q    It's not an issue important to you as a claims person on the claim committee?

A    No.

Q    And back then, meaning in July of 2005, did you know whether the term "skiing" included helicopter skiing or didn't include helicopter skiing?

A    I didn't know it back then. I don't know it today.

Q    In your understanding of how

Page 134

Ms. DeFoor and Mr. Carroll get them and Ms. Rucks doesn't. That's why I'm puzzled as to the composition of the claim committee. And maybe another witness will clarify, but right now, I just want your recollection. That's why I'm puzzled.

A    Well, I'm puzzled, too. I don't know the answer to that. I --

Q    All right. Fair enough. When you prepare a letter, as a claims committee member, to a beneficiary informing the beneficiary that the policy claim has been denied, do you have to have that letter approved by anyone before it is sent out?

A    I -- excuse me. Not normally, no, sir.

Q    All right. Do you recall whether you showed the denial letter to anyone prior to sending it to the beneficiary, the --

A    No.

Q    -- one that you wrote?

A    I'm sorry. No, sir, I don't.

Page 135

Q    Does the fact that you wrote the denial letter mean that you brought the claim to the committee in any way?

A    No.

Q    How would it come about or how did it come about that you were asked or that you wrote the denial letter to Telluride Properties?

A    Well, usually that was my -- it failed -- I was the one that usually wrote it.

Q    You were the lucky one?

A    Yes.

    MR. PACK: All right. Let's mark this as the next exhibit.

    (Defendant's Exhibit Number 48 was marked for identification.)

Q    The court reporter has handed you what's been marked as Deposition Exhibit 48. Is that your signature on the second page?

A    Yes, sir, it looks like it.

Q    And do you recognize this as the

Page 136

letter you sent to Telluride Properties on July 27th, 2005, informing Telluride Properties that the Butts claim had been denied?

A    Well, yeah, I think so.

Q    Okay. Well, why don't you take a moment and look and see if you know or you just think so.

A    Well, I'm sure it is. What I mean is, something -- a word could be changed. I wouldn't remember what the original was. I assume this is the letter; this is out of the file. Yes, this is the letter. That's my signature on it.

Q    Let me just tell you that I received this from Ms. Heatherly yesterday from the claim file. That's where it came from.

A    Okay.

Q    All right. That doesn't change your answer, I assume? You still think this is the letter you sent?

A    Well, yeah. I don't know what

Page 137

other one would be if this is the claim letter that went out. That does look like my signature.

Q    Okay. Let me ask you to take a look on page two. It's the second full paragraph that starts with the words "If our underwriters had known." Do you see that paragraph?

A    Yes, sir.

Q    Why don't you read that paragraph to yourself to refresh your memory?

A    All right.

Q    Was it your understanding at the time that you wrote this letter that if the underwriters had known about Mr. Butts' history of helicopter skiing at the time they were considering the policy, that they would not have issued a policy at all? Was that your understanding back in July of 2005?

A    Well, this says we would not have issued this policy. That's what I

36                                                                    (Pages 138 to 141)

Page 138

said, so I assume that was understanding back in July.

Q    Do you have a different understanding now?

A    No.

Q    Do you have an understanding now that a policy would have been offered, but -- the same policy would have been offered, but the price for it would have been higher?

A    Well, I understand absolutely from this that we wouldn't have issued the policy that we did. And --

Q    Please answer my question.

MR. JOHNSTON: He did answer your question.

Q    All right. You would not have issued the policy you did. But is it your understanding from reviewing the claim committee materials that the company would have offered the same form of policy and would have charged a higher price, that that's the offer the company would have

Page 139

made?

A    Yes, I think maybe that's what we would have done. I don't -- I don't see that as a statement.

Q    Well, I'm asking what your understanding is now. Is that your understanding?

A    My understanding now is, it seems like they would have added more to it. They would have issued a different policy.

Q    And when you say "different policy," what do you mean?

MR. JOHNSTON: Objection. Calls for speculation.

A    It's not the policy we issued.

Q    What would be the difference, from your understanding of the underwriting, between the policy that was issued and the different policy you said you understood would have been offered?

A    Well, I'm not sure. I believe that the underwriter said that they would

Page 140

not have issued this policy.

Q    Did the underwriter indicate in the materials that they would have flat-rated it up for an extra premium charge of $2.50 per thousand?

A    I think you've showed me that, yes.

Q    Do you have any reason to doubt that the claim committee was informed that had Mr. Butts disclosed that he heli-skied on the application, the policy that would have been offered to him would have been the same policy, but the premium charge would have been flat-rated up an additional $2.50 per thousand?

MR. JOHNSTON: Objection. Calls for speculation.

Q    Is that yes or no, sir?

A    Well, I'm agreeing that it's hypothetical because they didn't -- he didn't answer that, and I don't know what they would have done, but it sounds like that might be what they've done. They

Page 141

didn't --

Q    Is that not what the underwriters were telling you? As part of the claims committee work, isn't that what you were informed?

A    I was informed that this policy would not have been issued. That was uttermost in my mind.

Q    You were not informed that the company would have issued the same form of policy, but have charged an additional $2.50 per thousand over the non-smoker standard policy?

MR. JOHNSTON: Object to the form.

A    You've shown me a rate that says that. I don't -- I don't remember seeing anything this morning where they said we would have issued this policy at 200 -- the same policy with whatever it is, $250 per thousand. I don't remember that being a specific statement.

Q    You don't recall seeing that in

Page 150

he made?

A    Do I recall those? Did I -- I'm sorry. I don't remember those, if that's what the question was.

Q    And was it important to you in your decision to deny this claim that Mr. Butts had signed a waiver of liability to Tangiers sent -- to Selkirk-Tangiers with regard to his heli-skiing activities over a course of several years?

MR. JOHNSTON: Objection. Vague.

A    Well, I don't remember.

Q    In your mind as a claims person, would the fact that someone signs a release of liability for certain hazards of an activity such as helicopter skiing mean that the person signing it believed that those hazards exists?

MR. JOHNSTON: Objection. Foundation.

A    Maybe. I don't know.

Q    You don't know what they

Page 151

believed?

A    Well, I don't what they believed, no. It's just something he did.

Q    Do you play golf, sir?

A    No, sir, I don't.

Q    Do you play any sport or recreational activity?

A    I used to play tennis a lot.

Q    All right. Did you ever have to sign a waiver of liability when you went to play tennis?

A    Not that I -- no, I don't believe so.

Q    Have you ever signed a waiver of liability doing any activity, amusement park, sporting event, anything like that?

A    No. I'm kind of cautious. No, I don't --

Q    Cautious person. All right. But you would acknowledge that you don't know what someone is thinking when they sign a waiver as to whether they agree that there are certain hazards in the activity?

Page 152

You just don't know?

A    I don't know, no, sir.

MR. PACK: Let's go off the record for a moment.

THE VIDEOGRAPHER: Off the record. The time is 11:24 a.m.

(Break Taken.)

THE VIDEOGRAPHER: Back on the record. The time is 11:28 a.m.

Q    (By Mr. Pack) Mr. Tyson, does Protective Life have a written claim manual?

A    No, sir.

Q    Does it have any written materials that claims people consult as to how to process a claim?

A    No.

Q    Does it have any written materials that claims people have available to consult in how to decide whether to pay or not pay a claim?

A    No.

Q    With regard to your letter,

Page 153

Exhibit 48, the one that you sent on July 27th, are you aware of any other basis for West Coast Life denying the death claim other than the alleged failure to disclose heli-skiing on the application?

A    No, I'm not.

Q    So as far as you know, that is the sole and only reason why the claim was denied?

A    Yes, sir.

MR. PACK: I have nothing further.

MR. JOHNSTON: I'll reserve my questions until the time of trial. We'll read and sign.

MR. PACK: Thank you very much.

THE VIDEOGRAPHER: This marks the end of Tape Number 2. It concludes the deposition of Arthur Tyson. Off the record. The time is 11:29 a.m.

END OF DEPOSITION

Page 154

SIGNATURE OF WITNESS

I, _____, do hereby certify that on this _____ day of _____ 2006, I have read the foregoing transcript and to the best of my knowledge it constitutes a true and accurate transcript of my testimony taken by oral deposition on April 22nd, 2006.


_____
WITNESS

Subscribed and sworn to before me this _____ day of _____, 2006.


_____
NOTARY PUBLIC

Page 155

CERTIFICATE

STATE OF ALABAMA )
JEFFERSON COUNTY )

I hereby certify that the above and foregoing deposition was taken down by me in stenotype, and the questions and answers thereto were reduced to computer print under my supervision, and that the foregoing represents a true and correct transcript of the deposition given by said witness upon said hearing.

I further certify that I am neither of counsel nor of kin to the parties to the action, nor am I in anywise interested in the result of said cause.


_____
Jennifer Roebuck

Page 156

ERRATA SHEET

Page    Line    Correction    Reason