IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Edward W. Nottingham**

Civil Action No. 05–cv–01765–EWN–BNB


WEST COAST LIFE INSURANCE COMPANY,
a Nebraska corporation,

       Plaintiff,

v.

MARTHA HOAR, as the personal representative
of THE ESTATE OF STEPHEN M. BUTTS,
TELLURIDE PROPERTIES, LLC, a Colorado
limited liability company,
TELLURIDE PROPERTIES, INC., a Colorado
corporation,
ALBERT D. ROER, an individual, and
POLLY LYCHEE, an individual,

       Defendants.

---

## ORDER AND MEMORANDUM OF DECISION

---

      This is an insurance case.  Plaintiff West Coast Life Insurance Company seeks an order

from the court declaring void a contract insuring the life of Mr. Steven M. Butts based on an

alleged misrepresentation made in Mr. Butts' application for insurance.  Defendants assert

counterclaims for breach of insurance contract and bad faith.  This matter is before the court on:

(1) "Plaintiff West Coast Life Insurance Company's Motion for Summary Judgment," filed June

26, 2006; and (2) "Defendants' Motion for Partial Summary Judgment," filed the same day.

Jurisdiction is premised upon 28 U.S.C. § 1332 (2006).

## FACTS

### 1.    Factual Background

#### a.    The Buy-Sell Agreement

In August 2004, Mr. Butts and two other principals formed a new company, Telluride Properties, LLC.  (Pl. W. Coast Life Ins. Co.'s Opening Br. in Supp. of its Mot. for Summ. J., Statement of Undisputed Material Facts ¶¶ 1–2 [filed June 26, 2006] [hereinafter "Pl.'s Br."]; *admitted at* Resp. to Pl.'s Motion for Summ. J., Resp. to Statement of Undisputed Material Facts ¶¶ 1–2 [filed July 17, 2006] [hereinafter "Defs.' Resp."].)  The three principals entered into a buy-sell agreement requiring each principal to sell his or her interest in the business to the remaining principals in the event of his or her death.  (*Id.*, Statement of Undisputed Material Facts ¶ 3; *admitted at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 3.)  The agreement was financed by insurance policies on the lives of each of the three principals.  (*Id.*, Statement of Undisputed Material Facts ¶ 4; *admitted at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 4.)

#### b.    Application for Insurance

On September 21, 2004, Mr. Butts contacted Plaintiff's agent, Ms. Sharon Evanson, by phone to complete an application for a three million dollar life insurance policy (the "Butts Application").  (*Id.*, Statement of Undisputed Material Facts ¶¶ 5–6; *admitted at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶¶ 5–6.)  Ms. Evanson read the questions on the application and transcribed Mr. Butts' responses.  (*Id.*, Statement of Undisputed Material Facts ¶ 7; *admitted at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 7.)  The Butts Application contained a declaration that all statements and answers were full, complete, and true

to the best of Mr. Butts' "knowledge and belief." (*Id.*, Statement of Undisputed Material Facts ¶ 8; *admitted at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 8.)  At no point during the call did Mr. Butts mention that he was a "heli-skier."[1] (*Id.*, Statement of Undisputed Material Facts ¶ 14; *admitted at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 14.)

　　　　i.　　**Question 5**

The fifth question of the Butts Application ("Question 5") asked Mr. Butts if he had "engaged in auto, motorcycle or boat racing, parachuting, skin or scuba diving, skydiving, or [sic] hang gliding or other hazardous avocation or hobby." (*Id.*, Statement of Undisputed Material Facts ¶ 11; *admitted at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 11.)  Mr. Butts answered the question in the negative. (*Id.*, Statement of Undisputed Material Facts ¶ 12; *admitted at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 12.)

　　　　ii.　　**First Financial Interview**

First Financial Underwriting ("First Financial") is an independent, third-party company that, at the request of its insurance company clients, gathers information about the lifestyles and finances of life insurance applicants, typically through telephonic interviews. (*Id.*, Statement of Undisputed Material Facts ¶ 21; *admitted at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 21.)  Mr. Alex Chu, a senior life insurance reporter with thirteen years experience at First Financial, conducted a telephonic interview with Mr. Butts on October 12, 2004. (*Id.*,

---

[1]Heli-skiing involves flying by helicopter to the top of a backcountry mountain and skiing down, usually with the escort of guides. *See Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1266 (10th Cir. 2004).

Statement of Undisputed Material Facts ¶ 20; *admitted at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 20.)

Mr. Chu's interview outline contains two relevant questions concerning lifestyle: (1) "Any involvement in any private aviation, scuba diving, or sky diving?"; and (2) "Any other recreational activities or exercise in your spare time?" (*Id.*, Ex. 13 at 2 [Chu Notes].) Mr. Chu specifically asked Mr. Butts if he engaged in "any hazardous activities." (*Id.*, Statement of Undisputed Material Facts ¶ 25; *admitted at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 25.) Mr. Butts did not seek any clarification of this question or voice concerns or confusion as to the meaning of "hazardous activities." (*Id.*, Statement of Undisputed Material Facts ¶ 26; *admitted at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 26.) In response to Mr. Chu's question about hazardous activities, Mr. Butts stated he was involved in scuba diving and private aviation as a pilot. (*Id.*, Statement of Undisputed Material Facts ¶ 27; *admitted at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 27.) During his tenure at First Financial, applicants have identified heli-skiing in response to Mr. Chu's hazardous activity question. (*Id.*, Statement of Undisputed Material Facts ¶ 29; *admitted at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 29.)

Mr. Chu followed up with additional questions exploring the nature of Mr. Butts' flying and diving activities. (*Id.*, Statement of Undisputed Material Facts ¶ 28; *admitted in relevant part at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 28.) Mr. Chu then asked Mr. Butts about what he did for recreation and exercise in his spare time. (*Id.*, Statement of Undisputed Material Facts ¶ 30; *admitted at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 30.) Mr. Butts stated that he skied and golfed. (*Id.*, Statement of Undisputed

Material Facts ¶ 32; *admitted at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 32.)

Under a heading titled "Aviation-Recreation-Driving Record," Mr. Chu's report to Plaintiff on behalf of First Financial (the "First Financial Report") detailed Mr. Butts' piloting experience, briefly noted his scuba diving activities, and stated: "Mr. Butts also enjoys skiing and golfing in his spare time.  He reported no other recreational or hazardous pastimes in which he is active with [sic] on a regular basis."  (*Id.*, Ex. 14 at 4 [First Fin. Report].)

> c.      *The Underwriting Process*

In October 2004, Mr. Mark Youngquist, an underwriter for Plaintiff, underwrote a three million dollar policy insuring Mr. Butts' life (the "Butts Policy").  (*Id.*, Statement of Undisputed Material Facts ¶ 36 *admitted at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 36.)  In so doing, Mr. Youngquist reviewed the Butts Application, Mr. Butts' medical records, the First Financial Report, and a questionnaire Mr. Butts completed regarding his aviation activities.  (*Id.*, Statement of Undisputed Material Facts ¶ 38; *admitted at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 38.)  Mr. Youngquist, who had worked as an underwriter since 1995 for other insurance companies, had worked for Plaintiff for less than a month when he approved the Butts Application.  (Defs.' Mem. Br. in Supp of Mot. for Partial Summ. J., Statement of Undisputed Material Facts ¶¶ 13, 17 [filed June 26, 2006] [hereinafter "Defs.' Br."]; *admitted at* Pl. W. Coast Life Ins. Co.'s Resp. Br. in Opp'n to Defs.' Mot. for Partial Summ. J., Resp. to Statement of Undisputed Material Facts ¶¶ 13, 17 [filed July 17, 2006] [hereinafter "Pl.'s Resp."].)

Plaintiff's underwriting manual, published by reinsurer Swiss Re, does not rate resort skiing as a hazardous activity to be factored into the underwriting process. (Pl.'s Br., Statement of Undisputed Material Facts ¶ 42; *admitted in relevant part at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 42; *see also* Defs.' Br., Ex. A–14 at 1 [Rating Table].) "Heli-skiing," however, is a rated activity. (Defs.' Br., Ex. A–14 at 1 [Rating Table].) Mr. Youngquist never saw this rating table until after working on the Butts Policy. (*Id.*, Statement of Undisputed Material Facts ¶¶ 31, 33; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶¶ 31, 33.)

Mr. Youngquist evaluated the answers in the Butts Application as if Mr. Butts were a reasonable person who had answered the questions objectively. (*Id.*, Ex. A–6 at 80 [Youngquist Dep.].) Based on the information before him, Mr. Youngquist believed that Mr. Butts engaged only in non-rated resort skiing. (Pl.'s Br., Ex. 15 ¶¶ 4–6 [Youngquist Aff.].) Mr. Youngquist made no inquiry into the nature of the "skiing" activity mentioned in the First Financial Report. (Defs.' Br., Statement of Undisputed Material Facts ¶ 28; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 28.) Mr. Youngquist determined the Butts Policy should be issued on a "Standard, Non-Tobacco" basis as a result of Mr. Butts' aviation activities and some potential liver problems. (Pl.'s Br., Statement of Undisputed Material Facts ¶ 40; *admitted at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 40.)

On November 5, 2004, Plaintiff issued the Butts Policy with Telluride Properties, LLC as the sole owner and beneficiary. (*Id.*, Statement of Undisputed Material Facts ¶ 34; *admitted at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 34.) The Butts Policy expressly

incorporated the Butts Application.  (*Id.*, Statement of Undisputed Material Facts ¶ 35; *admitted at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 35.)

> ### d.    *Mr. Butts' Participation in Heli-Skiing and Related Safety Training*

In deposition, Mr. Butts' ex-wife testified that Mr. Butts had participated in approximately ten to fifteen heli-skiing trips with heli-skiing operator, Selkirk-Tangiers Helicopter Skiing Ltd. ("Selkirk-Tangiers") and more heli-skiing trips to Canada with another heli-skiing operator.  (*Id.*, Statement of Undisputed Material Facts ¶ 69; *admitted at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 69.)  In a letter dated July 18, 2005, counsel for Defendants provided documentation confirming that Mr. Butts had taken week-long heli-skiing trips to British Columbia every year for at least six consecutive years prior to his application.  (*Id.*, Statement of Undisputed Material Facts ¶ 55; *admitted at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 55.)  Each year, Mr. Butts had signed a "Release of Liability, Waiver of Claims, Assumption of Risk and Indemnity Agreement," each of which included the following language:

> I am aware that wilderness skiing involves risks, dangers and hazards in addition to those normally associated with downhill skiing.  Avalanches occur frequently in the alpine terrain used for wilderness skiing and may be caused by natural forces or by skiers.  I acknowledge and accept that the [o]perators and their staff may fail to predict whether the alpine terrain is safe for skiing or whether an avalanche may occur.  The alpine terrain used for wilderness skiing is uncontrolled, unmarked, not inspected and involves many risks, dangers and hazards in addition to that of avalanche.
>
> * * *
>
> I AM AWARE OF THE RISKS, DANGERS AND HAZARDS ASSOCIATED WITH WILDERNESS SKIING AND I FREELY ACCEPT AND FULLY ASSUME ALL SUCH RISKS, DANGERS AND HAZARDS AND THE POSSIBILITY OF PERSONAL INJURY, DEATH, PROPERTY DAMAGE OR LOSS RESULTING THEREFROM.

(*Id.*, Ex. 27 at 1, 3–8 [Selkirk-Tangiers Releases].)

Selkirk-Tangiers provides its guests with: (1) avalanche rescue and survival training; (2) helicopter safety training; and (3) specialized equipment such as "avalanche beacons," which signal to rescuers the location of skiers buried in avalanches. (*Id.*, Statement of Undisputed Material Facts ¶ 68; *admitted in relevant part at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 68.) Prior to each of his heli-skiing trips with Selkirk-Tangiers, Mr. Butts participated in mock avalanche drills and other on-site, hands-on training on helicopter safety protocols and avalanche rescue and survival. (*Id.*, Statement of Undisputed Material Facts ¶¶ 69, 71–72; *admitted at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶¶ 69, 71–72.) Although not required by Selkirk-Tangiers, Mr. Butts also purchased and wore an "Avalung" on 2004 and 2005 heli-skiing trips. (*Id.*, Statement of Undisputed Material Facts ¶ 74; *admitted in relevant part at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 74.) An Avalung is a product designed to provide a few minutes of air should its user become buried in an avalanche. (*Id.*) Mr. Butts never wore any such equipment while skiing at Telluride Ski Area. (*Id.*, Statement of Undisputed Material Facts ¶ 79; *admitted in relevant part at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 79.)

### *e.   Mr. Butts' Death*

On January 15, 2005, Mr. Butts traveled to Revelstroke, British Columbia with a group of friends for a week of heli-skiing in the Selkirk Mountains. (*Id.*, Statement of Undisputed Material Facts ¶ 44; *admitted at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 44.) The group hired Selkirk-Tangiers. (*Id.*, Statement of Undisputed Material Facts ¶ 45; *admitted in relevant part at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 45.)

On January 18, 2005, Mr. Butts was heli-skiing with his friends when an avalanche broke above them. (*Id.*, Statement of Undisputed Material Facts ¶ 46; *admitted at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 46.) The avalanche caught Mr. Butts, and swept him into some trees. (*Id.*, Statement of Undisputed Material Facts ¶ 47; *admitted at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 47.) Within minutes, Mr. Butts was found dead with a broken neck. (*Id.*, Statement of Undisputed Material Facts ¶ 48; *admitted at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 48.)

> f.    *Plaintiff's Investigation*

After receiving notification of Mr. Butts' death, Plaintiff initiated an investigation through International Claims Specialists, Inc., an outside firm Plaintiff employs to investigate claims. (*Id.*, Ex. 20 ¶ 6 [Heatherly Aff.], Ex. 21 at 49 [Heatherly Dep.].) Plaintiff received anecdotal evidence from Mr. Butts' executrix that Mr. Butts had previously participated in heli-skiing trips. (*Id.*, Statement of Undisputed Material Facts ¶ 50; *admitted at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 50.)

In March 2005, Plaintiff's chief underwriter, Mr. Steven R. Hetherington, composed an opinion as to the impact of heli-skiing on the risk assumptions for the Butts Policy. (*Id.*, Statement of Undisputed Material Facts ¶ 51; *admitted at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 51.) Mr. Hetherington determined that had Mr. Butts disclosed his heli-skiing activities, the Butts Policy would have been "rated" in the amount of an extra $2.50 per thousand dollars of coverage. (*Id.*, Statement of Undisputed Material Facts ¶ 52; *admitted in relevant part at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 52.) Ms. Marilyn Reed, Plaintiff's Vice President of Underwriting, determined that Plaintiff should contest

the Butts Policy claim because "a reasonable person should know that helicopters, skiing in out of

bounds [sic] territory etc [sic] are hazardous." (Pl. W. Coast Life Ins. Co.'s Reply Br. in Supp. of

its Mot. for Summ. J., Ex. 25 [3/29/05 Email] [filed Aug. 1, 2006] [hereinafter "Pl.'s Reply"].)

Plaintiff's underwriters testified that had Mr. Butts disclosed his heli-skiing avocation, his

annual premium would have almost tripled, rising from $4,880 to $12,380. (Pl.'s Br., Statement

of Undisputed Material Facts ¶¶ 80–81; *admitted at* Defs.' Resp., Resp. to Statement of

Undisputed Material Facts ¶¶ 80–81.) After learning Plaintiff had denied the Butts Policy claim,

Plaintiff's independent agent, Mr. Stuart Bachman, contacted other life insurance companies to

determine if they applied an additional rating for heli-skiing. (*Id.*, Statement of Undisputed

Material Facts ¶ 85; *admitted at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶

85.) Every carrier Mr. Bachman contacted indicated that heli-skiing would result in an additional

rating of at least $2.50 per thousand dollars of coverage. (*Id.*, Statement of Undisputed Material

Facts ¶ 86; *admitted at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 86.)

### g.      *Denial of Claim under the Butts Policy*

Plaintiff's contestable claims committee met on July 26, 2006 to discuss and evaluate the

Butts Policy claim. (*Id.*, Statement of Undisputed Material Facts ¶ 58; *admitted at* Defs.' Resp.,

Resp. to Statement of Undisputed Material Facts ¶ 58.) The committee considered whether "a

reasonable objective person's interpretation" of Question 5 would have lead such a person to

disclose a heli-skiing avocation such as Mr. Butts'. (Defs.' Br., Ex. A–19 at 47 [Rucks Dep.].)

The committee did not consider whether Mr. Butts was an expert skier, whether he believed heli-

skiing was hazardous, or if he had heli-skied previously without incident because it felt that such

information was irrelevant to its decision. (*Id.*) The committee voted unanimously to deny

payment under the Butts Policy based on Mr. Butts' failure to disclose that he regularly heli-skied. (Pl.'s Br., Ex. 29 at 3–4 [Denial Letter].)

Defendants' expert contends that an expert skier such as Mr. Butts — and any reasonable person with Mr. Butts' physical and mental characteristics — would not understand that Question 5 called for disclosure of heli-skiing, which, at least for an expert skier, is no more dangerous than resort skiing.[2]  (Defs.' Resp., Statement of Additional Disputed Facts ¶ 1; *denied at* Pl.'s Reply, Resp. Concerning Disputed Facts ¶ 1.)  The same expert contends that heli-skiing is not objectively hazardous, and is no more dangerous than skiing at a resort.  (*Id.*, Statement of Additional Disputed Facts ¶ 2; *denied at* Pl.'s Reply, Resp. Concerning Disputed Facts ¶ 2.)  However, a heli-skier is approximately 18,702 times more likely to die in an avalanche than is someone skiing within bounds at a ski resort.  (Pl.'s Br., Statement of Undisputed Material Facts ¶ 67; *admitted at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 67.)

## 2.    *Procedural History*

On September 12, 2005, Plaintiff filed its complaint, seeking: (1) judicial confirmation that it was entitled to rescind the Butts Policy; and (2) a declaration that the Butts Policy was void *ab initio* and Plaintiff is thus not liable to Defendants thereunder.  (Compl. ¶¶ 38, 44 [filed Sept. 12,

---

[2]Defendants proffer the opinions of their expert witnesses as if they were objective fact. (*See, e.g.*, Defs.' Resp., Statement of Additional Disputed Facts ¶¶ 1–11.)  I refuse to treat them as such.  Compounding this problem, many of such proffered "facts" contain legal conclusions, notwithstanding my rule explicitly baring such conclusions in the facts section of summary judgement briefs.  (*See id.*, Statement of Additional Disputed Facts ¶¶ 5–11; Practice Standards — Civil, Special Instructions Concerning Motions for Summary Judgment ¶ 7 [barring legal argumentation in the facts sections of summary judgment briefs].)  Consequently, Defendants' Additional Disputed Facts five through eleven are hereby stricken for failure to comply with my procedural rules.

2005].)  On October 11, 2005, Defendants filed their answer, asserting counterclaims for: (1)

breach of contract; (2) bad faith breach; and (3) violation of the Colorado Consumer Protection

Act, Colorado Revised Statutes section 6–1–101 *et seq.*  (Defs.' Answer and Counterclaims [filed

Oct. 11, 2005].)  On October 31, 2005, Plaintiff responded to Defendants' counterclaims.  (W.

Coast Life Ins. Co.'s Reply [sic] to Def. Telluride Properties LLC's [sic] Counterclaims [filed

Oct. 31, 2005].)  On July 29, 2006, this court dismissed Defendants' Consumer Protection Act

counterclaim with prejudice.  (Order [filed July 29, 2006].)

On July 26, 2006, Defendants filed a motion for partial summary judgment, asserting that:

(1) Plaintiff could not prove three of the necessary elements required to rescind an insurance

contract; and (2) Defendants were entitled to judgment as a matter of law on their breach of

contract claim.  (Defs.' Br. at 12–23.)  On July 17, 2006, Plaintiff filed its response.  (Pl.'s Resp.)

On August 1, 2006, Defendants filed their reply.  (Defs.' Reply in Supp. of Mot. for Partial

Summ. J. [filed Aug. 1, 2006] [hereinafter "Defs.' Reply"].)

On July 26, 2006, Plaintiff filed a motion for summary judgment, asserting that: (1) it is

entitled to rescind the Butts Policy based on Mr. Butts' failure to disclose his heli-skiing

avocation; and (2) Defendants' counterclaims are therefore meritless.  (Pl.'s Br. at 19–28.)  On

July 17, 2006, Defendants filed their response.  (Defs.' Resp.)  On August 1, 2006, Plaintiff filed

its reply.  (Pl.'s Reply.)  Both motions are fully briefed.

## ANALYSIS

### 1.   *Legal Standard*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant

summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)

(2006); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Concrete Works, Inc.*

*v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). The moving party bears the

initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the

burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material

matter." *Concrete Works*, 36 F.3d at 1518 (citing *Celotex*, 477 U.S. at 325). The nonmoving

party may not rest solely on the allegations in the pleadings, but must instead designate "specific

facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P.

56(e) (2006). A fact in dispute is "material" if it might affect the outcome of the suit under the

governing law; the dispute is "genuine" if the evidence is such that it might lead a reasonable jury

to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir.

1997) (citing *Anderson*, 477 U.S. at 248). The court may consider only admissible evidence when

ruling on a summary judgment motion. *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d

1467, 1474 (10th Cir. 1985). The factual record and reasonable inferences therefrom are viewed

in the light most favorable to the party opposing summary judgment. *Byers v. City of*

*Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998) (citing *Concrete Works*, 36 F.3d at 1517).

2.	*Evaluation of Claims*

    a.	*Avoidance of Life Insurance Policies*

In *Hollinger v. Mutual Benefit Life Insurance Co.*, the Colorado Supreme Court held that in order to avoid a life insurance policy on the basis of misrepresentations in the application, the insurer must prove:

> (1) the applicant made a false statement of fact or concealed a fact in his application for insurance; (2) the applicant knowingly made the false statement or knowingly concealed the fact; (3) the false statement of fact or the concealed fact materially affected either the acceptance of the risk or the hazard assumed by the insurer; (4) the insurer was ignorant of the false statement of fact or concealment of fact and is not chargeable with knowledge of the fact; (5) the insurer relied, to its detriment, on the false statement of fact or concealment of fact in issuing the policy.

560 P.2d 824, 827 (Colo. 1977) (footnote omitted).  I consider each element in turn.

### i.    *False Statement or Concealment*

Regarding the first element, Question 5 asked Mr. Butts if he had "engaged in auto, motorcycle or boat racing, parachuting, skin or scuba diving, skydiving, or [sic] hang gliding or other hazardous avocation or hobby."  (Pl.'s Br., Ex. 2 at 2 [Butts Application].)  Plaintiff contends it is entitled to judgment as a matter of law because Mr. Butts' negative response to Question 5 was unreasonable in light of Mr. Butts' yearly heli-skiing vacations.  (*Id.* at 20.)  Defendants emphasize the fact that the term "hazardous" in Question 5 is undefined, arguing that the term and Question 5 as a whole are ambiguous as a matter of law.  (Defs.' Br. at 12–13.)  Defendants further contend that because Mr. Butts believed heli-skiing was not a dangerous activity, his response to Question 5 cannot constitute a misrepresentation.  (*Id.* at 16.)  I consider the parties' arguments below.

(A) *AMBIGUITY* — I first address Defendants' contention that because "hazardous avocation or hobby" went undefined, Question 5 is ambiguous.  Since the Butts Policy expressly

-15-

incorporated the Butts Application, I must apply thereto principles of contract interpretation. *Hecla Mining Co. v. N.H. Ins. Co.*, 811 P.2d 1083, 1090 (Colo. 1991). "Although a term used in a contract is ambiguous when it is susceptible to more than one reasonable interpretation, a mere potential for more than one interpretation of such term considered in the abstract, does not create an ambiguity." *Allstate Ins. Co. v. Juniel*, 931 P.2d 511, 513 (Colo. Ct. App. 1996) (citing *Hecla Mining Co.*, 811 P.2d 1083). It follows that "an insurance policy must be given effect according to the plain and ordinary meaning of its terms." *Terranova v. State Farm Mut. Auto. Ins. Co.*, 800 P.2d 58, 60 (Colo. 1990). Thus, the terms of an insurance contract:

> should be read in the sense which the insurer had reason to believe they would be interpreted by the ordinary reader and purchaser. The test to be applied is not what the insurer intended by his words, but what the ordinary reader and purchaser would have understood them to mean.

*Davis v. M.L.G. Corp.*, 712 P.2d 985, 989 (Colo. 1986); *see also id.* at 990 ("Words are [to be] given effect according to their ordinary or popular meaning.").

I find the term "hazardous avocation or hobby" is unambiguous, particularly as it appears in the context of Question 5, the questions that preceded it, and the scope of information relevant to an application for life insurance. An "ordinary reader and purchaser" of life insurance must understand that he is agreeing to pay a premium in exchange for the insurer's promise to pay benefits in the event of his untimely demise. Such a purchaser must also understand that the more likely he is to die, the more he will have to pay for such insurance. Thus, such an "ordinary reader and purchaser" would understand that an insurer would be very much interested in learning about any activities that increase his chances of premature death, such as smoking, drug or alcohol

-16-

abuse, reckless driving, or amateur aviation.  The four questions preceding Question 5 inquire into these exact activities.  (*See* Pl.'s Br., Ex. 2 at 2 [Butts Application].)

Question 5 itself asks whether the applicant engages in a variety of specific activities (such as skydiving, motorized racing, and scuba diving) that focus the applicant on risks of death (such as falling through the sky, racing at rapid speeds, and diving deep into the ocean) not attendant to more run-of-the-mill activities.  (*See id.*, Ex. 2 at 2 [Butts Application].)  The purpose of the use of such examples in association with the inquiry into "other hazardous avocations or hobbies" is obvious: to get the applicant to think about what he or she does that might pose risks similar to those posed by the enumerated activities.[3]  (*See* Defs.' Br., Ex. A–6 at 81–82 [Youngquist Dep.] [noting the activities listed in Question 5 are intended to trigger an association with any hazardous activities in which an applicant engages].)

Defendants argue that Question 5, with its open-ended, "catch-all phrase 'or other hazardous avocation or hobby,'" is "overly broad."  (Defs.' Br. at 14–15.)  In light of the fact that Mr. Butts answered "no" to Question 5, this contention is difficult to credit.  If the question really sought too much, then Mr. Butts unquestionably yielded too little.  Regardless, the case upon which Defendants rely does not support a finding of overbreadth here.  Defendants rely on a special concurrence in *Hollinger*, in which Justice Erickson acknowledged the court's holding that the materiality of a false statement "does not depend upon the opinion or upon the actual or subjective knowledge of the applicant," but emphasized that an insurer is not at liberty to deny

---

[3]Although Defendants suggest otherwise, it would be onerous and unnecessary to require insurance companies to provide either an all-inclusive list of hazardous activities or a specific question concerning heli-skiing.  *See generally Am. Eagle Fire Ins. Co. v. Peoples Compress Co.*, 156 F.2d 663, 667 (10th Cir. 1946) (stating that "honesty, good faith, and fair dealings require" insured to communicate material facts to insurer).

coverage on the basis of a question that is "ambiguous or too general to evoke a material response." 560 P.2d at 827 (Erickson, J., specially concurring).  Justice Erickson's special concurrence explicitly refers to *Hollinger*'s companion case, *Wade v. Olinger Life Ins. Co.*, 560 P.2d 446 (Colo. 1977).  *Id.*  In *Wade*, an insurer sought to deny coverage based on an applicant's alleged misstatements in response to an ambiguous and overly broad question.  *Wade*, 560 P.2d at 448; *Hollinger*, 560 P.2d at 827.  This question asked:

> Does any person above named now have or did he or she ever have any of the following: Heart trouble, high blood pressure, tuberculosis, paralysis, cancer, epilepsy, tumor, venereal disease, kidney trouble, ulcer, diabetes, alcoholism, asthma, emphysema, dropsy, swelling or edema, circulatory ailment, rheumatism, arthritis, rheumatic fever, muscular disease, physical injury, physical or mental defect, other disease or ailment or surgical operation?

*Wade*, 560 P.2d at 448.  The *Wade* opinion recognized that this question, "if taken literally, would require an open-ended, exhaustive disclosure of even the slightest ill-feeling ever suffered by [the applicant]."  *Id.* at 450.  Thus, the court determined that it was reasonable to infer that the insurer was only interested in "serious" medical conditions.  *Id.*  This inferred limitation to "serious" medical problems is analogous to Question 5's express limitation to "hazardous" activities.  Significantly, the potential breadth of terms such as "serious" and "hazardous" is bounded by the law's imposition of a reasonableness standard:  "A particular misrepresentation . . . must be such that a [r]easonable person would, under the circumstances, have understood that the question calls for disclosure of specific information."  *Id.* at 452.  In light of an insurer's right to expect an applicant to construe an application question reasonably, I find that Question 5's inquiry into "hazardous" activities is neither overbroad nor ambiguous.

*(B) MISREPRESENTATION* — A misrepresentation occurs when an applicant withholds information that "a [r]easonable person would, under the circumstances, have understood" the insurance application requests. *Id.* For the reasons set forth below, I find that a reasonable person would have understood Question 5 to encompass the heli-skiing activities in which Mr. Butts was involved for years prior to applying for the Butts Policy. It is undisputed that the heli-skiing operator Mr. Butts skied with required its clients to: (1) demonstrate proficiency in avalanche rescue techniques and equipment; (2) undergo training on safety protocols associated with helicopter loading, flight, off-loading, and landing; and (3) carry an avalanche beacon while skiing. (Pl.'s Br., Statement of Undisputed Material Facts ¶¶ 71–73, 75; *admitted at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶¶ 71–73, 75.) Such training took place prior to the execution of a waiver and release agreement in which Mr. Butts recognized that: (1) wilderness skiing involves "risks, dangers and hazards in addition to those normally associated with downhill skiing;" (2) avalanches occur frequently in the alpine terrain used for wilderness skiing; (3) the skiing outfit's "staff may fail to predict whether the alpine terrain is safe for skiing or whether an avalanche may occur;" and (4) the "alpine terrain used for wilderness skiing is uncontrolled, unmarked, not inspected and involves many risks, dangers and hazards in addition to that of avalanche."[4] (*Id.*, Ex. 27 at 1, 3–8 [Selkirk-Tangiers Releases].) Additionally, it is undisputed that Mr. Butts chose to purchase and carry an "Avalung" avalanche emergency air

---

[4]The law charges a party to a contract such as the release with knowledge of its contents. *Barciak v. United of Omaha Life Ins. Co.*, 777 F. Supp. 839, 843 (D. Colo. 1991) ("[O]ne who signs a contract is presumed to have read and understood each of its terms."); *O'Brien v. Houston*, 262 P. 1020, 1021 (Colo. 1927) ("[O]ne cannot say he did not know the contents of a contract he has executed.").

supply while heli-skiing.  (*Id.*, Statement of Undisputed Material Facts ¶ 74; *admitted in relevant part at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 74.)

Based on these undisputed facts, I find as a matter of law that a reasonable person would understand Question 5 calls for an applicant to report heli-skiing activities in response thereto. An ordinary person would recognize that a sport presenting "risks, dangers and hazards in addition to those normally associated with downhill skiing" is precisely the sort of "hazardous" activity that might pique a life insurer's interest.  (*See id.*, Ex. 27 at 1, 3–8 [Selkirk-Tangiers Releases].)  Even absent having signed a waiver expressly acknowledging such risk, a reasonable, ordinary person would understand that a sport whose participants equip themselves with "avalanche beacons" and "Avalungs" and then ride in helicopters to the summits of isolated backcountry mountains in order to ski down ungroomed alpine terrain obviously falls along with sky diving, hang gliding, and scuba diving into the commonsense category of "hazardous" activities — rather than into a category of comparatively non-hazardous pastimes such as basketball, tennis, and stamp collecting.  Although the court recognizes that certain activities may well tax the distinction between hazardous and non-hazardous activities (*e.g.*, mountain biking, ice hockey, or quail hunting), no reasonable insurance purchaser would view backcountry helicopter skiing as such a borderline activity.

Defendants make three feeble arguments counseling against this determination.  Although Defendants point to their expert witness' opinion and assert that "[h]eli-skiing is not objectively hazardous," I find that the witness' opinion testimony is generally unfounded and marginally relevant at best.  (*See* Defs.' Resp., Statement of Additional Material Facts ¶¶ 1–4.)  Mr. Vincent Anderson, a "certified alpine and ski mountaineering guide with experience in heli-skiing guiding,"

states in his report: "[I]t is my professional opinion that the risks involved in participating in a

guided heli-skiing trip . . . are not unreasonably high and are no greater than that involved in

skiing at a ski resort." (*Id.*, Ex. A–35 at 6 [Anderson Report].)  Mr. Anderson's opinions are

difficult to embrace, though, in light of: (1) Defendants' admission that a heli-skier is

approximately 19,000 times more likely to die in an avalanche than someone skiing within bounds

at a ski resort, (Pl.'s Br., Statement of Undisputed Material Facts ¶ 67; *admitted at* Defs.' Resp.,

Resp. to Statement of Undisputed Material Facts ¶ 67); (2) language in the Selkirk-Tangiers

release stating backcountry skiing poses hazards beyond those of typical downhill skiing, (*id.*, Ex.

27 at 1, 3–8 [Selkirk-Tangiers Releases]); (3) the fact that it is accepted practice among life

insurers to apply an additional rating of at least $2.50 per thousand dollars of coverage for heli-

skiers, (*id.*, Statement of Undisputed Material Facts ¶ 86; *admitted at* Defs.' Resp., Resp. to

Statement of Undisputed Material Facts ¶ 86); and (4) Mr. Anderson's admission that he only

"measure[s] risk levels *subjectively*."  (Pl.'s Reply, Ex. 46 at 63, 64–65 [Anderson Dep.]

[emphasis added].)  Moreover, while Mr. Anderson's report states "advanced and expert skiers

have much less risk of being involved in a fatal avalanche," in deposition Mr. Anderson declined

to refute the following statement from an avalanche study: "Almost all avalanche accidents occur

to [sic] recreationists who are very skilled at their sport."  (Defs.' Resp., Ex. A–35 at 7 [Anderson

Report]; Pl.'s Reply, Ex. 46 at 120 [Anderson Dep.].)  Mr. Anderson's "expert" opinions, then,

are contradicted by Defendants' admissions, objective fact, insurance industry practice, the

Selkirk-Tangiers release, and Mr. Anderson's own admissions.  In sum, he is not particularly

credible.  The final nail in Mr. Anderson's coffin, though, is hammered home by Defendants'

failure to explain how his unavailing opinions bear upon how an "ordinary reader and purchaser"

of life insurance would understand Question 5.  I am at a loss, and Defendants' silence on the issue does not help me along.

Second, Defendants assert that the court should consider "[Mr.] Butts' subjective state of mind and belief, including his experience as a skier and his prior uneventful experiences heli-skiing, in assessing whether Mr. Butts would understand that heli-skiing was a 'hazardous['] activity within the meaning of Question 5." (Defs.' Br. at 15.)  Defendants' position is unmoored from both logic and precedent.  Moreover, it conflates *Hollinger*'s first element — whether a misrepresentation was made — with its second element — whether such misrepresentation was made knowingly.  *See* 560 P.2d at 827.

Regardless of whether Defendants make their argument under the first or second element, however, Mr. Butts' subjective beliefs are irrelevant.  An insurance applicant might well genuinely believe, thanks to her favorable experiences handling small arms and her "prior uneventful experiences" playing Russian roulette, that the game is beyond the ambit of Question 5, and answer it in the negative.  Under Defendants' view, such an applicant could continue playing and rest assured that her beneficiaries would be entitled to receive her life insurance benefits should her lucky streak abruptly terminate.  In turn, life insurance premiums would increase for those poor saps whose "subjective state of mind and belief" precludes them from playing Russian roulette.  Fortunately, this is not how the insurance game is played.  The Colorado Supreme Court offers up a healthy dose of reality:

> [A]n applicant may "know" that he . . . has had "any physical injury" [as stated in a health insurance application] in the sense of a bruise or sore muscle from some routine physical activity.  Under the rule announced in this case, the trier of fact would look at the circumstances of the case, *e.g.*, the bruise or soreness, and decide if a *reasonable person would have perceived it as an item which, because*

*of the nature of the questions asked and the type of insurance, the insurer would desire to know about in assessing the risks.*

*Wade*, 560 P.2d at 452–53 (emphasis added).  Consequently, I reject Defendants' contention that the inquiry should focus on Mr. Butts' "subjective state of mind and belief."  As clearly set forth above, the proper inquiry is whether a "reasonable person" would have thought that Mr. Butts' yearly backcountry helicopter skiing trips required an affirmative answer to Question 5.

Third, Defendants argue, in a similar vein, that Question 5 *itself* seeks a subjective answer, such that if Mr. Butts' believed that heli-skiing was not hazardous, then his answer to Question 5 was not a misrepresentation.  (Defs.' Br. at 15.)  Defendants arrive at this conclusion by way of reference to language at the end of the Butts Application, wherein Mr. Butts affirmed that all answers in the "application [were] full, complete and true to the best of [his] *knowledge and belief*."  (*Id.* at 15–16 [emphasis added].)  Again, I note that this argument straddles *Hollinger*'s first and second elements.  *See* 560 P.2d at 827.  In support, Defendants cite to *Hauser v. Life Gen. Sec. Ins. Co.*, 56 F.3d 1330, 1334 (11th Cir. 1995), in which the Eleventh Circuit examined whether an inaccurate statement had been made in an insurance application under Florida law. (*Id.* at 16.)  In *Hauser*, the insurance application at issue similarly required a prospective insured to affirm that she had answered the insurer's questions "to the best of [her] belief and knowledge."  56 F.3d at 1334.  The *Hauser* court concluded: "Where an insurer only requests the disclosure of information to the best of the insured's 'knowledge and belief,' and where the applicant so complies, we will decline to protect the insurer 'from a risk it assumed by virtue of the contractual language it drafted.'"  *Id.* at 1335 (quoting *William Penn Life Ins. Co. v. Sands*,

912 F.2d 1359, 1364 [11th Cir. 1990]).  While Defendants quote the immediately preceding language, they omit reference to the limiting principle espoused promptly thereafter:

> The twin qualifiers [knowledge and belief] require[] that knowledge not defy belief. . . .  What the applicant in fact believed to be true is the determining factor in judging the truth or falsity of his answer, but only so far as that belief is not clearly contradicted by the factual knowledge on which it is based.  In any event, a court may properly find a statement false as a matter of law, however sincerely it may be believed.  To conclude otherwise would be to place insurance companies at the mercy of those capable of the most invincible self-deception — persons who having witnessed the Apollo landing still believe the moon is made of cheese.

*Id.* (quoting *Sands*, 912 F.2d at 1365) (further citations omitted) (alterations in original).  The record contains uncontroverted evidence of Mr. Butts' knowledge of the multiple dangers of backcountry helicopter skiing: (1) he underwent the above-referenced training each year; (2) he signed the above-referenced waiver six separate times; (3) he wore an avalanche beacon while heli-skiing; and (4) he even purchased and carried the "Avalung," in clear recognition of the deadly possibility of avalanche.  (Pl.'s Br., Statement of Undisputed Material Facts ¶¶ 71–72, 74; *admitted at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶¶ 71–72, 74.)  If, as Defendants contend, Mr. Butts genuinely believed that heli-skiing was not a "hazardous" activity along the lines of skydiving, motor racing, or scuba diving, then the law must step in to protect Plaintiff from being held at the mercy of such self-deception.  *See Hauser*, 56 F.3d at 1335.  Thus, assuming (1) Colorado law endorses the view that the Butts Application's "knowledge and belief" language does indeed transform Question 5 into a question seeking a subjective response, and (2) Mr. Butts *believed* heli-skiing was safe, I find that his response to Question 5 was false as a matter of law under *Hauser* in light of the undisputed evidence of his *knowledge* to the contrary.

Finally, Defendants also contend that *Sands* and a Florida Supreme Court case applying *Sands* support their contention that the "knowledge and belief" language transforms Question 5 into a question seeking a subjective response.  (Defs.' Br. at 17.)  I disagree.  Neither case dealt with a scenario where an insured's belief in a representation made to the insurance company defied his or her own knowledge.  *See Sands*, 912 F.2d at 1360, 1364 (finding no misrepresentation where applicant who did not know he had HIV denied, to the "best of his knowledge and belief," having "blood disorder"); *Green v. Life & Health of Am.*, 704 So. 2d 1386, 1388, 1391 (Fla. 1998) (finding no misrepresentation where applicant, whose doctor exclusively employed layman's terms such as "slow kidneys" or "little kidneys" to explain applicant's health ailments to him, denied, to the best of his "knowledge and belief," suffering "chronic renal failure").

### ii.     *Knowing Misrepresentation or Concealment*

The second *Hollinger* element looks to whether the applicant knowingly made a false statement or concealment.  560 P.2d at 827.  This element  "require[s] an element of knowledge, while dispensing with proof of an intent to deceive." *Wade*, 560 P.2d at 451.  Plaintiff argues *Wade*'s reasonableness standard requires disclosure of heli-skiing because a reasonable person in Mr. Butts' position would have understood that heli-skiing was an activity about which a life insurer would need to know in order to underwrite the risk.  (Pl.'s Br. at 22.)  Defendants merely reargue their contention that Mr. Butts's subjective beliefs control the *Hollinger* analysis, contending that since Mr. Butts believed heli-skiing was "very safe," he could not have knowingly misrepresented the facts when he answered Question 5.  (Defs.' Br. at 18–20; Defs.' Resp. at 16.) Indeed, Defendants argue that the only way Plaintiff could prove a knowing false statement or

concealment would be "if the [Butts] Application asked Mr. Butts 'Do you heli-ski?' and he answered 'No.'"[5]  (Defs.' Resp. at 18.)  Defendants are sorely misguided.

I have already found as a matter of law that: (1) a reasonable, ordinary reader and purchaser of life insurance would understand that Question 5 calls for an applicant to report the helicopter skiing activities in which Mr. Butts engaged; and, thus, (2) Mr. Butts' negative response to Question 5 constitutes a misrepresentation.  (*See Analysis* § 2ai, *supra*.)  Although Mr. Butts may well have subjectively believed that heli-skiing was a "very safe" activity, there is ample undisputed evidence that he knew of the significant dangers the sport presents.  Because the law essentially charges an insurance applicant with reasonableness, on the undisputed facts before me there is no way that Mr. Butts could have known of the dangers involved in heli-skiing and truthfully denied engagement in hazardous activities in response to Question 5.

Defendants revisit their contention that Question 5 sought "'to probe [the] applicant's state of mind.'"  (Defs.' Br. at 18–19.)  I remain unconvinced.  It is obvious from the focus, text, and thrust of the Butts Application that Plaintiff did not care about Mr. Butts' subjective beliefs.  Rather, it merely sought to learn about those lifestyle choices that made Mr. Butts a more risky life insurance candidate.  (*See* Pl.'s Br., Ex. 2 at 2 [Butts Application].)

Next, Defendants contend Plaintiff has no evidence that Mr. Butts actually "knew . . . that heli-skiing was hazardous when he responded to Question 5."  (Defs.' Br. at 20.)  This is not true.  As set forth above, Plaintiff proffered, *inter alia*, undisputed evidence that Mr. Butts: (1) signed

---

[5]As Hemingway famously noted, "'the most essential gift for a good writer is a built-in, shock-proof shit detector.'"  Jeffrey Meyers, Hemingway: A Biography 139 (Da Capo Press ed. 1999) (1985).  The assertion to which this footnote is appended is the olid consequence of writing executed without the benefit of such detection.

at least six liability releases concerning the hazards of heli-skiiing; (2) repeatedly underwent training for the dangers posed by heli-skiing; and (3) carried his Avalung and an avalanche beacon only when heli-skiing.  (*See Analysis* §2ai, *supra*.)  Even construing such facts in the light most favorable to Defendants, it is clear that such releases, training, and equipment would only be necessary for an activity that presented a risk of injury or death commensurate to the other activities listed in Question 5.

Finally, Defendants tenaciously — or perhaps belligerently — argue Plaintiff's contestable claims committee applied the wrong standard in denying the Butts Policy.  (Defs.' Br. at 20.)  Although the argument might sound novel at first blush, it is nothing more than Defendants' all-too-familiar subjective belief argument dressed up in new clothes: "[The committee] evaluated Mr. Butts' response to Question 5 based on an average, reasonable person, not a person similar to Mr. Butts and having his knowledge, experience, background, and skiing ability."  (*Id.*)  Winning on summary judgment is not like leaving Oz.  Defendants cannot prevail by scrunching their eyes to the law, clicking their heels three times, and repeating a refrain over and over and over.

### iii.    Materiality

Next, Plaintiff must prove "the false statement of fact or the concealed fact materially affected either the acceptance of the risk or the hazard assumed by the insurer."  *Hollinger*, 560 P.2d at 827.  Plaintiff argues that Mr. Butts' misstatement materially affected its acceptance of the risk embodied by the Butts Policy.  (Pl.'s Br. at 23.)  In support, Plaintiff points to undisputed evidence that had heli-skiing been disclosed in response to Question 5, the Butts Policy premium would have almost tripled.  (*Id.*; *see also id.*, Statement of Undisputed Material Facts ¶¶ 80–82.)  Defendants argue that the misstatement "did not materially affect the acceptance of the

risk . . . because [Plaintiff] would have issued the policy regardless of Mr. Butts' heli-skiing."

(Defs.' Resp. at 21.)  I find that the scope of materiality is necessarily broader than Defendants

suggest.

If the Colorado Supreme Court intended for an insurer to be able to rescind insurance

policies only in cases where the insurer would not have insured the applicant had it been truthfully

informed, it would have so stated.  It did not.  Instead, the court indicated that a

misrepresentation "must be [a]ctually material to the insurer's risk, as demonstrated by customary

underwriting procedures . . . ."  *Wade*, 560 P.2d at 409.  In the instant case, it is undisputed that

Plaintiff's underwriting manual would have supported an increase in the Butts Policy's annual

premium from $4,880 to $12,380 based exclusively upon Mr. Butts' heli-skiing vacations.  (Pl.'s

Br., Statement of Undisputed Material Facts ¶ 81; *admitted at* Defs.' Resp., Resp. to Statement of

Undisputed Material Facts ¶ 81.)  Moreover, it is undisputed that other insurers similarly

underwrite the risk posed by heli-skiing.  (*Id.*, Statement of Undisputed Material Facts ¶ 85;

*admitted at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 85.)  Indeed,

Defendants' own claims and underwriting expert witness characterized this price increase as

"significant."  (*Id.*, Statement of Undisputed Material Facts ¶ 82; *admitted at* Defs.' Resp., Resp.

to Statement of Undisputed Material Facts ¶ 82.)  Consequently, I find that there is no issue of

fact as to whether nondisclosure of heli-skiing materially affected the hazard assumed by Plaintiff

under the Butts Policy.

### iv.    Ignorance/Chargeability

*Hollinger*'s fourth prong requires that Plaintiff prove it "was ignorant of the false statement of fact or concealment of fact and is not chargeable with knowledge of the fact."  560 P.2d at 827.  Defendants assert that Plaintiff is chargeable with knowledge of Mr. Butts' heli-skiing because Plaintiff should have investigated "what type of skiing [Mr. Butts] enjoyed" once it learned he skied from the First Financial Report.  (Defs.' Br. at 22–23.)  Plaintiff contends that: (1) it had no knowledge of Mr. Butts' heli-skiing; and (2) since Mr. Butts only indicated to Mr. Chu that he enjoyed skiing in response to a question concerning "recreational activities," such a response cannot be used to impute knowledge of heli-skiing to Plaintiff.  (Pl.'s Br. at 25.)  For the reasons set forth below, I agree with Plaintiff.

Both parties cite to a Tenth Circuit case applying Oklahoma law for the proposition that in order to decide whether an insurer is chargeable with knowledge of an undisclosed fact material to coverage, one must consider whether the insurer "had sufficient information that would have put a prudent man on notice and would have caused him to start an inquiry which, if carried out with reasonable thoroughness, would have revealed the truth."  *Major Oil Corp. v. Equitable Life Assurance Soc.*, 457 F.2d 596, 604 (10th Cir. 1972); *accord Jones v. New York Life & Annuity Corp.*, 61 F.3d 799, 802 (10th Cir. 1995) (applying an analogous test under Utah law); *Columbian Nat'l Life Ins. Co. v. Rodgers*, 116 F.2d 705, 707 (10th Cir. 1940) (applying an analogous test under Kansas law).  Although my research revealed no Colorado state case adopting the test endorsed in *Major Oil Corp.*, I am convinced that if it were called upon to announce a test for deciding when an insurer is chargeable with knowledge of concealed application information, the Colorado Supreme Court would endorse *Major Oil Corp.*'s sound

adaptation of general principles of misrepresentation to the specific contours of disputes arising

out of an insurance application.  *Cf. M.D.C./Wood, Inc. v. Mortimer*, 866 P.2d 1380, 1382 (Colo.

1994) ("If [the party alleging fraudulent misrepresentation] ha[d] access to information that was

equally available to both parties and would have led to the true facts, [such party] ha[s] no right

to rely upon the false representation."); *see also Fidelity Union Trust Co. v. Field*, 311 U.S. 169,

177 (1940) ("[I]t is still the duty of the federal courts, where the state law supplies the rule of

decision, to ascertain and apply that law even though it has not been expounded by the highest

court of the [s]tate.").   Indeed, this court has in the past applied *Major Oil Corp.*'s rule to a case

arising under Colorado law.  *See Barciak v. United of Omaha Life Ins. Co.*, 777 F. Supp. 839,

842–43 (D. Colo. 1991).

Turning to the instant case, Mr. Butts' negative response to Question 5 is, of course, not

the only information Plaintiff had when it decided to insure him.  In his report to Plaintiff on

behalf of First Financial, under a heading titled "Aviation-Recreation-Driving Record," Mr. Chu

carefully detailed Mr. Butts' piloting experience, briefly noted his scuba diving activities, and

stated: "Mr. Butts also enjoys skiing and golfing in his spare time.  He reported no other

recreational or hazardous pastimes in which he is active with [sic] on a regular basis."  (Pl.'s Br.,

Ex. 14 at 4 [First Fin. Report].)  Plaintiff's underwriter, Mr. Youngquist, interpreted "skiing" in

the report to mean resort skiing.  (Defs.' Br., Statement of Undisputed Material Facts ¶ 25;

*admitted in relevant part at* Pl.'s Resp., Resp. to Statement of Undisputed Material Facts ¶ 25.)

The "Winter Sports Life Ratings" table in Plaintiff's underwriting manual breaks skiing activities

down into six categories, specifically distinguishing "pleasure" skiing, which does not merit a life

insurance rate increase, from heli-skiing, which does.  (*Id.*, Ex. A–14 [Rating Table].)  Mr.

-30-

Youngquist was unaware of the fact that the underwriting manual treated different kinds of skiing differently and did not consult the manual during the course of underwriting Mr. Butts' policy. (*Id.*, Ex. A–6 at 27 [Youngquist Dep.].)

Based on the above-stated facts, Defendants contend "[Mr.] Butts' disclosure that he skied required [Plaintiff] to conduct an investigation into the nature of [Mr.] Butts' skiing precisely because of the six classification [sic] of skiing in the Winter Sports Life Ratings." (Defs.' Resp. at 22.) Defendants further assert Plaintiff's "failure to inquire into Mr. Butts' skiing was the direct result of its underwriter's ignorance of [Plaintiff's underwriting manual] and the assumptions he made regarding about [sic] the disclosure of 'skiing' contained in [the First Financial Report]." (*Id.* at 23.) While it is clear that it would have been quite easy for Mr. Youngquist to contact Mr. Butts to inquire into the nature of his skiing activities, I see no evidence suggesting that Mr. Youngquist had any reason to think that Mr. Butts' report that he skied recreationally merited such further inquiry. As he decided to insure Mr. Butts, Mr. Youngquist considered: (1) Mr. Butts' negative response to Question 5; (2) Mr. Butts' report to Mr. Chu that the only hazardous activities in which he engaged were scuba diving and private aviation; and (3) Mr. Butts' report to Mr. Chu that he "also enjoy[ed] skiing and golfing in his spare time." No reasonable mind would perceive this set of facts as one that would put "a prudent man on notice and would have caused him to start an inquiry" into whether the skiing Mr. Butts' engaged in was resort skiing or backcountry helicopter skiing.

Mr. Youngquist's ignorance of the ratings table concerning heli-skiing does not alter this conclusion. Indeed, even had Mr. Youngquist looked to the underwriting manual and noted the difference between resort skiing and heli-skiing, such awareness would not have sufficed to put a

prudent person on notice that he ought to further investigate a situation where an applicant

reports that he skis recreationally and denies hazardous activities.  If such were the burden of a

prudent insurance company, then it would seem that any report of a generally low-hazard

recreational activity — *e.g.*, wrestling, juggling, or fishing— would require the insurer to

investigate the myriad possible "extreme" variants thereof — *e.g.*, bear wrestling, juggling live

grenades, or whaling on the high seas.  The more prudent, practical, and manageable alternative is

to permit insurers to rely on the honesty and reasonableness of the people with whom they do

business.  *See Am. Eagle Fire Ins. Co.*, 156 F.2d at 667.

Although Defendants suggest otherwise, a comparison to the facts of *Barciak* is

unfavorable to their position.  (Defs.' Br. at 21; Defs.' Resp. at 22; Defs.' Reply at 26–27.)  In

that case, the applicant neglected to inform his life insurance company that, *inter alia*, he had a

serious heart condition.  777 F. Supp. at 841.  The applicant did, however, report having once

seen his doctor for a "headache" and undergoing a battery of tests (including a chest x-ray and an

EKG), but strangely reported that he did not know his doctor's diagnosis.  *Id.*  Promptly after the

insurer approved the applicant's life insurance application, he suffered a heart attack and expired.

*Id.*  The insurer's subsequent investigation into the insured's medical history revealed extended

treatment for a heart condition predating the application.  *Id.*  Notwithstanding the questions

raised by the reported battery of tests and the insured's questionable lack of knowledge of the

results thereof, the court emphasized the materiality of the applicant's misrepresentations and

concluded that the revealed information concerning the tests would not "cause a prudent person

to investigate [the plaintiff's] medical condition."  *Id.* at 844 (citing *Major Oil Corp.*, 457 F.2d

596; *Murray*, 584 P.2d 78).  The facts of the case at bar present even *less* compelling grounds for

-32-

notice justifying further investigation.  Unlike the insurance company in *Barciak*, which had at least some reason to suspect the applicant's representation concerning his doctor's visit for a "headache" in light of the battery of testing he underwent, Mr. Butts' report that he skied and golfed recreationally was *consistent* with his denial of hazardous activities in response to Question 5.

Defendants also suggest that *Major Oil Corp.* and *Rodgers* support their position.  (Defs.' Resp. at 22–23.)  Both cases are readily distinguishable.  In *Major Oil Corp.*, the insurer's independent investigation prior to issuance of the disputed policy revealed that the applicant had lied in the insurance application about his health — in particular, he had concealed his ongoing treatment for alcoholism.  457 F.2d at 598–99.  Moreover, another insurance company also considering the same applicant had called the insurer and reported that the applicant "had an alcoholic problem of a continuing nature and that [the insurer] ought to take a 'hard look at it.'"  *Id.* at 601.  The insurer nevertheless issued the policy, and the insured subsequently died of a liver-related ailment.  *Id.*  The Tenth Circuit concluded that the insurer was chargeable with the knowledge that it had so confoundingly disregarded.  *Id.* at 604.  The contrast between *Major Oil Corp.* and the instant case could not be more stark.  It is not as if Plaintiff in the instant case was receiving phone calls warning it that Mr. Butts was a regular heli-skier.  Plaintiff simply knew that Mr. Butts skied.  Had *Major Oil Corp.* endorsed charging the insurer with knowledge of the applicant's alcoholism by virtue of its awareness that the applicant was a connoisseur of fine wine, Defendants would have a solid analogy.  But such are not the facts.

In *Rodgers*, the applicant wrongly represented in his application that he had never been declined insurance.  116 F.2d at 706.  The insurer sought rescission, but the Tenth Circuit found

the insurer was estopped from asserting reliance upon such a misrepresentation because, prior to issuing the policy, it had in its possession information "'that the applicant had [previously] either been declined or had been rated differently from the established rates, or that some other unusual circumstances were involved.'"  *Id.* at 966.  Unlike the instant case, the insurer in *Rodgers* had in its possession specific knowledge that called into question the veracity of representations made in the application.  Plaintiff's knowledge that Mr. Butts enjoyed recreational skiing does not cast a shadow of doubt upon Mr. Butts' failure to disclose heli-skiing in response to Question 5.

Construing the facts before me in the light most favorable to Defendants, I find no reasonable mind could believe that Mr. Butts' report of recreational "skiing and golfing" ought to have put Plaintiff on notice that it should investigate Mr. Butts' recreational activities in further detail.  The implausibility of Defendants' position comes into sharper contrast when viewed in light of the fact that Mr. Butts *twice* failed to report his heli-skiing when asked if he engaged in hazardous activities.  Plaintiff was entitled to rely on such representations.  *See Am. Eagle Fire Ins. Co.*, 156 F.2d at 667.  Consequently, I find that there is no genuine issue of fact as to whether Plaintiff knew or was chargeable with knowledge of Mr. Butts' heli-skiing avocation.

        **v.**     **Reliance**

The final element Plaintiff must prove is that it "relied, to its detriment, on the false statement of fact or concealment of fact in issuing the policy."  *Hollinger*, 560 P.2d at 827.  The relevant facts are undisputed.  The Butts Policy was issued at a rate of $4,880 per annum.  (Pl.'s Br., Statement of Undisputed Material Facts ¶ 80; *admitted at* Defs.' Resp., Resp. to Statement of Undisputed Material Facts ¶ 80.)  Had Mr. Butts disclosed his heli-skiing avocation, Plaintiff would have insured his life at a rate of $12,380 per annum.  (*Id.*)  Thus, Plaintiff contends it relied

-34-

to its detriment on Mr. Butts' non-disclosure by issuing a policy at a rate that did not reflect the

risk for which it had bargained.  (Pl.'s Br. at 25.)  With apparent nostalgia for their argument

concerning materiality, Defendants familiarly contend Plaintiff "did not rely to its detriment on the

alleged false statement . . . 'in issuing the policy' . . . because it would have issued the policy

anyhow."  (Defs.' Br. at 12 n.3; Defs.' Resp. at 25.)

I disagree with Defendants' contention that *Hollinger*'s reliance prong "requires that

[Plaintiff] prove that the application would have been denied entirely . . . to justify rescission."

(Defs.' Br. at 12 n.3.)  Indeed, Defendants' further contention that this prong would otherwise be

"redundant and superfluous of [sic] the third prong's requirement that the false statement of

fact . . . materially affect . . . the acceptance of the hazard assumed by the insurer" is dead wrong.

(*Id.*)  One need look no further than the plain language of the fifth prong to appreciate the

implausibility of Defendants' position.  The prong requires "detrimental reliance."  *Hollinger*, 560

P.2d at 827.  Detrimental reliance occurs when one person's statement, conduct, or silence

reasonably induces another to change position detrimentally.  *Ross v. Old Republic Ins. Co.*, 134

P.3d 505, 509 (Colo. Ct. App. 2006).  Thus, while a misrepresentation may be material under

*Hollinger*'s third prong, rescission is nevertheless unjustified under the fifth prong when an

insurer does not detrimentally change its position based upon such misrepresentation.  *See* 6 LEE

R. RUSS & THOMAS E. SEGALLA, COUCH ON INSURANCE § 82:13 (3d ed. 1995) ("[The test is

w]hether the fact or circumstance represented or misrepresented operated to induce the insurer to

accept the risk, or *to accept it at a lower premium*.") (emphasis added).  Consequently, I find as a

matter of law that Plaintiff relied on Mr. Butts' misrepresentation in response to Question 5 by

accepting the risk of Mr. Butts' death at a premium that did not reflect the risk posed by his lifestyle.

In sum, there is no genuine issue of material fact as to any of *Hollinger*'s five elements for rescission of an insurance contract.  Accordingly, the Butts Policy was void *ab initio* and Plaintiff is not liable for payment of benefits to Defendants thereunder.

### b.    *Defendants' Counterclaims*

Plaintiff contends it is entitled to summary judgment on Defendants' counterclaims for breach of contract and bad faith breach.  (Pl.'s Br. at 25.)  Since Mr. Butts' nondisclosure of his heli-skiing avocation voided the Butts Policy, Defendants' counterclaims cannot lie against Plaintiff.  Consequently, Plaintiff is entitled to summary judgment on Defendants' counterclaims.

## 3.    *Conclusion*

Based on the foregoing it is therefore ORDERED that:

1.    DEFENDANTS' motion (#45) for partial summary judgment is DENIED.

2.    PLAINTIFF's motion (#46) for summary judgment is GRANTED.

The clerk shall forthwith enter judgment in favor of Plaintiff and against Defendants, declaring that the insurance contract in question is void for misrepresentation and dismissing Defendants' counterclaims with prejudice.

Dated this 25th day of January, 2007

BY THE COURT:


<u>s/ Edward W. Nottingham</u>
EDWARD W. NOTTINGHAM
United States District Judge