<u>PUBLISH</u>

# UNITED STATES COURT OF APPEALS

# TENTH CIRCUIT

---

| | |
|---|---|
| WEST COAST LIFE INSURANCE COMPANY, a Nebraska corporation, | |
| Plaintiff - Appellee, | |
| v. | No. 07-1080 |
| MARTHA HOAR, as the personal representative of the other Estate of Stephen M. Butts; TELLURIDE PROPERTIES, LLC., a Colorado Limited Liability Company; TELLURIDE PROPERTIES, INC., a Colorado corporation; ALBERT D. ROER, an individual; POLLY LYCHEE, an individual, | |
| Defendants - Appellants. | |

---

### APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLORADO
### (D.C. NO. 05-CV-01765-EWN-BNB)

---

Blain D. Myhre (Stuart Pack with him on the briefs), Isaacson Rosenbaum P.C., Denver, Colorado, for Defendants-Appellants.

Stephen G. Masciocchi (Lee F. Johnston with him on the briefs), Holland & Hart LLP, Denver, Colorado, for Plaintiff-Appellee.

---

Before **BRISCOE**, **EBEL**, and **MURPHY**, Circuit Judges.

---

**MURPHY**, Circuit Judge.

---

## I.     INTRODUCTION

West Coast Life Insurance Company ("WCLI") brought suit in federal district court seeking rescission of an insurance policy based upon an alleged misrepresentation by Stephen Butts.  Butts, who participated in heli-skiing on numerous occasions, stated in his insurance application that he did not engage in any hazardous activities.  Butts's estate and intended beneficiaries asserted counterclaims against WCLI alleging: (1) breach of contract, (2) bad faith, and (3) violation of the Colorado Consumer Protection Act.  The district court dismissed Defendants' Consumer Protection Act counterclaim with prejudice.  It then granted WCLI's motion for summary judgment, concluding Butts had knowingly made a false statement of material fact on which WCLI relied in issuing him the life insurance policy.  On appeal, Defendants contend the district court erred in granting summary judgment to WCLI on its rescission claim because genuine issues of material fact exist as to whether: (1) there was a false statement or concealed fact in the Butts application, (2) Butts knowingly made the false statement or concealed the facts, and (3) WCLI was chargeable with the knowledge Butts engaged in heli-skiing.  Defendants also appeal the district court's grant of summary judgment with respect to their bad faith claim. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we **affirm**.

## II.    BACKGROUND

1.  Factual Background

In August 2004, Butts (through his company, Defendant Telluride Properties, Inc.), Defendant Albert Roer, and Defendant Polly Lynchee formed a new company, Defendant Telluride Properties, LLC.[1]  The three principals entered into a buy-sell agreement requiring each principal to sell his or her interest in the business to the remaining principals in the event of his or her death. The agreement was financed by insurance policies on the lives of each of the three principals.  On September 21, 2004, Butts contacted WCLI agent Sharon Evanson by phone to complete an application for a three million dollar life insurance policy (the "Butts Application").  Evanson read the questions on the application and transcribed Butts's responses.

The fifth question of the Butts Application ("Question 5") asked if Butts "[e]ngaged in auto, motorcycle or boat racing, parachuting, skin or scuba diving, skydiving, or hang gliding or other hazardous avocation or hobby."  Butts answered the question in the negative.  The Butts Application contained a declaration that all statements and answers were full, complete, and true to the best of Butts's "knowledge and belief."  Butts did not at any point during the call mention he participated in "heli-skiing."  Heli-skiing involves flying by

---

[1]The other Defendant is Martha Hoar, the personal representative of Butts's estate.

helicopter to the top of a backcountry mountain and skiing down the mountain, usually with the escort of guides.

Alex Chu, a senior life insurance reporter at First Financial Underwriting Services, Inc. ("First Financial"), conducted a telephonic interview with Butts on October 12, 2004. First Financial is an independent, third-party company that, at the request of its insurance company clients, gathers information about the lifestyles and finances of life insurance applicants, typically through telephone interviews. Chu asked Butts what he did for recreation and exercise in his spare time, to which Butts answered he skied and golfed. Chu also asked Butts if he engaged in "any hazardous activities." Butts stated he was involved only in scuba diving and private aviation as a pilot. Butts did not seek any clarification of this question or voice concerns or confusion as to the meaning of "hazardous activities." During Chu's tenure at First Financial, applicants had identified heli-skiing in response to the hazardous activity question.

Under a heading titled "Aviation-Recreation-Driving Record," Chu's report to WCLI (the "First Financial Report") detailed Butts's piloting experience, briefly noted his scuba diving activities, and stated: Butts "also enjoys skiing and golfing in his spare time. He reported no other recreational or hazardous pastimes in which he is active on a regular basis."

In October 2004, Mark Youngquist, an underwriter for WCLI, underwrote a three million dollar policy (the "Butts Policy") insuring Butts's life. In so doing,

Youngquist reviewed the Butts Application, Butts's medical records, the First Financial Report, and a questionnaire completed by Butts regarding his aviation activities. Youngquist, who worked as an underwriter since 1995 for other insurance companies, had worked for WCLI for less than a month when he approved the Butts Application. The WCLI underwriting manual, published by reinsurer Swiss Re, does not rate resort skiing as an activity to be factored into the underwriting process. "Heli-skiing," however, is a rated activity requiring the insured to pay a higher premium. Youngquist never referred to this rating table during the process of underwriting the Butts Policy.

Based on the information before him, Youngquist believed Butts engaged only in non-rated resort skiing. Youngquist made no inquiry into the nature of the "skiing" activity mentioned in the First Financial Report. Youngquist determined the Butts Policy should be issued on a "Standard, Non-Tobacco" rating.[2] On November 5, 2004, WCLI issued the Butts Policy, which expressly incorporated the Butts Application.

On January 15, 2005, Butts traveled to British Columbia with a group of friends for a week of heli-skiing. The group hired heli-skiing operator Selkirk-Tangiers Helicopter Skiing LLP ("Selkirk-Tangiers"). On January 18, 2005, Butts was heli-skiing with his friends when an avalanche broke above them. The

---

[2]Neither party addresses the significance, if any, of the disclosure by Butts of his scuba diving activities. We therefore deem it irrelevant.

avalanche caught Butts, and swept him into some trees. Within minutes, Butts was found dead. He suffered a broken neck as a result of the avalanche.

During her deposition, Butts's ex-wife testified he took approximately ten to fifteen heli-skiing trips with Selkirk-Tangiers and additional trips to Canada with another heli-skiing operator. Butts took heli-skiing trips to British Columbia with Selkirk-Tangiers every year for at least six consecutive years prior to his application. Each year, Butts had signed a Selkirk-Tangiers "Release of Liability, Waiver of Claims, Assumption of Risk and Indemnity Agreement," each of which included the following language:

> I am aware that wilderness skiing involves risks, dangers and hazards in addition to those normally associated with downhill skiing. Avalanches occur frequently in the alpine terrain used for wilderness skiing and may be caused by natural forces or by skiers. I acknowledge and accept that the [o]perators and their staff may fail to predict whether the alpine terrain is safe for skiing or whether an avalanche may occur. The alpine terrain used for wilderness skiing is uncontrolled, unmarked, not inspected and involves many risks, dangers and hazards in addition to that of avalanche.
>
> * * *
>
> I AM AWARE OF THE RISKS, DANGERS AND HAZARDS ASSOCIATED WITH WILDERNESS SKIING AND I FREELY ACCEPT AND FULLY ASSUME ALL SUCH RISKS, DANGERS AND HAZARDS AND THE POSSIBILITY OF PERSONAL INJURY, DEATH, PROPERTY DAMAGE OR LOSS RESULTING THEREFROM.

Selkirk-Tangiers provides its guests with: (1) avalanche rescue and survival training; (2) helicopter safety training; and (3) specialized equipment such as

"avalanche beacons," which signal to rescuers the location of skiers buried in avalanches.  Prior to each of his heli-skiing trips with Selkirk-Tangiers, Butts participated in mock avalanche drills and other onsite, hands-on training on helicopter safety protocols and avalanche rescue and survival.  Although not required by Selkirk-Tangiers, Butts also had purchased and used an "Avalung" on heli-skiing trips in 2004 and 2005.  An Avalung is a product designed to provide a few minutes of air should its user become buried in an avalanche.

After receiving notification of Butts's death, WCLI initiated an investigation.  WCLI received evidence indicating Butts had previously participated in heli-skiing trips.  In March 2005, WCLI's chief underwriter, Steven Hetherington, composed an opinion as to the impact of heli-skiing on the risk assumptions for the Butts Policy.  Hetherington determined that had Butts disclosed his heli-skiing activities, the Butts Policy would have been rated in the amount of an extra $2.50 per $1000 of coverage.  Marilyn Reed, WCLI's Vice President of Underwriting, adopted Hetherington's underwriting opinion.

According to WCLI underwriters, had Butts disclosed his heli-skiing avocation, his annual premium would have almost tripled, rising from $4880 to $12,380.  WCLI's independent agent, Stuart Bachman, contacted other life insurance companies to determine if they applied an additional rating for heli-skiing.  Every carrier Bachman contacted indicated heli-skiing would result in an additional rating of at least $2.50 per $1000 dollars of coverage.

WCLI's contestable claims committee met on July 26, 2006, to discuss and evaluate the Butts Policy claim.  The committee considered whether "a reasonable objective person's interpretation" of Question 5 would have led such a person to disclose a heli-skiing avocation such as that of Butts.  The committee did not consider whether Butts was an expert skier, whether he believed heli-skiing was hazardous, or if he had heli-skied previously without incident because it felt such information was irrelevant to its decision.  The committee voted unanimously to deny payment under the Butts Policy based upon Butts's failure to disclose he regularly engaged in heli-skiing.

2.    Procedural History

WCLI filed its complaint in the district court seeking: (1) rescission of the Butts Policy pursuant to Colorado law, and (2) a declaration that the Butts Policy was void *ab initio* and WCLI was thus not liable to Defendants thereunder.  In their answer, Defendants asserted state law counterclaims for: (1) breach of contract, (2) bad faith, and (3) violation of the Colorado Consumer Protection Act, Colo. Rev. Stat. §§ 6-1-101 to -115.  The district court dismissed Defendants' Consumer Protection Act counterclaim with prejudice.

Both parties moved for summary judgment.  The district court granted WCLI's motion for summary judgment, concluding: (1) Butts had made a false statement of fact or concealed a fact in his application for insurance because a reasonable person would have understood heli-skiing was a hazardous activity for

purposes of Question 5, (2) Butts knew heli-skiing was a hazardous activity and knowingly concealed the fact he engaged in it, (3) the concealment materially affected the risk assumed by WCLI, (4) WCLI was ignorant of the false statement of fact or concealment of fact and was not chargeable with knowledge of the fact, and (5) WCLI relied on Butts's false statement in issuing the Butts Policy.

On appeal, Defendants contend the district court erred in granting summary judgment to WCLI on its rescission claim because genuine issues of material fact exist as to whether: (1) there was a false statement or concealed fact in the Butts application, (2) Butts knowingly made the false statement or concealed the facts, and (3) WCLI was chargeable with the knowledge Butts heli-skied.  Defendants also appeal the district court's grant of summary judgment with respect to their bad faith claim.

## III.  DISCUSSION

### 1. Motion to Strike

In its motion to strike, WCLI contends this court should not consider certain arguments and evidence raised by Defendants for the first time on appeal. Specifically, in their reply brief, Defendants for the first time offer statistical evidence regarding auto accident fatalities and discuss the Colorado Ski Safety Act requirement that ski resort lift tickets warn of the risk of resort skiing as support for their argument that reasonable minds could differ on whether heli-skiing is a hazardous activity.  Defendants ask the court to take judicial notice of

the accident statistics.  In addition, Defendants argue the Colorado Ski Safety Act

cite was properly included in their reply brief in order to rebut an argument raised

in WCLI's answer brief.

"Whether an appellate court will for the first time take judicial notice of a

judicially notable fact rests largely in its own discretion."  *Mills v. Denver

Tramway Corp.*, 155 F.2d 808, 812 (10th Cir. 1946).  Defendants offer no

explanation for why they did not seek to introduce the auto accident fatality

statistics before the district court.  In addition, consideration of this evidence for

the first time in Defendants' reply brief denies WCLI the opportunity to contest or

rebut the evidence.  *Stump v. Gates*, 211 F.3d 527, 533 (10th Cir. 2000).  We

therefore decline to take judicial notice of the auto accident fatality statistics and

grant WCLI's motion to strike these statistics.  *See Am. Stores Co. v.  Comm'r of

Internal Revenue*, 170 F.3d 1267, 1270 (10th Cir. 1999) ("Judicial notice is not a

talisman by which gaps in a litigant's evidentiary presentation . . . may be

repaired on appeal." (quotation omitted)).

As to the introduction of Colorado's statutory requirement that ski resort

lift tickets warn of the risk of resort skiing, Defendants maintain this evidence

was properly introduced for the first time in their reply brief in response to an

argument in WCLI's answer brief.  Specifically, it rebuts WCLI's contention that

the requirement that individuals sign a release before engaging in heli-skiing

supports the proposition a reasonable person would view heli-skiing as hazardous.

While WCLI's precise argument regarding the release requirement was raised before the district court, the evidence Defendants now seek to introduce to rebut the argument was never brought to the attention of the district court. This court has stated "[i]n reviewing a grant of summary judgment, our inquiry is limited to the summary judgment record before the district court when the motion was decided." *Feichko v. Denver & Rio Grande W. R.R.*, 213 F.3d 586, 593 n.5 (10th Cir. 2000). In addition, as discussed above, this court is reluctant to consider evidence raised only in a reply brief, leaving the opposing party no opportunity to challenge its validity or relevance. *See Am. Stores Co.*, 170 F.3d at 1270. We therefore grant WCLI's motion to strike this evidence.

   2.  Rescission of the Life Insurance Policy

   "We review de novo a district court's grant of summary judgment, viewing the evidence in the light most favorable to the nonprevailing party." *Mullin v. Travelers Indem. Co. of Conn.*, 541 F.3d 1219, 1222 (10th Cir. 2008). "Summary judgment is appropriate if there is no genuine dispute over any material fact, and a party is entitled to prevail as a matter of law." *Id.* (quotation omitted). Under Colorado law, to avoid a life insurance policy due to misrepresentations in the application, an insurer must prove:

> (1) the applicant made a false statement of fact or concealed a fact in his application for insurance; (2) the applicant knowingly made the false statement or knowingly concealed the fact; (3) the false statement of fact or the concealed fact materially affected either the acceptance of the risk or the hazard assumed by the insurer; (4) the

insurer was ignorant of the false statement of fact or concealment of fact and is not chargeable with knowledge of the fact; (5) the insurer relied, to its detriment, on the false statement of fact or concealment of fact in issuing the policy.

*Hollinger v. Mut. Benefit Life Ins. Co.*, 560 P.2d 824, 827 (Colo. 1977) (footnote omitted).  Defendants contend the district court erred in concluding no genuine issue of material fact existed as to the first, second, and fourth elements of the *Hollinger* standard.

### i.  The First and Second *Hollinger* Elements

The first element, "the applicant made a false statement," is encompassed in the second element, "the applicant knowingly made a false statement."  *Id.* Because there is significant overlap in the parties' arguments regarding the first and second elements, we consider the two elements together.  *Wade v. Olinger Life Insurance Co.* holds that in determining whether an applicant knowingly made a false statement, a court must look beyond the applicant's mere knowledge she engaged in the activity which was allegedly required to be disclosed by the open-ended insurance question.  560 P.2d 446, 452 (Colo. 1977).  Namely, "to protect innocent insurance applicants, an applicant must be reasonably chargeable with knowledge that the facts omitted or misrepresented were within the scope of questions asked on the application."  *Id.*  The court further explained that in the context of answering an insurance application question which calls for a value judgment, "[a] particular misrepresentation . . .  must be such that a [r]easonable

person would, under the circumstances, have understood that the question calls

for disclosure of specific information." *Id.* The court elaborated on this standard

in *Hollinger*, a companion case to *Wade*. *Hollinger*, 560 P.2d at 827. In

*Hollinger*, the court explained the standard applied in *Wade* was "whether a

reasonable person, with the applicant's physical or mental characteristics, under

all the circumstances, would understand that the question calls for disclosure of

specific information." *Id.*

Question 5 asked Butts if he "[e]ngaged in auto, motorcycle or boat racing,

parachuting, skin or scuba diving, skydiving, or hang gliding or other hazardous

avocation or hobby." WCLI contends Butts's negative response to Question 5

was unreasonable in light of his yearly heli-skiing vacations. Defendants argue

reasonable minds could differ as to whether heli-skiing constitutes a hazardous

activity, and thus the question should have been submitted to the jury.

Defendants further contend because Butts believed heli-skiing was not a

hazardous activity, his response to Question 5 could not have constituted a

misrepresentation.

This court must thus decide whether a reasonable person in Butts's position

would know heli-skiing constituted a hazardous activity for purposes of the

insurance policy. We agree with the district court that reasonable purchasers of

life insurance understand they are agreeing to pay a premium in exchange for the

insurer's promise to pay benefits in the event of death, and thus an insurer would

be interested in learning of activities that increase the chance of premature death. Question 5 asks applicants whether they engage in hazardous activities and provides as examples of hazardous activities, skydiving, motorized racing, and scuba diving. A reasonable applicant understands these examples are provided to have the applicant determine if she engages in activities that might pose risks similar to those posed by the enumerated activities.

WCLI presented evidence indicating a heli-skier is approximately 18,702 times more likely to be killed in an avalanche than an individual skiing inbounds at a ski area.[3] In addition, the heli-skiing operator Butts skied with required its clients to: (1) demonstrate proficiency in avalanche rescue techniques and equipment, (2) undergo training on safety protocols associated with helicopter loading, flight, offloading, and landing, and (3) carry an avalanche beacon while skiing. Such training took place prior to the execution of a waiver and release agreement in which Butts recognized: (1) wilderness skiing involves "risks, dangers and hazards in addition to those normally associated with downhill skiing," (2) avalanches occur frequently in the alpine terrain used for wilderness skiing, (3) the ski outfitter's "staff may fail to predict whether the alpine terrain is safe for skiing or whether an avalanche may occur," and (4) the "alpine terrain used for wilderness skiing is uncontrolled, unmarked, not inspected and involves

___

[3] The probability of an avalanche fatality occurring while heli-skiing or snowcat skiing is approximately 1 per 29,000 visits.

-14-

many risks, dangers and hazards in addition to that of avalanche." Additionally, Butts chose to purchase and carry an "Avalung" avalanche emergency air supply while heli-skiing.

Based on these facts, a reasonable person in Butts's position would understand Question 5 calls for an applicant to report heli-skiing. As the district court explained, "a reasonable, ordinary person would understand that a sport whose participants equip themselves with 'avalanche beacons' and 'Avalungs' and then ride in helicopters to the summits of isolated backcountry mountains in order to ski down ungroomed alpine terrain . . . falls along with sky diving, hang gliding, and scuba diving into the commonsense category of 'hazardous' activities." Butts's status as an experienced heli-skier who engaged in the activity in the past without incident does not change the conclusion it was unreasonable for an individual in his position to answer "no" to Question 5. Butts knew of the great risks of heli-skiing. Notably, Defendants' expert declined to refute the Utah Avalanche Center's statement that "[a]lmost all avalanche accidents occur to recreationists who are very skilled at their sport."

Defendants contend this court should rely on the expert opinion of Vincent Anderson, a certified alpine and ski mountaineering guide who, without citing any statistical evidence, states in a report that, in his opinion, the risks involved in heli-skiing are not unreasonably high and are not greater than those involved in skiing at a resort. This opinion, however, does little to rebut the statistical

evidence presented by WCLI demonstrating a heli-skier is approximately 19,000

times more likely to die in an avalanche than someone skiing within bounds at a

ski resort.  Moreover, it is difficult to see how the subjective opinion testimony of

this one individual, lacking any statistical support, does much to support the

proposition a reasonable person with Butts's characteristics would not understand

heli-skiing to be a hazardous activity.  This is especially true where heli-skiers

such as Butts were required to sign a waiver explicitly acknowledging heli-skiing

was far more dangerous than resort skiing.

Finally, Defendants argue that because of the language at the end of the

Butts Application, wherein Butts affirmed all answers in the "application [were]

full, complete and true to the best of [his] knowledge and belief," Question 5

solicited a subjective answer and thus could not be a false statement of fact.  In

support of this argument Defendants cite to *Hauser v. Life General Security

Insurance Co.*, 56 F.3d 1330, 1335 (11th Cir. 1995), in which the Eleventh Circuit

stated, "[w]here an insurer only requests the disclosure of information to the best

of the insured's 'knowledge and belief,' and where the applicant so complies, we

will decline to protect the insurer from a risk it assumed by virtue of the

contractual language it drafted." *Id.* at 1335 (quotation omitted).  The court went

on to state, however:

> [w]hat the applicant in fact believed to be true is the determining
> factor in judging the truth or falsity of his answer, but only so far as
> that belief is not clearly contradicted by the factual knowledge on

which it is based.  In any event, a court may properly find a statement false as a matter of law, however sincerely it may be believed.  To conclude otherwise would be to place insurance companies at the mercy of those capable of the most invincible self deception . . . .

*Id.* (quotation omitted).  Here, even assuming Colorado courts would follow the reasoning of *Hauser*, any belief Butts may have had in the non-hazardous nature of heli-skiing is contradicted by his underlying knowledge of the significant risks inherent in heli-skiing as indicated by the training he was required to undertake, waivers he signed, and equipment he used.  We therefore affirm the district court's conclusion that as a matter of law Butts knowingly made a false statement of fact.

### ii.     The Fourth Element

In order to satisfy the fourth element of the *Hollinger* standard, WCLI must demonstrate it was "not chargeable" with the knowledge Butts heli-skied.  560 P.2d at 827.  Colorado has yet to adopt a test for determining when an insurer is "chargeable with knowledge" of an undisclosed material fact.  The parties agree, however, and the district court concluded, the Colorado Supreme Court would endorse the following standard: an insurer is chargeable with knowledge of undisclosed information only where it "had sufficient information that would have put a prudent man on notice and would have caused him to start an inquiry" which would have uncovered the truth.  *Major Oil Corp. v. Equitable Life Assurance Soc'y*, 457 F.2d 596, 604-05 (10th Cir. 1972).

Butts gave a negative response to Question 5, indicating he did not engage in any hazardous activities.  Later, however, in response to the question of what he did for recreation and exercise in his spare time during his phone interview with Chu, Butts stated he enjoyed skiing and golfing.  In response to Chu's question about hazardous activities, Butts stated only that he was involved in scuba diving and private aviation as a pilot.  WCLI's underwriter, Youngquist, interpreted Butts's response that he participated in skiing in his spare time, to mean he engaged in resort skiing.  Youngquist had only worked for WCLI for about a month, and was unaware the underwriting manual treated the various kinds of skiing differently, with heli-skiing, but not resort skiing, meriting an increase in the insured's premium.  He did not consult the manual during the course of underwriting Butts's Policy.  Defendants contend that based on Butts's disclosure that he skied, WCLI had a duty to conduct an investigation into the nature of Butts's skiing precisely because of the six classes of skiing identified for differing treatment in the underwriting manual.  A reasonably prudent insurer, they argue, would have been put on notice to conduct further investigation into the type of skiing in which Butts engaged.

In deciding to insure Butts, Youngquist had before him: (1) Butts's negative response to Question 5, (2) Butts's report to Chu stating the only hazardous activities in which he engaged were scuba diving and private aviation, and (3) Butts's report to Chu stating he "also enjoy[ed] skiing and golfing in his

spare time."  Thus, even if Youngquist had been aware of the classifications in the underwriting manual, such awareness would not have sufficed to put a prudent underwriter on notice he should further investigate a situation where an applicant reports recreational skiing and denies engaging in any hazardous activities.  As the district court explained, "[i]f such were the burden of a prudent insurance company, then it would seem that any report of a generally lowhazard recreational activity — e.g., wrestling, juggling, or fishing — would require the insurer to investigate the myriad possible 'extreme' variants thereof."  *Cf. Am. Eagle Fire Ins. Co. of N.Y. v. Peoples Compress Co.*, 156 F.2d 663, 667 (10th Cir. 1946) (stating "honesty, good faith, and fair dealings require [an insured] to communicate [facts material to the risk] to his insurer.").

Accordingly, courts have generally found insurance companies chargeable with knowledge of an undisclosed fact only where it has knowledge of evidence indicating the applicant was not truthful in answering the particular application question at issue.  *See Major Oil Corp.*, 457 F.2d at 598-604 (concluding insurer was chargeable with knowledge of applicant's alcohol problem where another insurance company considering the applicant informed the insurer of the applicant's ongoing alcohol problem and a report by the Medical Information Bureau received by the insurer prior to issuance of the policy revealed the insured had a drinking habit); *Columbian Nat. Life Ins. Co. v. Rodgers*, 116 F.2d 705, 708 (10th Cir. 1940) (concluding insurer was chargeable with knowledge that

applicant had previously been declined insurance despite applicant's answer to the contrary where it had in its possession documentation indicating "that the applicant had either been declined or had been rated differently from the established rates, or that some other unusual circumstances were involved."). Here, WCLI had no such evidence.  Butts twice informed WCLI he did not engage in hazardous activities.  Contrary to Defendants' assertions, Butts's statement he engaged in the recreational activities of skiing and golfing does not constitute evidence or raise a red flag as to his lack of truthfulness in answering the hazardous activities question, as recreational resort skiing is not considered a hazardous activity.  *See Barciak v. United of Omaha Life Ins. Co.*, 777 F. Supp. 839, 843 (D. Colo. 1991) (concluding insurer was not chargeable with knowledge of applicant's heart condition where applicant did not disclose he received medical care for chest pain, extensive medical tests, and had been referred to a cardiologist, but in a subsequent phone interview stated he had seen a doctor for a headache and received a variety of tests, including a chest x-ray and EKG, and the doctor's diagnosis was unknown.).

We therefore affirm the district court's conclusion that WCLI has met the *Hollinger* elements as a matter of law entitling it to summary judgment on its claim for rescission of the Butts Policy.

3.      Defendants' Counterclaim

Defendants' bad faith counterclaim depends on the existence of a valid and enforceable insurance policy.  Because we affirm the district court's ruling that Butts's nondisclosure voided the Butts Policy entitling WCLI to rescission, Defendants' counterclaim fails.

**IV.    CONCLUSION**

Because WCLI was entitled to rescission of the Butts Policy, the district court's decision is **affirmed**.